1              UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF INDIANA
2               FORT WAYNE DIVISION

3

JILL L. TREAT, CODY W. TREAT,    )
4  and TIFFANY L. JOHNSON,        )
                                  )
5        Plaintiffs,              )
                                  )
6        vs.                      )Cause No.
                                  )1:08-CV-0173-WCL-RBC
7  TOM KELLEY BUICK PONTIAC GMC,  )
   INC., d/b/a KELLEY SUPERSTORE, )Volume 1
8  14/69 CAR RENTAL and INDIANA   )
   CREDIT CENTER, KELLEY          )
9  AUTOMOTIVE SUPERSTORES, INC.,  )
   KELLEY CARS, INC., KELLEY      )
10 AUTOMOTIVE GROUP, INC., and    )
   DANIEL HENDERSON,              )
11                                )
        Defendants.               )
12

13        The videotaped deposition upon oral

14      examination of JILL L. TREAT, a witness produced

15      and sworn before me, Lisa S. Robbins, CSR, RPR,

16      Notary Public in and for the County of Jay, State

17      of Indiana, taken on behalf of the Kelley

18      Defendants at the offices of Carson Boxberger,

19      1400 One Summit Square, Fort Wayne, Indiana, on

20      March 18, 2009, beginning at 9:14 a.m., pursuant to

21      the applicable rules.

22

           STEWART RICHARDSON & ASSOCIATES
23         Registered Professional Reporters
            One Indiana Square, Suite 2425
24           Indianapolis, Indiana 46204
                  (317) 237-3773
25

EXHIBIT
1

Jill Treat - 1

1    A.    No.

2    Q.    Okay.  When did you talk with Mr. Henderson about

3          this pay statement?

4    A.    I called him when I received my pay.

5    Q.    Was that on or about October 10th?

6    A.    Correct.

7    Q.    Okay.  And what did you say?

8    A.    I asked him how he came up with that amount.

9    Q.    Were you in Las Vegas at the time?

10   A.    No.  We had come back.  It was the day we were

11         back.

12   Q.    What did he say?

13   A.    He said he would get that for me.

14   Q.    What did you say?

15   A.    I asked him if we could meet the next morning and

16         he show that to me.

17   Q.    What did he say in response of your request that

18         you meet the next morning?

19   A.    I told him there were several things we needed to

20         meet about, and he said we would meet in the

21         morning.

22   Q.    Did you say anything else?

23   A.    Concerning the pay?

24   Q.    Did you say anything else to Mr. Henderson in that

25         conversation when you asked him can we meet the

1       next morning?

2   A.  I told him we needed to talk about how the leads

3       were being divided up between the different stores,

4       that it was not being done fairly.

5   Q.  Did you give him any more detail at that time?

6   A.  I don't believe so.

7   Q.  Okay.  Did you say anything else to Mr. Henderson

8       in the conversation over the phone?

9   A.  That I was not happy with the way this was being

10      handled, that I wanted to be more informed with how

11      these figures were coming about.  And that if he

12      couldn't get my answers, that I would go over him

13      to get them.

14  Q.  Did you say anything else?

15  A.  I don't recall.

16  Q.  Did you feel like your pay was being cut like you

17      felt it was being cut at Integrity?

18  A.  I felt it was not accurate, but I didn't think it

19      was the same as at Integrity.  That was

20      something --

21  Q.  I'm sorry.  Go ahead.

22  A.  Pardon me?

23  Q.  I don't want to talk over you.  Go ahead and finish

24      your answer.

25  A.  What was the question again?

111

```
 1          one large room with cubicles.  And when you went

 2          into the executive offices, he was in there, but

 3          you had to go through a door.

 4    Q.    And what was Mr. Thelen's position at that time?

 5    A.    I believe he was the CFO.

 6    Q.    What about Billie McKinnie?

 7    A.    Administrative.  I'm not real sure what her title

 8          was.

 9    Q.    Okay.  Do you know anything about her job duties?

10    A.    She had a lot.

11    Q.    Okay.  Do you know what topics they were related

12          to?

13    A.    I know we would ask her if there was problems with

14          payroll and if we needed anything.

15    Q.    Okay.

16    A.    She was kind of the go-to.

17    Q.    What was Maureen's, Maureen Claussen's job?

18    A.    She is Tom Kelley's assistant, secretary.

19    Q.    Okay.  And what is Tom Kelley's title?

20    A.    He's the owner.

21    Q.    What about Fred Grote?

22    A.    He was the general manager over all of the stores I

23          believe.

24    Q.    Did he have any responsibilities for special

25          finance?
```

