UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

JILL L. TREAT, CODY W. TREAT            )
and TIFFANY L. JOHNSON,                 )
                                        )
     Plaintiffs,                        )
                                        )
    v.                                  )    CIVIL NO.  1:08cv173
                                        )
TOM KELLEY BUICK PONTIAC GMC,           )
INC., d/b/a KELLEY SUPERSTORE,          )
KELLEY AUTOMOTIVE GROUP, INC.,          )
and DANIEL HENDERSON,                   )
                                        )
     Defendants.                        )

OPINION AND ORDER

This matter is before the court on a motion for summary judgment filed by the defendants

Tom Kelly Buick Pontiac GMC, Inc. d/b/a Kelley Superstore and  Tom Kelley Automotive

Group, Inc., (collectively "the Kelley Defendants"), on December 4, 2009.  The plaintiff, Tiffany

L. Johnson ("Johnson"), filed her response on January 18, 2010, to which the Kelley Defendants

replied on February 4, 2010.

Also before the court is a "Motion to Strike Evidentiary Submissions of Plaintiff Tiffany

Johnson" filed by the Kelley Defendants on February 4, 2010.  Johnson responded to the motion

on February 18, 2010, to which the Kelley Defendants replied on February 25, 2010.

For the following reasons, the motion for summary judgment and the motion to strike

will both be granted.

Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. Fitzpatrick v. Catholic Bishop of Chicago, 916 F.2d 1254, 1256 (7th Cir. 1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." Id. In Re Matter of Wildman, 859 F.2d 553, 557 (7th Cir. 1988); Klein v. Ryan, 847 F.2d 368, 374 (7th Cir. 1988); Valentine v. Joliet Township High School District No. 204, 802 F.2d 981, 986 (7th Cir. 1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 322 (7th Cir. 1992)(quoting Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact, Celotex, 477 U.S. at 323. The non-moving party may oppose the

motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. Goka v. Bobbitt, 862 F.2d 646, 649 (7th Cir. 1988); Guenin v. Sendra Corp., 700 F. Supp. 973, 974 (N.D. Ind. 1988); Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir.), cert. denied, 464 U.S. 960 (1983).

So that the district court may readily determine whether genuine issues of material fact exist, under Local Rule 56.1, the moving party is obligated to file with the court a "Statement of Material Facts" supported by appropriate citation to the record to which the moving party contends no genuine issues exist. In addition, the non-movant is obligated to file with the court a "Statement of Genuine Issues" supported by appropriate citation to the record outlining all material facts to which the non-movant contends exist that must be litigated. See, Waldridge v. American Hoechst Corp. et al., 24 F.3d 918 (7th Cir. 1994). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. Anderson, 477 U.S. at 249-251, 106 S.Ct. at 2511. Furthermore, in determining the motion for summary judgment, the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the "Statement of Genuine Issues" filed in opposition to the motion. L.R. 56.1

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. Anderson, 477 U.S. at 248. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. Id. The issue of fact must be genuine. Fed. R. Civ. P. 56(c), (e). To establish a genuine issue of fact, the non-

moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586; First National Bank of Cicero v. Lewco Securities Corp., 860 F.2d 1407, 1411 (7th Cir. 1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. Id. A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-252. Finally, the court notes that, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. Mason v. Continental Illinois Nat'l Bank, 704 F.2d 361, 367 (7th Cir. 1983).

Discussion

Defendant Tom Kelley Buick Pontiac GMC ("TKBPG") maintains a superstore of used cars, commonly referred to as the "Superstore." TKBPG is part of a group of separate dealerships, commonly known as the "Kelley Automotive Group" (hereinafter "Kelley"). Johnson was employed by TKBPG from July 2006 until her resignation on October 12, 2006. Johnson believed TKBPG acted violation of her federal civil rights and state law, and thus she instituted the instant action[1].

---

[1] In her Complaint, Johnson alleges sexual harassment, sex discrimination, and constructive discharge in violation of Title VII, as well as negligent retention and supervision. Her First Amended Complaint also includes "gender discrimination" in Paragraph 1, although a separate gender discrimination claim cannot be found in the Complaint or briefs. The Kelley Defendants have informed the court that "Johnson also originally alleged assault, battery, intentional infliction of emotional distress, negligent infliction of emotional distress and claims under the Indiana Wage Payment Statute and Wage Claims Statute. However such claims have been voluntarily dismissed by Johnson, with prejudice . . . .". The Kelley Defendants have further noted that "Johnson fails to oppose Kelley Defendants' unrebutted evidence that TKBPG

The Kelley Defendants are seeking summary judgment on all of Johnson's remaining claims. The following facts, which are supported by the record, are relevant to the motions under consideration.