114

1    A.   At the Superstore, when we started there was Amber

2         Folkner, Brett Gump, Tom Seat, Andy Bowman, Rob

3         Pargeon, and then eventually we hired Ron Lytle.

4         Oh, and there was Josie.  I'm not sure how to

5         pronounce her last name.  Oh, Johnston was what it

6         was then.  Ron Lytle, a Greg Armstrong, Lynn

7         Tripolett, Jodi Guggleman.

8              I think I -- at the Chevy store was Jason

9         Zigler, Dick Kauffman.  Another guy, I can see his

10        face.  I can't remember his name, because I didn't

11        deal with him as much.  Bill Katehis.  I think

12        that's about it.

13   Q.   So any salespeople that were not at the Superstore

14        or the Chevy dealership?

15   A.   Pardon me?

16   Q.   Were there any special finance salespeople that

17        were not at the Superstore or the Chevy dealership?

18   A.   No.

19   Q.   Okay.  Did you have a job description for your

20        position, Ms. Treat?

21   A.   Yes.

22                  (Defendant's Exhibits 6 and 7

23                   were marked for identification.)

24   Q.   I'm showing you -- I will be showing you two

25        documents.  One will be marked as Defendant's

## Job Description

**Position:  Special Finance Director**
**Direct Supervisor:  Dan Henderson**

Duties to include, but not limited to:

- Complete overseer of special finance department and supervision of its staff to complete their required job duties.

- Training of staff to include phone training, word scripts, handling different types of customers, closing, negotiating, vehicle selection and other major and minor things for the department.

- Scheduling and all supervisory roles for everyone in the department.

- Securing, Building, and maintaining lender relationships from across the spectrum of credit.

- Securing approvals for each customer that work both for the customer and for the dealership.

- Supervising all funding efforts in means to maintain a 7 day CIT time.

- Customer relations as it applies to the position in maintaining good relationships and handling any issues that delegation of the position cannot handle.

- Reporting as the Senior Management of the store requires to include but not limited to Lead Counts vs. Appointments/Appt. Show vs. Sales from those leads, Lender reports, Vendor Reports, Funding reports etc…

- Sets the tone for the overall direction of the department and its staff.

- Motivation of staff for best results.


This job description is just a basic outline of the job.  It does not limit the job holder to these duties but could in fact include more not listed here. The job description is subject to change at any time as seen necessary by Senior Management.

DEFENDANT'S EXHIBIT

Treat v. Kelley Automotive
KEL000042

242

1           during the day?

2    A.    I called him more than once during the afternoon

3           and in the evening.

4    Q.    Okay.  During the multiple times that you called

5           him, was this always the topic of discussion?

6    A.    No.

7    Q.    Okay.  You called him for other reasons?

8    A.    Correct.

9    Q.    Okay.  When did you call him about this

10          conversation?

11   A.    In the evening.

12   Q.    Okay.  And is this a conversation that you have

13          already described in your deposition today?

14   A.    I don't remember.

15   Q.    Okay.  What exactly did you say to Mr. Henderson

16          when you called him in the evening on October 11,

17          2006?

18   A.    That I wanted to know how he came up with my pay

19          amount that I received, that I still did not have

20          answers for August and I was wanting September's,

21          and that what we talked about before, the leads not

22          going to the correct -- not being distributed

23          evenly to the stores, and that I wanted to talk to

24          him about other problems within the department.

25   Q.    Okay.  And what was his response to that statement?

243

1    A.    That we could meet in the morning.

2    Q.    Okay.  And did you meet with him in the morning?

3    A.    He called me in the morning, yes.

4    Q.    Okay.  Is that when your employment was terminated?

5    A.    Correct.

6    Q.    Okay.  And is that conversation where your

7          employment was terminated, you have already

8          testified about that conversation in your

9          deposition today?

10   A.    Yes.

11   Q.    Is there anything about that conversation that you

12         have not talked about today?

13   A.    Yes.

14   Q.    What have you not talked about the termination

15         conversation?

16   A.    No. 34.

17   Q.    Okay.  Tell me about that part of the conversation.

18   A.    When he told me they were letting me go, he said

19         that the -- I would not be replaced because there

20         wasn't a position to replace, that it wasn't

21         needed.