In 2006, Kelley's owner and managers, including Tom Kelley, President and Owner of Kelley, Gary Thelen, Chief Financial Officer of Kelley, and Fred Grote, Kelley General Manager, decided to create a new department within TKBPG to help customers with special finance needs.[2] Previously, TKBPG had used its finance and insurance managers for special financing on a case by case basis.[3] Kelley planned for the new Special Finance Department to service the TKBPG's "Superstore," and later it expanded to other stores.[4] Special Finance Department deals were contracted through TKBPG.[5]

To open the department, based upon the recommendation of an industry colleague, Grote hired defendant Daniel Henderson ("Henderson") to manage the Special Finance Department in June 2006.[6] Henderson then interviewed and hired Jill Treat ("Ms. Treat") to serve as Assistant

---

was Johnson's employer, and thus fail to present any claims against Kelley Automotive Group, Inc." (Reply Brief at 2). At her deposition, Ms. Treat admitted that her intent was to sue her place of employment. (Johnson Dep. at 112-13). Lastly, the Kelley Defendants note that Johnson has wholly failed to discuss her claim of sex discrimination in her response brief. It is well-settled that arguments not presented to the district court in response to a summary judgment motion are waived. Palmer v. Marion County, 327 F.3d 588, 597 (7th Cir. 2003). Thus, the court will grant summary judgment on the sex discrimination claim without further discussion.

[2] Thelen Dep., p. 17; Kelley Dep., pp. 6, 18; Grote Dep., pp. 5, 7.

[3] Kelley Dep., p. 17.

[4] Grote Dep., pp. 17-19.

[5] Henderson Dep., p.103; Kelley Dep., p. 8.

[6] Grote Dep., p. 12.

Manager/Assistant Co-Director of the Special Finance Department.[7] Ms. Treat subsequently

recommended that her adult children, Cody Treat ("Mr. Treat") and Johnson work in the Special

Finance Department, and Henderson hired Mr. Treat and Johnson as well.[8] Johnson was hired as

the Special Finance Department Funding Manager.[9] Johnson reported directly to her mother,

Ms. Treat, and Henderson.[10] When Johnson began working in the Special Finance Department,

Mr. Treat, Andy Bowman, Amber Folkner, Tom Seat, Rob Pargeon, Ron Lytle, Bret Gump and

Josie Johnston worked as salespeople in the department.[11] As part of her duties, Kelley expected

Johnson to get every deal funded within seven days. Outstanding contracts were considered

"contracts in transit" ("CIT").[12]

   Johnson received Kelley's Team Member Handbook, including TKBPG's anti-

harassment policy.[13] Johnson also completed TKBPG's sexual harassment training course in

August 2006.[14] The anti-harassment policy provides: "If you believe you are subjected to

conduct or comments that violate this policy, you are encouraged to, and have a responsibility to

---

[7] J. Treat Dep., pp. 57, 71; Henderson Dep., p. 56.

[8] Johnson Dep., p. 28.

[9] Johnson Dep., p. 28.

[10] Johnson Dep., p. 43.

[11] Johnson Dep., p. 50.

[12] Johnson Dep., pp. 35-36.

[13] Johnson Dep., p. 62, Ex. 40.

[14] J. Treat Dep., pp. 145-46.

immediately report these matters to your team leader or to the General Manager."[15] Johnson also understood that if she had a problem that was not resolved after raising it within her department, she should ask someone "higher", outside the department.[16]

At the beginning of Johnson's employment, her office was located in the Superstore building on the Avenue of Autos in Fort Wayne.[17]  In approximately August 2006, Johnson's office was moved to the TKBPG building, also on the Avenue of Autos.[18]  Kelley's administrative offices were also located in the TKBPG building.  Tom Kelley, Thelen and Grote also had offices in the TKBPG building.[19]

Johnson testified that while at an out-of-work party, Henderson handed her his ringing cell phone and, when Johnson answered, the voice on the other side was James Cohen, one of Kelley's bankers at AmeriCredit, who stated: "Hello, this is Dan Henderson's personal dildo salesman."[20] Johnson claims that she told her mother, Ms. Treat, about the alleged comments, but not Henderson.[21] Johnson also states that she was aware that she could inquire who else to talk to if the situation was not handled in the department.[22]  Johnson had "good and friendly

---

[15]  Johnson Dep., pp. 63-64, Ex. 8.

[16]  Johnson Dep., p. 65.

[17]  Johnson Dep., p. 48.

[18]  Johnson Dep., p. 49.

[19]  Johnson Dep., pp. 49, 54.

[20]  Johnson Dep., p. 55.

[21]  Johnson Dep., p. 121.