22   Q.    What did you say to that?

23   A.    Nothing.

24   Q.    Okay.  Was there anything else said in that

25         conversation that you have not shared in your

314

```
 1    A.   That would be part of it, yes.

 2    Q.   Okay.  What's the other part of it?

 3    A.   That he no longer wanted to share 50 percent of the

 4         13 percent that we were going to be receiving for

 5         our pay and that he understood that I was bringing

 6         to him all of the complaints of the department of

 7         how things are being mishandled.

 8    Q.   When you say Mr. Henderson understood that you

 9         would be bringing all of the complaints of the

10         department to him, is this based upon your request

11         to meet with him the morning of October 12th, that

12         he would know that you were bringing these

13         complaints to him?

14    A.   Yes.

15    Q.   Okay.  Did he know what the complaints were at that

16         time?

17    A.   Yes.

18    Q.   Okay.  What were the complaints that you believe he

19         knew about?

20    A.   One was the way the leads were being distributed to

21         the employees, the firing and rehiring of Andy

22         Bowman, the cost of running our department.  I

23         continually asked him for the breakdown of all the

24         expenses and grosses so I could see how we were

25         being paid.  On the -- Julia Hartman's inability to
```

315

1      continually not be able to keep the spreadsheets

2      and information updated the way we needed them.

3          How when Mr. Henderson would fill in for the

4      desking managers, his deals were the most

5      problemsome and we continuously had that problem

6      with getting his deals correct and getting the down

7      payment money from him in a timely manner.

8          And also that as I have said before, I did not

9      want him discussing his personal life with me and

10     it continued and I did not appreciate it.

11         And about the BDC center that we were opening

12     that he had not let me have a part in.  I didn't

13     know how we were paying them, where the money was

14     coming from, and did not think it was necessary at

15     that time.  That's it.

16  Q.  Okay.  What is BDC?

17  A.  Business Development Center, a call center.

18  Q.  How do you think that Mr. Henderson would have

19     known that all of the topics that you have just

20     described would be the subject of your

21     conversation?

22  A.  I had told him and then I had also sent him an

23     e-mail with most of those in there.

24  Q.  Which ones were not in the e-mail?

25  A.  I don't recall.

334

1      claims?

2          MR. ROCHYBY:  I'm going to object to the

3      extent of the question, because I don't know that

4      it's possible for her to know every fact, but --

5          MS. MARTIN:  To your knowledge.

6   A.  Would you repeat the question, please?

7   Q.  Have we talked about every fact that supports your

8      claims?

9   A.  As far as I know.

10         MS. MARTIN:  Okay.  I have no further

11     questions at this point.

12         THE WITNESS:  May I have a break again?

13         THE VIDEOGRAPHER:  The time now is 11:31 a.m.

14     We're off the record.

15             (A recess was taken, after which

16             the deposition resumed as follow:)

17         THE VIDEOGRAPHER:  The time now is 11:38 a.m.

18     We're back on the record.

19  CROSS EXAMINATION

20     QUESTIONS BY MR. JACKSON:

21  Q.  Ms. Treat, good morning.  My name is Steve Jackson,

22     and I represent Mr. Henderson today.  I have a few

23     questions for you.

24         Do you have your first amended complaint in

25     front of you now?

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE INDIANA

JILL L. TREAT, CODY W. TREAT )
and TIFFANY L. JOHNSON, )
)
) CASE NUMBER: 1.08cv-0173-WCL-RBC
        Plaintiffs, )
)
VS )
)
TOM KELLY BUICK PONTIAC GMC, )
INC., d/b/a KELLEY SUPERSTORE,)
14/69 CAR RENTAL and INDIANA )
CREDIT CENTER, KELLY )
AUTOMOTIVE SUPERSTORE, INC., )
KELLEY CARS, INC., KELLEY )
AUTOMOTIVE GROUP, INC., and )
DANIEL HENDERSON, )
)
        Defendants )

# DEPOSITION OF DANIEL A. HENDERSON

    The deposition of Daniel A. Henderson was taken June 1, 2009,
at 9:36 a.m. local time, by Jack R. Rochyby, Esquire, at the law
offices of Baker & Daniels LLP, located at 111 East Wayne Street,
Suite 800, Fort Wayne, Indiana, before Diane Case a notary public
in and for the State of Indiana, and the parties were represented
by counsel as follows:


PLAINTIFF            JACK R. ROCHYBY, ESQUIRE
                     SARA ROCHYBY, ESQUIRE
                     ROCHYBY, SPIELMAN & FLORA
                     2777 Maplecrest Road
                     Fort Wayne, Indiana 46815

DEFENDANT            ROBERT D. MORELAND, ESQUIRE
                     BAKER & DANIELS LLP
                     111 East Wayne Street, Suite 800
                     Fort Wayne, Indiana 46802

                     BRANDON M. SHELTON, ESQUIRE
                     OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C
                     111 Monument Circle, Suite 4600
                     Indianapolis, Indiana 46204

Also Present: Jill Treat, Tiffany Treat.