[22]  Johnson Dep., p. 135.

relationships" with her co-workers at Kelley, and good relationships with her managers.[23]

On October 12, 2006, Henderson terminated the employment of both Ms. Treat and Mr. Treat.[24] Henderson first informed Ms. Treat of her termination, and then called Johnson into his office around 8:00 a.m.[25] Henderson told Johnson that he was not letting her go. [26] Johnson alleges that Henderson also told her that he would be letting her go within the next month.[27] Johnson also alleges that Henderson stated that she could not be in contact with Ms. Treat or Mr. Treat, though Johnson did not ask what topics she was not to discuss with them.[28] Johnson told Henderson that she wanted to stay, and left Henderson's office.[29]

After her conversation with Henderson, Johnson alleges that Henderson asked her "every 15 minutes or so" if she changed her mind and if she wanted to stay at Kelley.[30] At approximately 8:30 a.m., Mr. Treat was called in to Henderson's office, and left to get his belongings.[31] Within an hour of Mr. Treat's 8:30 a.m. meeting with Henderson, Johnson resigned her employment with Kelley by saying "Okay, I will go." [32] Johnson claims she was "forced out"

---

[23]  Johnson Dep., p. 52.

[24]  Johnson Dep., p. 66.

[25]  Johnson Dep., pp. 66-67, 72.

[26] Johnson Dep., p. 67.

[27]  Johnson Dep., p. 67.

[28]  Johnson Dep., pp. 67-68.

[29]  Johnson Dep., p. 71.

[30]  Johnson Dep., p. 72

[31]  Johnson Dep., pp. 71-72.

[32]  Johnson Dep., p. 72.

of Kelley, with "no other choice" but to resign her employment.[33]

Prior to Ms. Treat's termination and Johnson's resignation, the following alleged sexual harassment occurred. While at lunch with Ms. Treat and Tiffany Johnson, after answering Johnson's questions about banks and job-related issues, Henderson (who is openly gay) stated that his roommate Ray ordered a date off the Internet.

> And Dan [Henderson] told us that he heard screaming and yelling coming from his bedroom. And he went up to see what was going on, and he saw his roommate's date running across the parking lot. And when he went in the room, he said it looked like a war zone, that there was blood all over the bedroom and the bathroom. And when he questioned Ray about what had happened, when they were being intimate, something got torn and they were trying to fix it with nail clippers I believe he said.

(Johnson Dep., p. 59).

After Henderson shared the above story, Ms. Treat told Henderson that she was "not interested in his personal life, did not want to hear them, the story was disgusting, and that it was very inappropriate."[34]  Johnson did not say anything to Henderson about Henderson's comments and, at that point, Henderson stopped telling the story.[35]  During the course of discovery, Plaintiffs produced a printout of a "MySpace" page belonging to Henderson, printed off by Mr. Treat's wife, who shares a mutual friend of Henderson's.[36] On Henderson's MySpace page, he posted the story that he told Ms. Treat and Johnson about his roommate.[37]  Henderson

---

[33]  Johnson Dep., p. 66.

[34]  Johnson Dep., p. 61.

[35]  Johnson Dep., p. 61.

[36]  J. Treat Dep., pp. 185-87, Ex. 15.

[37]  J. Treat Dep., p. 187.

posted this information so that it would be available to both male and female friends.[38]  The content of the story on the MySpace page was less graphic than the way the story was portrayed to Ms. Treat and Johnson.[39]  Henderson also told males and females that he hit it off with a bank's homosexual loan officer.[40]  As a result of Henderson's behavior and her "forced" decision to leave employment at Kelley, Johnson filed the present lawsuit.

The Kelley Defendants have filed a motion for summary judgment on all of Johnson's claims and have also filed a motion to strike some of Johnson's evidentiary submissions. The court will first consider the motion to strike.[41]

The Kelley Defendants contend that references to Ms. Treat's October 11, 2006, e-mail to Henderson must be stricken. On page four of her response brief, Johnson refers to an e-mail allegedly sent by Ms. Treat to Henderson on October 11, 2006, in which Johnson claims that Treat addressed various issues relating to a telephone conversation with Henderson.[42] However, Johnson does not attach the described e-mail to her opposition materials, nor does she

---

[38]  Henderson Aff., ¶ 8, Ex. 1.

[39]  J. Treat Aff., at ¶ 6; Johnson Aff., at ¶ 11.

[40]  Henderson Aff., ¶ 11.

[41]  Although not part of the motion to strike, the Kelley Defendants in their summary judgment brief have made a general request that the court "delete" Johnson's errata sheets to her deposition testimony.  The Kelley Defendants have not pointed out any specific instances where the errata sheets are relied upon in this case, and a review of Johnson's "Genuine Issue of Material Facts" (attached to her response brief) reveals that Johnson has not cited to the errata sheets in support of her factual statements.  Thus, the court will consider the errata sheets a non-issue with respect to the summary judgment motion under consideration.

[42]  The Kelley Defendants note that, interestingly, Ms. Treat's summary judgment opposition materials make no mention of such an e-mail.  The purported e-mail appears to be attached to Cody Treat's Designation as Exhibit J.

authenticate the content of any e-mail in her opposition.