 

*PETRO REPORTING SERVICE, INC.*
229 WEST BERRY STREET, SUITE 330
FORT WAYNE, INDIANA 46802
PHONE: 260-422-4404 FAX: 260-422-3360
www.petroreporting.com

1    A.    I don't know, sir.

2    Q.    What did you do with the reports when you received

3          them?

4    A.    Would review them and make changes as necessary.

5    Q.    Did anybody at Kelley, while the Plaintiffs were

6          employed, come to you and complain about the contracts

7          in transit?

8    A.    Absolutely.

9    Q.    Who was that?

10   A.    Billie McKinney.  Deb Naylor.  Gary Thelen.  Fred

11         Grote.  Tom Kelley.

12   Q.    Now, how would they know how long the contracts had

13         been in transit?

14             ROBERT D. MORELAND, ESQUIRE:  Objection.

15             Speculation.

16   A.    Yeah.  I'm not sure exactly how they would know, or if

17         they were, uh, more concerned with the dollar amount.

18   Q.    When you say "dollar amount", what do you mean?

19   A.    Every contract has a value to it, and the more

20         contracts that are in transit, the more -- the more

21         unfunded contracts in transit, the more unfunded assets

22         the Kelley organization has on the street that it has

23         to go and replace.

24   Q.    When you say "go and replace", what do you mean?

25   A.    They had to purchase vehicles to replace those vehicles

133

```
 1   A.   Oh, at this point in time, uh, when, uh, I reviewed all

 2        the documents with, uh, with Billie McKinney and

 3        everything going on, uhm, right, wrong, or indifferent,

 4        we felt that that, uh, was all she earned.

 5   Q.   Even though the agreement was different.

 6             ROBERT D. MORELAND, ESQUIRE:  Objection.  Assumes

 7             facts not in evidence.

 8   A.   I, I have not seen, uh, her pay plan submitted to me

 9        here today, sir, so I can't recall the specifics of it.

10   Q.   Did you ever generate a notice telling Ms. Treat that

11        she was going to, you were going to change her pay

12        plan?

13   A.   I don't recall, sir.

14   Q.   Don't recall or didn't do it?

15   A.   I don't recall doing it.

16   Q.   Let's look at Exhibit "O" then.  So looking at page 2

17        then, Jill Treat is not listed there at all.

18   A.   Correct.

19   Q.   And why would that be?

20   A.   Hmm, she was not employed at the end of October.

21   Q.   Did she complete sales, and were there sales done at

22        the beginning of the month?

23   A.   I don't recall if she completed any sales at the

24        beginning of the month or certainly sales done at the

25        beginning of the month.
```