Documentary evidence is admissible if authenticated "by evidence sufficient to support a finding that the matter in question is what the proponent claims." Fed. R. Evid. 901(a). The Kelley Defendants argue that the e-mail is not authenticated by anyone and cannot oppose summary judgment. The Kelley Defendants further argue that Johnson's conclusory statements about the content of the e-mail must be stricken, because it constitutes hearsay by Ms. Treat and is an out-of-court statement offered for the truth of the matter asserted, and thus inadmissible pursuant to Fed. R. Evid. 801 and 802.

In response, Johnson asserts that references to the e-mail must be considered because it contains "numerous authenticating elements demonstrating that the document is what it claims to be." (DE 131 at 5). As the Kelley Defendants point out, however, neither Ms. Treat nor Henderson have provided any sworn testimony that such an e-mail was either sent or received by either of them.

The Kelley Defendants argue that Johnson's arguments not only fail to authenticate the e-mail and remove its hearsay problem, but expose its core relevance deficiency. In her efforts to keep the e-mail in evidence Johnson states that the "e-mail is being offered to demonstrate that Henderson had knowledge of Cody Treat's complaints, via the e-mail sent from Jill Treat to Henderson." (DE 131 at 6). The Kelley Defendants argue that this is precisely what the e-mail does not do. That is, nowhere does Ms. Treat's evidence demonstrate that Henderson received any such e-mail, and such information is not within any Plaintiffs' personal knowledge. The Kelley Defendants further argue that Johnson in no way demonstrates how this is relevant to her claims in this case. This court agrees with the Kelley Defendants that Johnson's references to

the unauthenticated e-mail constituted inadmissible hearsay and are conclusory and irrelevant. Thus the e-mail cannot be used to oppose summary judgment. <u>Toro Co. v. Krouse, Kern & Co., Inc.</u>, 644 F. Supp. 986, 990 (N. D. Ind. 1986).

The Kelley Defendants next argue that references to Ms. Treat's alleged post-termination conversation with Gary Patterson must be stricken. On page 10 of her response brief (DE 111), Johnson states that "Immediately after Treat was fired, she contacted Gary Patterson and spoke to him in detail regarding Henderson's conduct." The Kelley Defendants argue that Johnson neither describes what was said to Patterson, nor does she provide any testimony by Patterson about such a conversation. Thus, the Kelley Defendants contend that the statement is inadmissible hearsay. The Kelley Defendants further argue that Johnson cannot demonstrate that "something" was said, because she cannot even identify what that "something" is.

Johnson denies that the statement is hearsay. Johnson argues that she is not attempting to admit into evidence any comments or statement made by Patterson, nor is she trying to admit into evidence any statements of her own. Johnson further argues that she is not offering the statement to prove the truth of the matter asserted and that the statement is "nothing more than a first-hand recollection of an action taken by her personally." The Kelley Defendants continue to object to the statement even when used for this purpose, due to Johnson's failure to describe what "in detail regarding Henderson's conduct" means. The Kelley Defendants contend that the statement is too vague and conclusory for summary judgment purposes and must be stricken. <u>Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist. 163</u>, 315 F.3d 817, 822 (7th Cir. 2003)(in order to withstand summary judgment, non-movant must rely on specific facts, not vague, conclusory allegations).

This court agrees that the statement at issue is a vague, conclusory, self-serving allegation that must be stricken. There is simply nothing in the record to support the statement, other than Ms. Treat's errata sheet answer (ES 15), which has already been stricken in a separate order. Accordingly, the motion to strike will be granted.

Having resolved all of the evidentiary issues, the court will now turn to the Kelley Defendants' motion for summary judgment. In support of this motion, the Kelley Defendants first argue that Johnson's Title VII sexual harassment claim is without merit. Johnson claims that she endured sexual harassment so severe that it created a hostile work environment. To prevail under Title VII on her hostile work environment claim, Johnson must prove: (1) she was subject to unwelcome sexual advances, requests for sexual favors, or other verbal or physical sexual conduct; (2) the conduct was directed at her because of her sex; (3) the conduct was severe or pervasive enough that it created a hostile work environment; and (4) there is a basis for employer liability. Quantock v. Shared Mktg. Servs., Inc., 312 F.3d 899, 903 (7th Cir. 2002); see also McClain v. TP Orthodontics, 2009 WL 2381915 (N.D. Ind., July 30, 2009) (Van Bokkelen, J.). The test for an actionable hostile work environment under Title VII includes both an objective and subjective inquiry. Ripberger v. Western Ohio Pizza, Inc., 908 F. Supp. 614, 618-19 (S.D. Ind. 1995). The Seventh Circuit has noted that "it is critical, in sexual harassment cases, to distinguish between 'a merely unpleasant working environment on the one hand and a hostile or deeply repugnant one on the other.'" Gleason v. Mesirow Financial, Inc., 118 F.3d 1134, 1144 (7th Cir. 1997).