Daniel Henderson

134

```
 1    Q.   Would she not be entitled to commissions from those?

 2              ROBERT D. MORELAND, ESQUIRE:  Objection.  Calls

 3              for a legal conclusion.  Lack of foundation.

 4              Speculation.

 5    A.   Certainly, uh, not up to me to decide.

 6    Q.   Who would have made that decision?

 7    A.   Uh, who...whoever pays people at the Kelley Automotive

 8         Group.

 9    Q.   Would that have been Tom Grote at that time?

10    A.   I don't know who Tom Grote is.

11    Q.   I'm sorry.  Fred.

12    A.   Fred Grote?  Uh, I believe -- I could be wrong.  I

13         don't want to assume if he was still there at this time

14         or not, uh, uh, so I can't answer that question.  I

15         don't know if Fred Grote would've made that decision

16         here or not.

17    Q.   Who else could have made it?  Any ideas?

18              ROBERT D. MORELAND, ESQUIRE:  Objection.

19              Speculation.  Lack of foundation.

20    Q.   I will re-word that question.  If Mr. Grote did not

21         make that decision, who would have?

22              ROBERT D. MORELAND, ESQUIRE:  Objection.  Same as

23              before.

24    A.   Whoever makes those decisions in the Accounting

25         Department.  I wasn't in Accounting, so I don't know.
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE, INDIANA

JILL L. TREAT, CODY W. TREAT,  )
and TIFFANY L. JOHNSON,        )
                               )
            Plaintiffs,        )
                               )
vs.                            )    CASE NO. 1:08-CV-0173-WCL-RBC
                               )
TOM KELLEY BUICK PONTIAC GMC,  )
INC., d/b/a KELLEY SUPERSTORE, )
14/69 CAR RENTAL and INDIANA   )
CREDIT CENTER, KELLEY          )
AUTOMOTIVE SUPERSTORE, INC.,   )
KELLEY CARS, INC., KELLY       )
AUTOMOTIVE GROUP, INC., and    )
DANIEL HENDERSON,              )
                               )
            Defendants.        )



# DEPOSITION OF
# DEBORAH J. NAYLOR

    The deposition of Deborah J. Naylor was taken September 22,
2009, 9:50 a.m. local time, by Jack R. Rochyby, Esquire, at the
law offices of Baker & Daniels, LLP, located at 111 East Wayne
Street, Fort Wayne, Indiana, before Tim Petro, a notary public
in and for the State of Indiana, and the parties were
represented by counsel as follows:


PLAINTIFFS              JACK R. ROCHYBY, ESQUIRE
                        ROCHYBY, SPIELMAN & FLORA, LLP
                        2777 Maplecrest Road
                        Fort Wayne, Indiana  46802


DEFENDANTS              BRANDON M. SHELTON, ESQUIRE
                        OGLETREE, DEAKINS, NASH,
                        SMOAK & STEWART, P.C.
                        111 Monument Circle, Suite 4600
                        Indianapolis, Indiana  46204

                        ROBERT D. MORELAND, ESQUIRE
                        BAKER & DANIELS LLP
                        111 East Wayne Street, Suite 800
                        Fort Wayne, Indiana 46802

Also Present:  Jill Treat and Tiffany Johnson Treat




*PETRO REPORTING SERVICE, INC.*
229 WEST BERRY STREET, SUITE 330
FORT WAYNE, INDIANA 46802
PHONE: 260-422-4404 FAX: 260-422-3360

www.petroreporting.com

2

1          you ever had your deposition taken before?

2     A.   No.

3     Q.   Have you ever been involved in a lawsuit before?

4     A.   None that I recall.

5     Q.   Are you currently employed at Kelley?

6     A.   Yes, I am.

7     Q.   Who is your official employer?  I know we have Kelley

8          Automotive Group, we have Kelley Pontiac GMC,

9          Incorporated, and I think there's some other companies

10         involved.  Who do you work for in particular?

11    A.   I work for Kelley Automotive Group.

12    Q.   And your paychecks come from Kelley Automotive Group?

13    A.   Yes.

14    Q.   When did you start working for Kelley?

15    A.   I've actually worked for Kelley's on two different

16         occasions.  The last I've been there about eight-and-a-

17         half years.  I started in February of '91.  Then prior

18         to that in the late '70s, early '90s, I worked for them

19         for about ten, twelve years.

20    Q.   What is your current title?

21    A.   Controller.

22    Q.   Who do you report to?

23    A.   Gary Thelen and Tom Kelley.

24    Q.   How long have you been in that particular position?

25    A.   The entire time I've been there this last time.  I

Deborah Naylor

3

```
 1            should rephrase that.
 2    Q.    Understood.
 3    A.    Yes.
 4    Q.    What sort of job duties do you have as Controller?
 5    A.    I'm responsible for producing the financial statements,
 6          overseeing the Accounting Department, doing tax
 7          returns, setting up procedures according to GM
 8          guidelines.
 9    Q.    When you say "setting up procedures [pursuant] to GM
10          guidelines," what does that entail?
11    A.    GM has a manual, a standard accounting manual that they
12          have listed how they want transactions handled, and my
13          job would be to make sure that those are handled
14          according to that.  It's not all comprehensive, but it
15          goes into quite a bit of detail.
16    Q.    Do you ever take care of calculating payroll,
17          commissions, those sort of things?
18    A.    No.
19    Q.    Who would do that?
20    A.    We have another controller.  Her name is Billie
21          McKinney.
22    Q.    And she takes care of the payroll end?
23    A.    As far as commissions and month-end bonuses.
24    Q.    Has that always been that way?
25              BRANDON M. SHELTON, ESQUIRE:  Objection.  Calls
```

Deborah Naylor

42

```
 1    Q.   No.  If he said that you did, that would be an

 2         incorrect statement?

 3    A.   Yes.

 4    Q.   Do you deal or have you ever dealt with the deal recap

 5         sheets?

 6    A.   I've seen them.  I don't deal with them, per se.

 7    Q.   The reports that we looked at this morning, "A" and

 8         "B", are not based on the deal recaps?