The ultimate inquiry for a sexual harassment plaintiff is whether he or she can prove "that the conduct at issue was not merely tinged with offensive sexual connotations, but actually

constituted discrimination . . . because of . . . sex." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75 (1998). In Oncale, looking at same-sex harassment, the United States Supreme Court stated:

> Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at "*discrimination* . . . because of . . . sex." We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations. "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."

Id. at 80 (citations omitted) (emphasis in original). In Oncale, the Supreme Court emphasized that Title VII was not a general civility code: "[T]he statute does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex. The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment." Id. at 81.

The Kelley Defendants claim that Henderson's alleged conduct cannot be considered to be "because of sex" because Henderson engaged in the alleged conduct in the presence of both men and women. The Seventh Circuit has recognized this type of alleged harasser as an "equal opportunity harasser," for which no Title VII liability can lie". The Seventh Circuit has upheld decisions dismissing claims by a husband and wife (or man and woman) who each claim sexual harassment based on the same facts and circumstances. See Venezia v. Gottlieb Mem. Hosp., Inc., 421 F.3d 468 (7th Cir. 2005); Holman v. Indiana, 211 F.3d 399 (7th Cir. 2000). It is clear that Johnson's allegations in paragraph 23 (b), (c) and (f) of the Amended Complaint were also

made by Mr. Treat in paragraph 21 (b), (c), (d) and (e) of the Amended Complaint. The Kelley Defendants argue that Johnson cannot allege that such comments were based on her sex, if her brother also alleges that such comments were made to him.

As noted, Johnson alleges that Henderson told "stories about his former roommate in California and his sexual encounters with a male date hired off a computer service." After Henderson shared his story with Johnson and Ms. Treat, Ms. Treat told Henderson that she was "not interested in his personal life, did not want to hear them, the story was disgusting, and that it was very inappropriate." At that point, Henderson stopped telling the story.

During the course of discovery, Plaintiffs produced a printout of a "MySpace" page belonging to Henderson, printed off by Mr. Treat's wife, who shares a mutual friend of Henderson's. "MySpace is 'an online community that lets you meet your friends' friends.'" A.B. v. State of Indiana, 885 N.E.2d 1223, 1224 (Ind. 2008) (citations omitted). On Henderson's MySpace page, he posted a reference to the story that he told Ms. Treat and Johnson about his California roommate. Henderson posted this information so that it would be available to both male and female friends. The Kelley Defendants argue that because Henderson provided information about the same story related by Johnson to both men and women, such a comment cannot have been shared with Johnson because of her sex.

Johnson also alleges that Henderson called in to work while he was on vacation and stated that a friend had a vibrator that looked like the Virgin Mary.[43] While Henderson does not recall this particular comment, he recalls calling in to work while on vacation, and recalls that males and females were with him on vacation.

---

[43] Johnson Dep., p. 129.

Additionally, Johnson asserts that Henderson stated that Kelley was "in" with a bank because Henderson had hit it off over the phone with the bank's homosexual loan officer. As noted, Henderson acknowledges that he told both males and females that he hit it off with a bank's homosexual loan officer. The Kelley Defendants argue that such statements, made to both males and females, cannot support a sexual harassment claim under Title VII. Likewise, the Kelley Defendants argue that the cell phone call that Johnson answered for Henderson from James Cohen as "Dan Henderson's personal dildo salesman," is not "because of" Johnson's sex. Johnson has admitted that Henderson could not have known what Cohen was going to say on the cell phone. Johnson has also admitted that this telephone call occurred at male co-worker Rob Pargeon's home.

The evidence clearly shows that Mr. Treat was present for some of Henderson's harassing behavior, but Johnson argues that Mr. Treat was not subjected to the majority of comments described by Ms. Treat and Johnson. In Mr. Treat's affidavit, attached as Exhibit 6 in his "Designation of Evidence" he states:

> 6.     Daniel Henderson, while he would make sexual comments in front of both men and women, he did not make the same sexually graphic and offensive comments to me as he did my mother, Jill Treat and my sister, Tiffany Johnson.

> 7.     Henderson would comment that he was sexually interested in the Sales Manager of Special Finance Department at the Kelly Super Store, at a different location than the store for which I was Special Finance Director.