 9    A.   That is the starting point for my reports.

10    Q.   Explain what you mean by "starting point."

11    A.   For example, a deal would be processed in the Finance

12         Department.  That is, once they are done, to the best

13         of their knowledge, they would print those deal recap

14         sheets, which would go to a sales manager to review, to

15         the best of his knowledge, to see if numbers are

16         accurate.  Then that would go over to, the deal would

17         go to the Accounting Department.  Accounting would pull

18         across that deal from Finance, make any modifications

19         or corrections.  For example, if they had the cost

20         wrong, and then do the final processing of that deal at

21         that time.

22    Q.   When you say the "final processing," what does that

23         include?

24    A.   That would include making any corrections to that deal.

25         If costs were not correct, they would make those
```

Deborah Naylor

43

1    corrections on that deal.  If, uh, let's say someone

2    had called and said this bank's gonna charge us a five

3    hundred dollar ($500) fee for processing that or 495.

4    We would make that correction also if we knew there was

5    a fee that a bank charged.  But, at that particular

6    point in time, if we knew other costs were involved or

7    other profits, we would modify those at that time.

8  Q.  Eventually, your reports are generated, correct, and

9    eventually the report that they were using to calculate

10   the pay was generated.  Now, were those generated from

11   the deal recaps being entered into a computer system?

12 A.  The pay appears to have been calculated from the

13   spreadsheet from a log that Special Finance Department

14   turned in.

15 Q.  Do you know if that was an Accounting document or

16   solely a Special Finance document?

17 A.  It was produced by an Accounting person, but it was not

18   necessarily something out of the Accounting computer.

19 Q.  Would somebody in the Accounting Department have been

20   the person to enter that data?  I mean, the reports

21   need to be generated.  Somebody has to enter data to

22   generate a report.

23 A.  The logs, I believe, were generated by the Finance

24   Department.

25 Q.  Do you have any thoughts about how those -- that's not

Deborah Naylor

44

```
 1        your department?
 2   A.   That's not what I do.
 3   Q.   Okay.  And I'm trying to understand.  It's a big
 4        organization.  Lots of people.  Lots of different...
 5   A.   Yeah.
 6   Q.   ...bits and pieces of the puzzle.  I understand.  Now,
 7        your reports, how are they generated?  Where do you get
 8        your database to generate that report?
 9   A.   Once a deal is through in the Finance Department, it's
10        turned in to the Accounting Department.  They will
11        actually what we call interface over, pull over that
12        deal from Finance into our accounting system.  And
13        before they finalize it, it would be when they go
14        through, check for errors, make any corrections that
15        need to be done.  That would then be what would go on
16        the Accounting records to produce financial
17        information.
18   Q.   I understand.  At some point in time, somebody keys in
19        this information?
20   A.   Yeah.
21   Q.   Where does that happen in this process?
22   A.   Which information?  I'm sorry.
23   Q.   The deal recaps or the sales.
24   A.   The de...deal -- it's a two-part process.  The deal
25        recaps are created in the Finance area, and then pulled
```

45