Johnson claims that other male employees, such as Fred Grote, Gary Thelen and Thomas Kelley, deny hearing Henderson ever make remarks of a sexual nature. (Grote Dep. at 21, Thelen Dep. at 23, T.Kelley Dep. at 25). Johnson further states, without citation to evidence, that "Henderson made the majority of his comments in front of women only and he directed his most graphic

sexual comments toward Treat and Johnson." Johnson testified that Henderson told her he enjoyed "the reaction he got" when he discussed his sexual life, and that when he worked in California he liked to pick on a younger girl and "make her boyfriend uncomfortable."[44]

The Kelley Defendants point out that Danielle Gigli, another female TKBPG employee, testified that Henderson made sexual comments in front of both men and women.[45] As the record in this case shows that both men and women were subject to Henderson's repeated discussions of a sexual nature, the court finds that Johnson has not shown that the offensive conduct was directed at her because of her sex. It appears that Henderson would discuss his sexual life with anyone who would listen, and that he particularly enjoyed telling stories to people who would react strongly. But there is no evidence that he specifically targeted women simply because they were women.

The Kelley Defendants next assert that, even if Johnson showed that the conduct at issue was directed at her because of her sex, the conduct was not sufficiently severe or pervasive to create a hostile work environment, as it was sporadic conduct stretched over slightly more than two months, consisting solely of verbal remarks. In evaluating the severity and pervasiveness of the alleged offensive conduct, courts examine "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Smith v. Northeastern Ill. Univ., 388 F.3d 559, 566 (7th Cir. 2004). Ultimately, to satisfy the "severe or pervasive" prong, an employee must show that the work environment was

---

[44] Johnson Dep. at 107-08.

[45] Gigli Dep. at 9-10.

both subjectively and objectively offensive. Id. In other words, the environment must be "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Id. The Seventh Circuit repeatedly has noted that unpleasant or boorish behavior is not prohibited by the law. See Russell v. Board of Trustees of the Univ. of Ill. at Chicago, 243 F.3d 336, 343-44 (7th Cir. 2001). The Kelley Defendants assert that the conduct alleged by Johnson may have been crude and vulgar, and may have been more information than she wanted to receive from Henderson, but that such behavior, even collectively, does not rise to the level of actionable conduct under Title VII.

Johnson contends that Henderson's comments were constant, and not sporadic, and offers the testimony of Gigli to support this contention. [46] However, as the Kelley Defendants point out, Johnson cannot use Gigli's testimony to establish her own experience with Henderson and, moreover, Gigli was not employed in the Special Finance Department at the same time as Johnson.

Johnson also claims that her office was located within twenty feet Henderson's office and and that she was "forced to endure his constant sexually natured comments." Johnson also relies on the evidence that Henderson told her and Ms. Treat a story about his former roommate's sexual encounters to support her claim that the sexual harassment at work was pervasive. However, the undisputed evidence is that this story was related at Carlos O'Kelly's (a local restaurant) during lunch, and not at work. Additionally, once Ms. Treat told Henderson

---

[46] Gigli Dep. at 8-12.

that she did not want to hear about the story, Henderson never mentioned it again. [47]

Johnson claims that the overall conduct she was subjected to makes her case similar to Robinson v. Sappington, 351 F.3d 317 (7th Cir. 2003). In Robinson, the plaintiff experienced not only sex-related comments, but touching, following, and angry possessive behaviors. Johnson alleges that Henderson commented that some customers were "faggots", and spoke regularly about his sexual preferences and sexual life. Johnson argues that this conduct combined with Henderson's graphic sexual comments, along with the fact that she worked in close proximity to Henderson, are sufficient evidence that a reasonable person would find her work environment hostile, as in the Robinson case.

While it is unfortunate that Johnson was subjected to Henderson's crude habit of sharing too much information, which likely made the workplace uncomfortable at times, there is simply insufficient evidence to suggest that an objectively reasonable person would find the work environment "hostile". There are no cases in which such relatively mild conduct suffices to support a claim of hostile work environment. Therefore, Johnson's sexual harassment claim fails on this basis as well.

Next, the court will consider whether, even if Johnson's sexual harassment claim had survived this far, a basis for employer liability exists. Under Title VII, employee harassment by a supervisor creates vicarious and strict liability for the employer. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998). If the alleged harassment does not culminate in a tangible employment action, the Kelley Defendants may raise an affirmative defense comprised of two

---

[47] Johnson Dep. at 60; J. Treat Dep. at 220.

elements: (1) TKBPG exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) Johnson unreasonably failed to take advantage of any preventive or corrective opportunities provided by TKBPG or to avoid harm otherwise. Id. The Kelley Defendants assert that Ms. Treat has provided no evidence that the comments she attributes to Henderson resulted in a tangible employment action, and therefore, TKBPG is entitled to assert the Ellerth affirmative defense. See Kampmier v. Emeritus Corp., 472 F.3d 930, 943 (7th Cir. 2007) (employer entitled to raise affirmative defense where employee's termination had nothing to do with alleged harassment).