```
 1            over to Accounting.
 2    Q.    Okay.
 3    A.    So they don't rekey anything, other than if they see an
 4          error, like if a cost were off.
 5    Q.    Now, do they go down a list and say, "Okay, this is a
 6          Special Finance.  It needs to be transferred over,
 7          transferred over"?  How does that work out?
 8    A.    When they pull the deal over, there's a code in the
 9          computer that tells you that it's Special Finance
10          that....
11    Q.    So if somebody put in the wrong code,...
12    A.    Right.
13    Q.    ...would...?
14    A.    That's typically put in by the Finance Department,
15          though.  But then we would pull it over, double-check
16          it, you know.  I mean, that's -- a title person would
17          pull it over.  It should be coded as a Special Finance
18          deal.
19    Q.    So the Finance Department, though, is the one who codes
20          it so it shows up on the Special Finance report?
21    A.    The -- yes.  Accounting ultimately does it, but, yes,
22          they start the process.
23    Q.    Do you ever go back and look to see if there's any
24          missed reports?
25    A.    They check the logs, I believe, at the end of the
```

1    month, and, usually, since it does incur people's pay,
     they'll let you know.  So....

2  Q.  Okay.  I appreciate that.
        JACK R. ROCHYBY, ESQUIRE:  Let's go off the record

3       for a moment.

   OFF RECORD

4  ON RECORD

   Q.  If you guys made corrections, did you make them on the

5      deal recap deal or did you print a new deal recap?

   A.  We did not print a new re...deal recap.

6  Q.  Would you just sort of handwrite on there what the
       change was?

7  A.  On the deal jacket we put.
   Q.  On the jacket?

8  A.  Yes.
   Q.  Would there be any way for a sales manager or a

9      salesperson to know if somebody had changed a
       particular, the deal?  Would they receive notice of a

10     correction or some error?
        BRANDON M. SHELTON, ESQUIRE:  Objection.  Calls

11      for speculation.

12 Q.  You can go ahead and answer.

13 A.  I don't recall what process was in place at that time.

14 Q.  Do you have any information about or knowledge -- and I

15     ask sort of a broad question -- about how sales leads

16     were directed for the Special Finance Department?

17 A.  No, I don't.

18 Q.  That's all the questions I have then.

19 A.  Okay.

20 Q.  Thank you.

21      BRANDON M. SHELTON, ESQUIRE:  I have nothing.

22      ROBERT D. MORELAND, ESQUIRE:  None for me.  Thank

23      you.

24          FURTHER WITNESS SAITH NAUGHT

25 OFF RECORD  11:11 a.m.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE INDIANA

JILL L. TREAT, CODY W. TREAT )
and TIFFANY L. JOHNSON, )
)
Plaintiffs, )
)
vs. )  Case No.: 1:08-CV-0173-WCL-RBC
)
TOM KELLEY BUICK PONTIAC GMC, )
INC., d/b/a KELLEY SUPERSTORE,)
14/69 CAR RENTAL and INDIANA )
CREDIT CENTER, KELLEY )
AUTOMOTIVE SUPERSTORE, INC., )
KELLEY CARS, INC., KELLEY )
AUTOMOTIVE GROUP, INC. and )
DANIEL HENDERSON, )
)
Defendants. )

# DEPOSITION OF
# GARY K. THELEN

The deposition of Gary K. Thelen was taken July 16, 2009, 9:31 a.m. local time, by Sara Rochyby, Esquire, at the law offices of Rochyby, Spielman & Flora LLP, located at 2777 Maplecrest Road, Fort Wayne, Indiana, before Claire Marks, a notary public in and for the State of Indiana, and the parties were represented by counsel as follows:

PLAINTIFFS                          SARA ROCHYBY, ESQUIRE
                                    JACK ROCHYBY, ESQUIRE
                                    ROCHYBY, SPIELMAN & FLORA LLP
                                    2777 Maplecrest Road
                                    Fort Wayne, Indiana  46815


DEFENDANTS                          ROBERT D. MORELAND, ESQUIRE
                                    BAKER & DANIELS LLP
                                    Suite 800
                                    111 East Wayne Street
                                    Fort Wayne, Indiana  46802

Page 1 of 2

 

3

1     as sexual harassment?

2  A.  Yes, probably some seminars throughout the years.  In

3      addition to our own.

4  Q.  Okay.  Who is your employer?

5  A.  Our  - my employer is  - technically, I'm employed by

6      Kelley Chevrolet, Inc.

7  Q.  When did you start working for Kelley?

8  A.  I began in 1991.  I left them from '96 through February.

9      It was like October, September of '96.  I came back in

10     February of '99 until the present.

11 Q.  And what's your current position?

12 A.  Chief financial officer.

13 Q.  When you came back in '99, what position did you start

14     in?

15 A.  It  - the same one previously was chief fin...I've

16     always been chief financial officer.

17 Q.  All right.  In July of 2006, what were your job duties?

18 A.  I was the chief financial officer.  Basically, the

19     balance sheet and income statement preparation.  You'd

20     buy insurance, healthcare benefits, 401K, uh, bank

21     lending.  I would say things that are typical of a chief

22     financial officer.  Those are probably the bigger ones.

23 Q.  When you say "bank lending," what do you mean?

24 A.  Preparing, uh, securing financing for our inventories

25     for any myriad of, of items.  And they typically have

Gary Thelen

1       terminated?

2   A.   The contracts in transit were cleaned up after Jill

3       left.  Improved.

4   Q.   You just stated that you did talk to Dan Henderson after

5       that time period.  I'm just wondering why you would

6       continue discussing that if it was improved.  Or maybe I

7       misunderstood you.

8   A.   Because you would always have an aged contract.  You

9       would potentially have an issue of which bank are you

10      sending this to?  For instance, a bank may go bankrupt.

11      So if I have a hundred thousand ($100,000) to a bank,

12      it's an issue.  I mean, there were any myriad of

13      reasons...

14   Q.   Okay.

15   A.   ...why I would talk to him from a business point of

16      view.

17   Q.   How would you keep track of the contracts in transit?

18   A.   Well, contracts in transit is a general ledger account.

19      It's an, it's an accounting function.  I mean, we do

20      track that.  It's money owed to us.  Businesses tend to

21      try to keep track of that kind of thing.

22   Q.   Do you know if that general ledger account was produced

23      to the Plaintiffs?

24         BONNIE L. MARTIN, ESQUIRE:  Objection,

25         attorney/client privilege.  Asks the witness facts

Gary Thelen

52

1   Q.   Okay.

2   A.   You know, hourlys and commissions?  What were the

3        commissions?  This deal or that deal.  But that's all

4        handled through the supervisors in accounting.

5   Q.   Are you aware that, through the Discovery process,

6        Plaintiffs have received Deal Recaps from June 2006 to

7        December 2006?

8             BONNIE L. MARTIN, ESQUIRE:  Objection, speculation.

9   A.   Am I aware they received Deal Recaps?

10  Q.   Are you aware?

11  A.   Well, I assume that's what you took, and then I think

12       also the Plaintiff took them prior to it.

13            SARA ROCHYBY, ESQUIRE:  What letter are we on?

14            COURT REPORTER:  If you're just going to carry

15            straight on, then it's "NN".

16  Q.   Mr. Thelen, I'm going to show you what's been marked as

17       Plaintiffs' Exhibit "NN".  Do you know what this

18       document is?

19  A.   Looks like a Deal Recap sheet.

20  Q.   Okay.  Would you be able to determine what the profit

21       was from this deal by looking at the Deal Recap sheet?

22  A.   Not from an accounting purpose, no.

23  Q.   Okay.  Why not?

24  A.   Because they're useless.

25  Q.   Okay.  Why are they useless?

Gary Thelen