Johnson claims that Henderson promised Johnson she would be receiving bonuses on a monthly basis, but she never received a bonus.[48] Additionally, Johnson claims that on October 12, 2006, the day her mother and brother were fired by Henderson, Henderson informed her that he would be firing her within a month. This court agrees with the Kelley Defendants that these asserted "tangible employment actions" are insufficient to defeat the assertion of the affirmative defense. Molnar v. Booth, 229 F.3d 593, 601 (7th Cir. 2000)(proceeding to affirmative defense analysis in sexual harassment case when plaintiff presented a threat of a tangible action instead of a present detriment).

The Kelley Defendants attempt to raise the Ellerth affirmative defense by satisfying the two elements set forth above. The Kelley Defendants claim that TKBPG acted reasonably and that it is beyond dispute that TKBPG disseminated a policy prohibiting sexual harassment and

---

[48] Johnson cites to her deposition testimony (Johnson Dep., p. 33) in support of her assertion that she was entitled to bonuses. She has not presented any evidence apart from her own testimony that she was entitled to a bonus. Additionally, Johnson admitted that all deals were not funded within seven days, a criteria she understood could determine whether she received a bonus. (Johnson Dep., pp. 33, 35).

provided a reporting mechanism for complaints. The Kelley Defendants point out that Johnson does not dispute that she attended TKBPG's training seminar on sexual harassment and that she understood she had more than one avenue to report sexual harassment.[49] Although Johnson allegedly complained to her mother about Henderson's comments, it is clear that she had ample opportunity to report a harassment complaint to any other manager while she was employed by TKBPG, but chose not to do so.

As the Kelley Defendants note, Johnson had ample opportunity to report a harassment complaint to higher management while she was still employed, and it is unreasonable for her to save her complaint until after her termination. Therefore, the court finds that the Kelley Defendants are entitled to rely on the Ellerth affirmative defense and thus Johnson has not established any basis for employer liability arising from Henderson's conduct.

The Kelley Defendants next seek summary judgment on Johnson's constructive discharge claim. The Kelley Defendants argue that because Johnson's hostile work environment claim has been shown to be meritless, her constructive discharge claim also fails because the "working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment." McPherson v. City of Waukegan, 379 F.3d 430, 440 (7th Cir. 2004). Moreover, "absent extraordinary conditions, a complaining employee is expected to remain on the job while seeking redress." Cooper-Schut v. Visteon Automotive Sys., 361 F.3d 421, 428 (7th Cir. 2004); McPherson, 379 F.3d at 440. To succeed on her constructive discharge claim, Johnson must demonstrate more than a sexually hostile work environment, but that her work environment was so intolerable that resignation was a "fitting response." Bannon

---

[49] Johnson Dep., pp. 64-65.

v. Univ. of Chicago, 503 F.3d 623, 629 (7th Cir. 2007); see also Tidwell v. Meyer's Bakeries,

Inc., 93 F.3d 490, 494 (8th Cir. 1996) ("An employee who quits without giving his employer a

reasonable chance to work out a problem has not been constructively discharged."). See Fischer

v. Avanade, Inc., 519 F.3d 393, 410 (7th Cir. 2008) (An audit, negative performance reviews,

and a requirement to relocate or transfer departments, while "circumstances an employee would

not wish upon herself," have been deemed insufficient to support a constructive discharge.);

Tutman v. WBBM-TV, 209 F.3d 1044, 1046 (7th Cir. 2000)(finding no constructive discharge

when employee refused to return to work after co-worker allegedly threatened employee by

stating, "Get the fuck out of the office before I pop a cap in your ass," based on a movie the

co-worker believed was titled with a racial epithet); Simpson v. Borg-Warner Automotive, Inc.,

196 F.3d 873, 877-78 (7th Cir. 1999) (comment that "someone should take a dish and knock [the

plaintiff] upside the head", while boorish behavior, did not show constructive discharge). "Case

law illustrates that an employee has not acted reasonably if she assumes the employer will fail to

protect her without allowing the employer a chance to try." Cooper-Schut, 361 F.3d at 429

(citing Tidwell, 93 F.3d at 494).

The Kelley Defendants argue that because Johnson did not put anyone at Kelley other

than her mother on notice of any alleged sexual harassment, her constructive discharge claim is

meritless because if her mother were no longer employed, no one else at Kelley would have been

aware of Johnson's alleged concerns and able to assist her, nor did she give them a chance to do

so.  The Kelley Defendants point out that Johnson admits that she believed her mother talked to

Henderson and such conversation was the reason that Henderson's comments stopped.[50]  Indeed,

---

[50] Johnson Dep., p. 131.

Johnson admits that she was not preparing to quit her job at Kelley because of any conduct by Henderson; rather, Johnson claims that she was "forced out" by Henderson when he was asking her if she wanted to remain at Kelley without her mother and brother. Johnson was explicitly offered the chance to remain at her position, but chose not to do so after considering her options for 90 minutes or less.