```
 1    A.   This is, basically, for sales personnel to track it.  It
 2         has some pertinent information.  It has like, for
 3         instance, I believe the bank maybe, you know, that they
 4         want to send it to, uh -- and it's an estimate from the
 5         accounting side of so far what we have booked.  I don't
 6         know if commissions are taken out of here.  There still
 7         could be things posted that, to the cost of the vehicle.
 8         Repairs, I don't know if they had an add-on here.
 9    Q.   Is there a document that would show what the final
10         profit is on a particular deal?
11    A.   Well, you can, you can print an accounting detail
12         screen.
13    Q.   And that...?
14    A.   You can also go into the general ledger and, for
15         instance, click on it, and j...and view it.  You don't
16         have to just print it.  After it's posted in accounting.
17    Q.   And that document would take care of all the variables
18         we just mentioned, the commissions...?
19    A.   Uh,....
20              BONNIE L. MARTIN, ESQUIRE:  Objection, speculation.
21    A.   Yeah.
22              BONNIE L. MARTIN, ESQUIRE:  Not related to a
23         particular deal.
24    A.   Yeah, I mean, there would be things -- there could be
25         open Pos.  There could be, for work on it that are still
```

Gary Thelen

1    Q.    Mr. Thelen, we're back after a small break.  Do you
           understand that you're still under oath?

2    A.    Yes, I do.

     Q.    I'm just going to ask you a few follow-up questions.
3          That time period that you didn't work at Kelley, that
           was a short period of years, '96 to '99, where did you
4          work?

     A.    I worked for the Restoril Group.

5    Q.    And what did you do for them?

     A.    I was a general manager of, like JD Byriders.

6    Q.    Does Kelley have a human resource department?

     A.    No.

7    Q.    Are there certain employees who would do human resource
           duties instead of having a human resource department?

8    A.    Pri...well, primarily, payroll.

     Q.    Is payroll a part of accounting?

9    A.    Yes.

     Q.    And they're under your supervision?

10   A.    Yes.

     Q.    I think that's all my questions.

11              BONNIE L. MARTIN, ESQUIRE:  Well, let's take a
                quick break.

12   OFF RECORD
     ON RECORD

13                       CROSS-EXAMINATION
     BY:  BONNIE L. MARTIN, ESQUIRE

14   Q.    Mr. Thelen, we are back from a break, and I just had a
           brief couple of questions for you.  During your

15         testimony with Plaintiffs' counsel, you mentioned that
           you recall speaking with Dan Henderson about Jill

16         Treat's termination a certain number of days prior to
           the termination.  Is that correct?

17   A.    Yes.

     Q.    But you testified that you, in fact, don't remember the
18         exact number of days that you talked to Mr. Henderson
           about Jill Treat's termination before it occurred.

19         Isn't that correct?

20   A.    That's correct.

21              BONNIE L. MARTIN, ESQUIRE:  I have no further

22              questions.

23              JACK ROCHYBY, ESQUIRE:  No questions.

24                   FURTHER DEPONENT SAITH NAUGHT

25   OFF RECORD 11:48 a.m.

                         Gary Thelen