Johnson relies on her affidavit testimony wherein she states that Henderson would stop his comments but "start again later", and that he spoke to her in a "harassing and demeaning tone" during the 90 minutes before she resigned on October 12, 2006.[51]  However, even assuming the truth of these statements, it is clear that Johnson has not shown that she met her responsibility under Title VII to take action to alert management employees of Henderson's conduct, before quitting her job.  As the Kelley Defendants point out, Johnson's proximity to Thelen's office makes her inaction all the more culpable and inexplicable.[52]  Accordingly, summary judgment will be granted on the constructive discharge claim.

Next, the court will discuss Johnson's negligent retention and supervision claim.  To bring a cause of action for negligent hiring and retention, Johnson must show that Kelley hired and retained Henderson in its employ despite knowing that Henderson was in the "habit of misconducting [him]self in a manner dangerous to others." Briggs v. Finley, 631 N.E.2d 959, 967 (Ind. Ct. App. 1994).  During Henderson's deposition, Johnson's counsel elicited testimony regarding Henderson's prior criminal convictions for obtaining property by false pretenses and credit card abuse. The Kelley Defendants claim that there is no evidence of any prior dangerous

---

[51]  Johnson Aff., ¶¶ 12, 14.

[52]  Johnson Dep., pp. 49, 54.

sex-related conduct by Henderson, nor any evidence that they were aware of any such conduct.

Indiana recognizes the tort of negligent retention of an employee and has adopted the Restatement (Second) of Torts as the standard outlining liability for the tort. <u>Sandage v. Board of Commissioners of Vanderburgh County</u>, 897 N.E.2d 507, 511-12 (Ind. Ct. App. 2008). Section 317 of the Restatement provides that a master is "under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm," if (1) the servant is on the master's premises or using the master's chattel and (2) the master knows or has reason to know that he can control his servant and knows or should know of the necessity and opportunity for exercising such control. Restatement (Second) of Torts § 317 (1965).

The Kelley Defendants argue that the sex-related remarks such as those alleged by Johnson cannot be considered to have created a reasonable risk of "bodily harm" for purposes of this cause of action. This court recently held that a supervisor's statement to a subordinate employee suggesting that the employee sleep with the supervisor's ex-husband over a period of three days was not "dangerous" within the meaning of § 317. <u>See</u> <u>McClain v. TP Orthodontics</u>, 2009 WL 2381915 (N.D. Ind).

The Kelley Defendants further argue that even if Henderson's alleged comments created a reasonable risk of bodily harm they had no duty to Johnson regarding such alleged comments. Specifically, "[i]mposition of a duty is limited to those instances where a reasonably foreseeable victim is injured by a reasonably foreseeable harm." <u>Id</u>. (quoting <u>Webb v. Jarvis</u>, 575 N.E.2d 992, 995 (Ind. 1991)). The Kelley Defendants contend that Johnson does not, and cannot, allege

that the sex-related conduct by Henderson was "reasonably foreseeable" to them, and thus her negligent hiring and retention claim must fail.

Johnson argues that this case is similar to Grzan v. Charter Hosp. of Northwest Ind., 702 N.E.2d 786, 793 (Ind. Ct. App. 1998). In Grzan, it was rumored that an employee was engaging in an inappropriate sexual relationship with a patient. The affidavits of two employees confirmed this rumor, and the court found such "evidence to be sufficient to raise a question of fact about whether [the employer] knew or should have known of [the employee's] improper sexual conduct with Grzan." Id.

Johnson acknowledges that she did not personally inform her employer of Henderson's propensity for sexually inappropriate conduct, but argues that his conduct was pervasive enough that it was common knowledge among Kelley employees. Johnson cites to the deposition testimony of Gigli, a non-management employee who was around Henderson after Johnson's employment ended, in her attempt to show that her employer's managers were aware of Henderson's conduct during Johnson's employment. Clearly, Johnson's evidence misses the mark and cannot establish foreseeability.

Likewise, Grzan does not provide support for Johnson's claims. Ms. Grzan, unlike Johnson was subjected to actual alleged "bodily harm" by a mental health counselor at Charter Hospital in the form of hugging, kissing, fondling and oral sex, and the court held there was a question of fact whether the Hospital had information that an employee was engaging in an inappropriate sexual relationship with a patient. Id. at 789, 793. In the present case, it is abundantly clear that Johnson was not subject to any sort of "bodily harm" and she does not even make any allegations of that sort and, moreover, there is no evidence that the Kelley Defendants

knew of Henderson's propensity to act inappropriately during the time that Johnson was employed. Accordingly, summary judgment will be granted in favor of the Kelley Defendants on Johnson's negligent retention and supervision claim.

Conclusion

On the basis of the foregoing, the Kelley Defendants' motion for summary judgment [DE 93] and the Kelley Defendants' motion to strike [DE 129] are both hereby GRANTED.


Entered: April 30, 2010.


s/ William C.  Lee<br>
William C. Lee, Judge<br>
United States District Court