UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

JILL L. TREAT, CODY W. TREAT        )
and TIFFANY L. JOHNSON,             )
                                    )
        Plaintiffs,                 )
                                    )
    v.                              )        CIVIL NO.  1:08cv173
                                    )
TOM KELLEY BUICK PONTIAC GMC,       )
INC., d/b/a KELLEY SUPERSTORE,      )
KELLEY AUTOMOTIVE GROUP, INC.,      )
and DANIEL HENDERSON,               )
                                    )
        Defendants.                 )

<u>OPINION AND ORDER</u>

This matter is before the court on a motion for summary judgment filed by the defendants

Tom Kelly Buick Pontiac GMC, Inc. d/b/a Kelley Superstore and  Tom Kelley Automotive

Group, Inc., (collectively "the Kelley Defendants"), on December 4, 2009.  The plaintiff, Jill

Treat ("Ms. Treat"), filed her response on January 18, 2010, to which the Kelley Defendants

replied on February 4, 2010.

Also before the court is a "Motion to Strike Evidentiary Submissions of Plaintiff Jill

Treat" filed by the Kelley Defendants on February 4, 2010.  Ms.  Treat responded to the motion

on February 18, 2010, to which the Kelley Defendants replied on February 25, 2010.

For the following reasons, the motion for summary judgment and the motion to strike

will both be granted.

<u>Summary Judgment Standard</u>

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim.  Fitzpatrick v. Catholic Bishop of Chicago, 916 F.2d 1254, 1256 (7th Cir. 1990).  Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff."  Id.  In Re Matter of Wildman, 859 F.2d 553, 557 (7th Cir. 1988); Klein v. Ryan, 847 F.2d 368, 374 (7th Cir. 1988); Valentine v. Joliet Township High School District No. 204, 802 F.2d 981, 986 (7th Cir. 1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party."  Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 322 (7th Cir. 1992)(quoting Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact, Celotex, 477 U.S. at 323.  The non-moving party may oppose the

motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. Goka v. Bobbitt, 862 F.2d 646, 649 (7th Cir. 1988); Guenin v. Sendra Corp., 700 F. Supp. 973, 974 (N.D. Ind. 1988); Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir.), cert. denied, 464 U.S. 960 (1983).

So that the district court may readily determine whether genuine issues of material fact exist, under Local Rule 56.1, the moving party is obligated to file with the court a "Statement of Material Facts" supported by appropriate citation to the record to which the moving party contends no genuine issues exist. In addition, the non-movant is obligated to file with the court a "Statement of Genuine Issues" supported by appropriate citation to the record outlining all material facts to which the non-movant contends exist that must be litigated. See, Waldridge v. American Hoechst Corp. et al., 24 F.3d 918 (7th Cir. 1994). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. Anderson, 477 U.S. at 249-251, 106 S.Ct. at 2511. Furthermore, in determining the motion for summary judgment, the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the "Statement of Genuine Issues" filed in opposition to the motion. L.R. 56.1

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. Anderson, 477 U.S. at 248. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. Id. The issue of fact must be genuine. Fed. R. Civ. P. 56(c), (e). To establish a genuine issue of fact, the non-

moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586; First National Bank of Cicero v. Lewco Securities Corp., 860 F.2d 1407, 1411 (7th Cir. 1988).  The non-moving party must come forward with specific facts showing that there is a genuine issue for trial.  Id.  A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-252.  Finally, the court notes that, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate.  Mason v. Continental Illinois Nat'l Bank, 704 F.2d 361, 367 (7th Cir. 1983).

Discussion

Defendant Tom Kelley Buick Pontiac GMC ("TKBPG") maintains a superstore of used cars, commonly referred to as the "Superstore."  TKBPG is part of a group of separate dealerships, commonly known as the "Kelley Automotive Group" (hereinafter "Kelley").  Ms. Treat was employed by TKBPG from June 2006 until her termination on October 12, 2006.  Ms. Treat believed her termination was in violation of her federal civil rights and state law, and thus she instituted the instant action[1].

---

[1]  In her Complaint, Ms. Treat alleges sexual harassment, sex discrimination, and retaliation in violation of Title VII, age discrimination in violation of the ADEA,  Equal Pay Act violations, intentional infliction of emotional distress, negligent infliction of emotional distress, negligent retention and supervision, Indiana Wage Act violations, and common law retaliatory discharge.  Her First Amended Complaint also includes "gender discrimination" in Paragraph 1, although a separate gender discrimination claim cannot be found in the Complaint or briefs.  In her response to the summary judgment motion Ms. Treat has not objected to the granting of summary judgment on her claims of intentional and negligent infliction of emotional distress, and the Kelley Defendants have informed the court that "Treat's counsel agreed to dismiss

The Kelley Defendants are seeking summary judgment on all of Ms. Treat's remaining claims. The following facts, which are supported by the record, are relevant to the motions under consideration.

In 2006, Kelley's owner and managers, including Tom Kelley, President and Owner of Kelley, Gary Thelen, Chief Financial Officer of Kelley, and Fred Grote, Kelley General Manager, decided to create a new department within TKBPG to help customers with special finance needs.

Previously, TKBPG had used its finance and insurance managers for special financing on a case by case basis. Kelley planned for the new Special Finance Department to service the TKBPG's "Superstore," and later it expanded to other stores. Special Finance Department deals were contracted through TKBPG.

To open the department, based upon the recommendation of an industry colleague, Grote hired defendant Daniel Henderson ("Henderson") to manage the Special Finance Department in June 2006. Henderson received a $15,000 sign-on bonus. Grote instructed Henderson that he could either retain Erika Monroe ("Monroe") and Lee Bowman ("Bowman"), who were then performing some special finance functions, or they could be placed somewhere else. Henderson chose to keep Monroe, but Bowman was transferred out of the Special Finance Department.

Henderson then interviewed and hired Ms. Treat to serve as Assistant Manager/Assistant

---

Treat's claims of negligent and intentional infliction of emotional distress."  Thus, summary judgment will be granted on these two claims without further discussion. The Kelley Defendants have further noted that "Treat fails to oppose Kelley Defendants' unrebutted evidence that TKBPG was Treat's employer, and thus fail to present any claims against Kelley Automotive Group, Inc." (Reply Brief at 2).  At her deposition, Ms. Treat admitted that her claims in this case related to her employment.  (J. Treat Dep. at 208).

Co-Director of the Special Finance Department. During the interview, Henderson told Ms. Treat that "somebody had to be the boss, and it would be him."[2] Unlike Henderson, Ms. Treat did not receive a sign-on bonus. Ms. Treat subsequently recommended that her adult children, Cody Treat ("Mr. Treat") and Tiffany Johnson ("Johnson") work in the Special Finance Department, and Henderson hired Mr. Treat and Johnson as well.

On June 28, 2006, Ms. Treat received Kelley's Team Member Handbook, including TKBPG's anti-harassment policy. Ms. Treat also completed TKBPG's sexual harassment training course on August 23, 2006. The anti-harassment policy provides: "If you believe you are subjected to conduct or comments that violate this policy, you are encouraged to, and have a responsibility to immediately report these matters to your team leader or to the General Manager."[3] Ms. Treat understood that failing to report a violation of the anti-harassment policy to senior management (identified as Tom Kelley, Thelen and Grote) could subject her to disciplinary action, including discharge.[4]

At the beginning of Ms. Treat's employment, her office was located in the Superstore building on the Avenue of Autos in Fort Wayne, across the showroom floor from Henderson's office. At the end of July, 2006, Henderson decided to centralize the Special Finance Department, and Ms. Treat moved her office across the showroom floor, and in approximately August 2006, Ms. Treat's office was moved to the TKBPG building, also on the Avenue of Autos. TKBPG's administrative offices were also located in the TKBPG building. Tom Kelley,

---

[2]  J. Treat Dep., p. 63.

[3]  J. Treat Dep., Ex. 8.

[4]  J. Treat Dep., p. 145.

Thelen and Grote also had offices in the TKBPG building.

Ms. Treat signed an "Employee Acknowledgment of Information Safeguarding Obligations" ("Information Safeguarding Policy"), acknowledging that she would not remove any customer information from TKBPG.[5] Ms. Treat understood that in the event she failed to comply with the Information Safeguarding Policy, she would be subject to disciplinary action. [6] In the event of a violation, the Information Safeguarding Policy provided for discipline up to and including termination, whether the violation was unintentional or intentional.[7]

In the course of Ms. Treat's employment, the Special Finance Department accumulated increasing numbers of contracts-in-transit ("CIT"), which were unfunded contracts for car purchases.[8] The Special Finance Department's success was determined, in part, by the amount of time that a contract was "in transit."[9] The goal was for a contract to be "in transit" no more than seven days.[10]

Henderson relied upon Ms. Treat in large part for completing the task of securing approvals for customers.[11] During Ms. Treat's employment, Tom Kelley, Thelen, and Grote complained to Henderson about the Department's CIT time, as did Deb Naylor and Billie

---

[5] J. Treat Dep., p. 101, Ex. 5.

[6] J. Treat Dep., p. 102.

[7] J. Treat Dep., Ex. 5.

[8] Henderson Dep., p. 76.

[9] Henderson Dep., p. 81.

[10] Henderson Dep., p. 81.

[11] J. Treat Dep., p. 119.

McKinney in Kelley's accounting department.[12] McKinney went over the Special Finance Department's CIT, gross profit, advertising expenses and net profit with Henderson on a monthly basis.[13] It is undisputed that the CIT amount steadily increased during Ms. Treat's employment.[14] In October 2006, before Henderson and Ms. Treat were scheduled to leave for a special finance conference in Las Vegas, the Special Finance Department failed to submit the required number of contracts to the Accounting Department on time—a task for which Ms. Treat was primarily responsible.[15] Henderson had determined that Ms. Treat could not do her job, stating that the "deals were not getting done in a timely manner. There were outstanding contracts for silly reasons, and it was just overwhelming to her."[16] Henderson decided to terminate Ms. Treat's employment, but decided to wait until after the conference since Ms. Treat had already made arrangements for attendance.[17] On the morning of October 12, 2006, Henderson contacted Grote to let him know that he would be terminating Ms. Treat's employment that day.[18] Henderson informed Thelen of Ms. Treat's planned termination several days earlier.[19] When Henderson met with Ms. Treat on October 12 to inform her of her

---

[12] Henderson Dep., p. 83.

[13] Henderson Dep., p. 82.

[14] Henderson Dep., p. 182.

[15] Henderson Aff., ¶ 6.

[16] Henderson Dep., p. 182.

[17] Henderson Aff., ¶ 7.

[18] Henderson Dep., p. 181; Grote Dep., p. 28.

[19] Thelen Dep., p. 32.

termination, Henderson told Ms. Treat, "Well, my friend, we need to part ways."[20] Henderson informed Ms. Treat that the CIT were unacceptable, and that she was a "100 car a month store" person, rather than a "300 car a month store" person.[21] When Ms. Treat left TKBPG after her termination, she took copies of deal recaps with her, containing information about how much TKBPG customers wanted to finance through the Special Finance Department.[22]. Ms. Treat did not at that time tell anyone that she took the deal recaps.[23] After Ms. Treat's termination, the CIT was reduced.[24]

While cleaning up the CIT issue, Henderson also found deals "stuffed" in the back of filing cabinets that were missing signatures, and stuffed and hidden in Ms. Treat's former curio cabinet.[25] Monroe assisted with reducing the CIT for the Special Finance Department.[26]

Prior to Ms. Treat's termination the following alleged sexual harassment occurred. While at lunch with Ms. Treat and Tiffany Johnson, after answering Johnson's questions about banks and job-related issues, Henderson (who is openly gay) stated that his roommate Ray ordered a date off the Internet.

---

[20] J. Treat Dep., p. 148.

[21] J. Treat Dep., pp. 148-49.

[22] J. Treat Dep., p. 100.

[23] J. Treat Dep., p. 100.

[24] Henderson Dep., p. 85.

[25] Henderson Dep., p. 186.

[26] Thelen Aff., ¶ 6.

> And Dan [Henderson] told us that he heard screaming and yelling coming from his bedroom. And he went up to see what was going on, and he saw his roommate's date running across the parking lot. And when he went in the room, he said it looked like a war zone, that there was blood all over the bedroom and the bathroom. And when he questioned Ray about what had happened, when they were being intimate, something got torn and they were trying to fix it with nail clippers I believe he said.

(Johnson Dep., p. 59).

After Henderson shared the above story, Ms. Treat told Henderson that she was "not interested in his personal life, did not want to hear them, the story was disgusting, and that it was very inappropriate."[27] At that point, Henderson stopped telling the story.[28] During the course of discovery, Plaintiffs produced a printout of a "MySpace" page belonging to Henderson, printed off by Mr. Treat's wife, who shares a mutual friend of Henderson's.[29] On Henderson's MySpace page, he posted the story that he told Ms. Treat and Johnson about his roommate.[30] Henderson posted this information so that it would be available to both male and female friends.[31] The content of the story on the MySpace page was less graphic than the way the story was portrayed to Ms. Treat and Johnson.[32]

Henderson told males and females that he hit it off with a bank's homosexual loan

---

[27] Johnson Dep., p. 61.

[28] Johnson Dep., p. 61.

[29] J. Treat Dep., pp. 185-87, Ex. 15.

[30] J. Treat Dep., p. 187.

[31] Henderson Aff., ¶ 8, Ex. 1.

[32] J. Treat Aff., at ¶ 6; Johnson Aff., at ¶ 11.

officer.[33]  In September of 2006, Henderson asked Ms. Treat if it was too early in a relationship to loan his new boyfriend money and Ms. Treat told him that it was none of her business.[34]

Ms. Treat claims that Henderson made comments about her husband, but admits that she considered Henderson's comment that he was envious of her relationship with her husband to be a compliment.[35] Ms. Treat testified that she was not offended by Henderson showing her a text message from his boyfriend stating that the boyfriend thought Henderson was cute.[36] During the same car trip during which Henderson showed Ms. Treat the abovementioned text messages, Ms. Treat testified that Henderson told her it was cold in the front seat where he was sitting and asked if he could sit in the back seat and share a blanket with Ms. Treat's husband, and Ms. Treat told him "no."[37]

Ms. Treat testified that Henderson asked her whether she thought a limousine was "too much" for a second date, but she does not recall how she responded.[38] In her deposition, Ms. Treat testified that Henderson came in the office and told Ms. Treat and Julia Hartman, who were present, to "stop looking at his boyfriend in the car."[39] Ms. Treat admits that she never received any unwelcome physical contact from Henderson, and was never afraid or apprehensive

---

[33]  Henderson Aff., ¶ 11.

[34]  J. Treat Dep., p. 225.

[35]  J. Treat Dep., p. 228.

[36]  J. Treat Dep., pp. 226-27.

[37]  J. Treat Dep., p. 227.

[38]  J. Treat Dep., p. 226.

[39]  J. Treat Dep., pp. 223-24.

that he might touch her in an unwelcome manner.[40]

At the time of her hire and termination, Treat was 48 years old, and thus in the protected class for purposes of the Age Discrimination in Employment Act.[41] After Ms. Treat's employment was terminated, Kelley split Ms. Treat's duties between Monroe and Bowman.[42] Bowman took over some of Ms. Treat's duties when she left and Bowman was 41 years old at the time of Ms. Treat's termination, while Erika Monroe also assisted with duties that had been previously performed by Ms. Treat.[43]  It is undisputed that Henderson terminated employees at TKBPG who were both younger and older than Ms. Treat.[44]

Ms. Treat testified that she talked to Henderson in Las Vegas about more leads going to the Chevy store than the Superstore, but did not indicate that there was any discriminatory conduct at issue.[45]  Ms. Treat told Henderson that she "was not happy with the way this was being handled, that [she] wanted to be more informed with how these figures were coming about. And that if he couldn't get my answers, that I would go over him to get them."[46]

Ms. Treat does not dispute that Henderson was her supervisor[47], with authority to hire

---

[40]  J. Treat Dep., p. 252.

[41]  J. Treat's Answer to Defendants' First Set of Interrogatories, No. 2.

[42]  Thelen Aff., ¶ 5.

[43]  Hamrick Aff., ¶ 5; Thelen Aff., ¶¶ 5, 6.

[44]  J. Treat Dep., pp. 135, 172.

[45]  J. Treat Dep., pp. 159-60.

[46]  J. Treat Dep., p. 93.

[47]  J. Treat Dep., p. 116.

and fire her.[48] Henderson had the authority to determine who else joined the Special Finance Department, and was the individual who most often reported to senior management regarding the Special Finance Department.[49] When an employee, Andy Bowman, was fired by Cody Treat, Henderson hired him back, without telling Ms. Treat why, and despite Ms. Treat's disagreement with the re-hire: "It was his decision. He wasn't –it didn't matter what I said." [50]  In addition, Ms. Treat also admits that Henderson was responsible for the growth and direction of the Special Finance Department. [51]  Henderson, not Ms. Treat, made the decision to centralize the Special Finance Department in the TKBPG building.[52]

The Kelley Defendants have filed a motion for summary judgment on all of Ms. Treat's claims and have also filed a motion to strike some of Ms. Treat's evidentiary submissions. The court will first consider the motion to strike.

The Kelley Defendants argue that portions of Ms. Treat's errata sheet must be stricken. Ms. Treat has cited to her errata sheet to support her opposition to summary judgment.   Ms. Treat claims that immediately after she was fired, she contacted Gary Patterson and spoke to him in detail regarding Henderson's conduct.  (Plaintiff's Genuine Issues [DE 107-2] at D26).  Ms. Treat relies on her deposition at 317:14. The original deposition testimony states:

Q.      Did you ever e-mail Mr. Kelley about Mr. Henderson?

---

[48] J. Treat Dep., p. 118.

[49] J. Treat Dep., p. 118.

[50] J. Treat Dep., pp. 124-25.

[51] J. Treat Dep., p. 141.

[52] J. Treat Dep., p. 74.

A.      No.

Q.      Did you go to the dealership and set up an appointment?

A.      No.

The errata sheet for this last answer states:

> However, I did call Gary Patterson and conferenced in Mr.
> Kelley's assistant on the phone, Maureen Klausen and we
> discussed all the issues I had.  Gary Patterson called me back at a
> later date and told me that Mr. Kelley would not change the
> decision to fire me based on my complaints.  I did try to contact
> Mr. Kelley several times after that by telephone, and would leave
> messages.

Ms. Treat also claims that "The cause of the extended length in time for the CIT was in a large

part due to Henderson presenting false information on loan applications to banks."  (Plaintiff's

Genuine Issues at M68).  Ms. Treat cites to her deposition at 300:25 in support of this statement.

The original deposition testimony states:

> Q:      Well, you testified that you believe that he was the one that made the
> decision to pay you something other than what you were entitled to
> receive.  And my question was in your view, why did he do that?
>
> A:      So he could make more.
>
> Q:      Anything else?
>
> A:      No.  I don't think so.

The errata sheet for this answer states:

> I think he also did this because Mr. Henderson wanted me to look
> bad so that I could take the fall for his mistakes.  The majority of
> the outstanding contracts in transit were due to contracts he entered
> without obtaining all the necessary information and providing the
> car on the spot.  The majority of the contracts he entered took over
> 7 days.  I feel he probably knew he could pin me for his mistakes
> and pay me less than my pay plan, and no one at Kelley would
> question him.  I think Mr. Henderson wanted to pay me less

because he didn't want to share his pay equally with a woman, that
he felt he was superior to me and did not have to treat me fairly or
equally.

Substantive change to deposition testimony via an errata sheet is "impermissible unless it
can plausibly be represented as the correction of an error in transcription, such as dropping a
'not.'" Thorn v. Sundstrand Aerospace Corp., 207 F.3d 383, 389 (7th Cir. 2000). This principle
is supported by the well-established rule that deposition testimony may not be substantively
altered by a later affidavit. Id. The Tenth Circuit stated: "A deposition is not a take home
examination." Burns v. Bd. of County Comm'rs of Jackson County, 330 F.3d 1275, 1282 (10th
Cir. 2003).

The Kelley Defendants argue that because the errata sheet revisions do more than
"correct [] an error in transcription," the changes to Ms. Treat's testimony are improper and must
be disregarded. Thorn, 207 F.3d at 389; see also Moore v. Dixon, 2007 WL 4376211, *3 (E.D.
Wis. Dec. 12, 2007); Greenway v. Int'l Paper Co., 144 F.R.D. 322, 325 (W.D. La. 1992) (when a
party attempts to change the evidentiary record through contradictory errata sheets, appropriate
remedy is to order errata changes "deleted," and to treat the transcript "as if the plaintiff refused
to sign the
deposition or has waived the signing of the deposition").

Ms. Treat claims that Thorn stands for the proposition that Fed.R.Civ.P. 30(e)(1)[53] allows

---

[53] Fed.R.Civ.P. 30(e)(1) provides:

(1)     Review; Statement of Changes.  On request by the
deponent or a party before the deposition is completed, the
deponent must be allowed 30 days after being notified by
the officer that the transcript or recording is available in

substantive changes to deposition testimony and that the only remedy is that the original transcript be retained so the trier of fact can evaluate the honesty of the alteration.

Clearly, Ms. Treat has misunderstood the purpose of Rule 30(e)(1) and the holding in Thorn. In Thorn, the Seventh Circuit Court of Appeals specifically stated that "a change of substance which actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a 'not.'" Id. at 389. Ms. Treat has not indicated anywhere why she changed her deposition testimony. She does not claim that there was a transcription error or that she was confused during the deposition. In fact, Ms. Treat has not complied with Rule 30(e)(1)(B) which states that the deponent is "to sign a statement listing the changes and the reasons for making them." The record shows that Ms. Treat signed a statement indicating that:

> I have read the foregoing transcript of the testimony given by me at my deposition on March 18, 2009 and April 29, 2009, and that said transcript constitutes a true and correct record of the testimony given by me at said deposition except as I have so indicated on the errata sheets provided herein.

(Kelley Defendants' Designation of Evidence in Support , Exhibit A [DE 104-2], page 35 of 52). Ms. Treat has failed to explain why she changed her testimony. The exclusion of such testimony is fully supported by the case law. For example, Burns v. Board of County Commr's of Jackson County, 330 F.3d 1275, 1282 (10th Cir. 2003), states as follows:

---

    which:

    (A)    to review the transcript or recording; and

    (B)    if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

16

Burns argues that <u>Franks</u> and other cases dealing with "sham affidavits" are not relevant to the instant case, because he modified his statements not in a subsequent affidavit, but in an errata sheet submitted pursuant to Federal Rule of Civil Procedure 30(e). We reject this distinction. In the recent case of <u>Garcia v. Pueblo Country Club</u>, 299 F.3d 1233 (10th Cir.2002), this court discussed the purpose of Rule 30(e). Quoting <u>Greenway v. Int'l Paper Co.</u>, 144 F.R.D. 322, 325 (W.D.La.1992), we noted that "[t]he Rule cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses. Depositions differ from interrogatories in that regard. A deposition is not a take home examination." <u>Garcia</u>, 299 F.3d at 1242 n. 5 (quotation omitted). We stated that "[w]e do not condone counsel's allowing for material changes to deposition testimony and certainly do not approve of the use of such altered testimony that is controverted by the original testimony." <u>Id</u>.

We see no reason to treat Rule 30(e) corrections differently than affidavits, and we hold that Burns's attempt to amend his deposition testimony must be evaluated under <u>Franks</u>. None of the three <u>Franks</u> factors is satisfied in the instant case. First, Burns was cross-examined at his deposition. Second, Burns's corrections were not based on any newly discovered evidence. Third, although Burns asserts that he was confused at his deposition, his answers to the direct questions posed by counsel do not reflect any obvious confusion-as opposed to indecisiveness or inconsistency-that the corrections would need to clarify. Thus, the district court correctly disregarded Burns's testimony. <u>See</u> <u>Franks</u>, 796 F.2d at 1237.

<u>See also</u> <u>Moore v. Dixon</u>, 2007 WL 4376211 (E.D.Wis.)(striking deposition testimony after finding that the <u>Franks</u> factors had not been met); <u>Murray v. Conesco, Inc.</u>, 2009 WL 1884372 (S.D. Ind.)(striking deposition testimony after finding that the errata sheets "made material and contradictory changes to [the witnesses'] deposition testimony"); <u>Paul Harris Stores, Inc. v. Pricewaterhousecoopers, LLP</u>, 2006 WL 2644935 (S.D. Ind.)(striking deposition testimony because it was "an attempt to impermissibly change the factual testimony offered during Hettlinger's deposition, a tactic which has been rejected by the Federal courts"). <u>See e.g.</u>, <u>Eckert</u>

v. Kemper Fin. Servs., Inc., 1998 WL 699656 (N.D. Ill.).

The Kelley Defendants also seek to strike several incorrect citations to the record. On February 18, 2010, after the motion to strike was filed, Ms. Treat filed a motion to correct the record, which was granted. Thus, for the most part, the Kelley Defendants' motion on this point is moot. However, the Kelley Defendants continue to assert in their reply to motion to strike that Ms. Treat's Genuine Issue of Fact M68 remains unsupported even by the corrected citation to the record.

Genuine Issue of Fact M68 states: "The cause of the extended length of time for the CIT was in a large part due to Henderson presenting false information on loan applications to banks." Ms. Treat cites to her deposition on pages 338:15-25; 340:11-15, and 300:25 ES. The latter citation is already stricken as being an impermissible change in deposition testimony. With respect to pages 338 and 340, the Kelley Defendants argue that they do not provide evidence regarding the cause of any extended contracts in transit (CIT) but, rather, provide Ms. Treat's asserted personal knowledge regarding alleged false or fraudulent transactions. A review of the testimony at issue reveals that the Kelley Defendants are correct. While Ms. Treat's deposition testimony speaks of various allegedly fraudulent transactions, the testimony does not provide any evidence that the alleged transactions were the cause of the extended CITs. As Genuine Issue of Fact M68 is unsupported by the record, it will be stricken.

Next, the Kelley Defendants argue that references to Ms. Treat's alleged post-termination conversation with Gary Patterson must be stricken. Ms. Treat states that "Immediately after Treat was fired, she contacted Gary Patterson and spoke to him in detail regarding Henderson's conduct." The Kelley Defendants argue that Ms. Treat neither describes what was said to

Patterson, nor does she provide any testimony by Patterson about such a conversation. Thus, the Kelley Defendants contend that the statement is inadmissible hearsay. The Kelley Defendants further argue that Ms. Treat cannot demonstrate that "something" was said, because she cannot even identify what that "something" is.

Ms. Treat denies that the statement is hearsay. Ms. Treat argues that she is not attempting to admit into evidence any comments or statement made by Patterson, nor is she trying to admit into evidence any statements of her own. Ms. Treat further argues that she is not offering the statement to prove the truth of the matter asserted. Rather, the statement is offered to explain how she took measures to report her complaints about Henderson's activity to Kelley's Human Resource Specialist. The Kelley Defendants continue to object to the statement even when used for this purpose, due to Ms. Treat's failure to describe what "in detail regarding Henderson's conduct" means. The Kelley Defendants contend that the statement is too vague and conclusory for summary judgment purposes and must be stricken. Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist. 163, 315 F.3d 817, 822 (7th Cir. 2003)(in order to withstand summary judgment, non-movant must rely on specific facts, not vague, conclusory allegations).

This court agrees that the statement at issue is a vague, conclusory, self-serving allegation that must be stricken. There is simply nothing in the record to support the statement, other than Ms. Treat's errata sheet answer (ES 15), which has already been stricken.

Next, the Kelley Defendants request that the "Title Table" to Ms. Treat's affidavit be stricken. In her affidavit, Ms. Treat swears and affirms that the information in her affidavit is "based on my personal knowledge." In paragraph 18 of her Affidavit, Ms. Treat states: "If a

higher volume of Special Finance Department deals were being processed than were being reported on a monthly basis, it would make the dollar volume of the contract in transit appear artificially high. In reviewing the contracts in transit, and comparing them on a percentage basis, the dollar amount of contracts in transit did not go down significantly after I was terminated." Ms. Treat created a document entitled "Title Table – Summary of Information of KEL003214 to Kel003222 and Percentage Calculation of Contracts in Transit" and attached it to her affidavit.

The Kelley Defendants argue that Ms. Treat's statement regarding the "percentage" of CIT is argument, not evidence, and is not based upon her personal knowledge. The Kelley Defendants contend that her job did not require her to compare months of CIT in comparison to sales of that month and that Thelen testified that CIT represents "money owed to us" (Thelen Dep. at 36). Henderson also testified that: "Every contract has a value to it, and the more contracts that are in transit, the more – the more unfunded contracts in transit, the more unfunded assets the Kelley organization has on the street that it has to go and replace." (Henderson Dep. at 83). The Kelley Defendants thus conclude that the only admissible evidence indicates that the actual number of dollars in transit is of concern to TKBPG, and that Ms. Treat is not competent to testify to this information.

Ms. Treat argues that once she acquired the information regarding the CIT, she was able to compare the monthly sales of the Special Finance Department against the CIT, which revealed that on a percentage basis, the CIT did not change substantially after her termination. Ms. Treat argues that Federal Rule of Evidence 1006 permits the use of a summary of business records provided all of the records are otherwise admissible. Ms. Treat contends that there is no question that the documents upon which the summary is based are the Kelley Defendants' own corporate

documents. Ms. Treat claims that her "Title Table" merely summarizes the information on CIT into a more readily digestible form.

The Kelley Defendants continue to argue that the "Title Table" is argument and not evidence and is not the sort of summary of evidence contemplated by Federal Rule of Evidence 1006. The Kelley Defendants point out that Ms. Treat cannot dispute that her "percentage" concept is not part of the Kelley Defendants' records and thus the "percentage" concept is not relevant. The Kelley Defendants claim that Ms. Treat's "Sales by Special Finance Department" column is gathered from the positive numbers on the TKBPG Accounting Department documents (KEL 3214-3222) without deducting any of the corrections in the "debit" column as required by the Accounting Department. Thus, the Kelley Defendants argue that Ms. Treat has not met her burden of showing that the summary is accurate. See Naylor Dep. at 14, Ex. A, p.1 (KEL03214)(describing how actual amount of contracts calculated from the difference between the positive and negative columns); Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec, 529 F.3d 371, 382 (7th Cir. 2008)(affirming district court's striking of summary because proponent failed to properly authenticate summary; admission of a summary under Rule 1006 requires "a proper foundation as to the admissibility of the material that is summarized and ... [a showing] that the summary is accurate . . . .").

In light of the fact that there is no evidence that Ms. Treat's "percentage" concept is relevant or accurate, the court will strike the document, as well as Paragraph 18 of Ms. Treat's affidavit.

The Kelley Defendants next request that Ms. Treat's calculation for July, August and September 2006 pay (attached to her affidavit) be stricken. In paragraphs 15 and 16 of Ms.

Treat's affidavit, she refers to her review of deal recaps received in discovery and that she "learned" that "many of the Special Finance Department deals had not been included in calculating my wages." [54] Thus, Ms. Treat created her own calculations of her pay and attached them to her affidavit. The Kelley Defendants argue that Ms. Treat's job description did not include calculating the amount of commissions to be paid, nor did it include determining the universe of sales from which commissions could be paid in a given month. Rather, the Accounting Department received the deal recaps and performed whatever corrections needed to be made to determine sales and commissions. (Naylor Dep. at 2-3). According to the Kelley Defendants, the deal recaps themselves were useless to identify profit from sales (Thelen Dep. at 52-53). The Kelley Defendants point out that Gary Thelen was TKBPG's Chief Financial Officer and responsible for the Accounting Department, and can provide competent, admissible evidence of commission calculation. (Thelen Dep. at 3, 56) The Kelley Defendants argue that the fact that Ms. Treat reviewed the deal recap documents that were dated on a certain date does not provide admissible evidence that such sales were completed, correct, or even ripe for commission payment.

Ms. Treat responds that even though her job responsibilities did not include calculating commissions "she certainly knew how to calculate the wages she was to be paid." With respect to the Kelley Defendants' argument that the deal recaps were useless to identify profit from sales, Ms. Treat responds that she has not used the deal recaps to calculate profits, but used them to determine her alleged unpaid wages.

The Kelley Defendants strongly disagree that Ms. Treat has demonstrated that she is

---

[54] J. Treat Aff. at ¶ 15.

competent to testify about the calculation of her wages, as required by Rule 56(e) of the Federal Rules of Civil Procedure.  See Compania Adminstradora de Recuperacion de Activos Administradora de Fondos de Inversion Sociedad Anonima v. Titan Int'l, Inc., 533 F.3d 555, 562 (7th Cir. 2008)(affirming lack of credence given by district court to conclusory and unsupported assertions without foundation).  The Kelley Defendants argue that Ms. Treat assumes, without providing any reasoning or explanation, that TKBPG omitted certain deals for purposes of calculating the Special Finance Department's commissions and that this assumption renders her affidavit statement inadmissible.  The Kelley Defendants contend that Ms. Treat has only presented her own "common sense" view that certain deals would be part of the equation, without acknowledging that it was the Accounting Department's job, not hers, to determine which deals were to be considered for commission purposes.

A review of the Affidavit (paragraphs 15 and 16) and the accompanying documents entitled "Jill Treat's Calculation" reveals that much is left unexplained.  Ms. Treat does not explain how she knew which deal recaps to include in the wage calculation.  She seems to assume that every one of them should have been included, but she does not direct the court to any evidence that this is the case.  As there is no evidence that she has personal knowledge of how to calculate wages and commissions, this portion of her affidavit and the accompanying calculations she has presented will be stricken.

Having resolved all of the evidentiary issues, the court will now turn to the Kelley Defendants' motion for summary judgment.  In support of this motion, the Kelley Defendants first argue that Ms. Treat's Title VII sexual harassment claim is without merit. Ms. Treat claims that she endured sexual harassment so severe that it created a hostile work environment. To

prevail under Title VII on her hostile work environment claim, Ms. Treat must prove: (1) she

was subject to unwelcome sexual advances, requests for sexual favors, or other verbal or

physical sexual conduct; (2) the conduct was directed at her because of her sex; (3) the conduct

was severe or pervasive enough that it created a hostile work environment; and (4) there is a

basis for employer liability. Quantock v. Shared Mktg. Servs., Inc., 312 F.3d 899, 903 (7th Cir.

2002); see also McClain v. TP Orthodontics, 2009 WL 2381915 (N.D. Ind., July 30, 2009) (Van

Bokkelen, J.). The test for an actionable hostile work environment under Title VII includes both

an objective and subjective inquiry. Ripberger v. Western Ohio Pizza, Inc., 908 F. Supp. 614,

618-19 (S.D. Ind. 1995). The Seventh Circuit has noted that "it is critical, in sexual harassment

cases, to distinguish between 'a merely unpleasant working environment on the one hand and a

hostile or deeply repugnant one on the other.'" Gleason v. Mesirow Financial, Inc., 118 F.3d

1134, 1144 (7th Cir. 1997).

> The ultimate inquiry for a sexual harassment plaintiff is whether he or she can prove

"that

the conduct at issue was not merely tinged with offensive sexual connotations, but actually

constituted discrimination . . . because of . . . sex." Oncale v. Sundowner Offshore Services, Inc.,

523 U.S. 75 (1998). In Oncale, looking at same-sex harassment, the United States Supreme

Court stated:

> Title VII does not prohibit all verbal or physical harassment in the
> workplace; it is directed only at "*discrimination* . . . because of . . .
> sex." We have never held that workplace harassment, even
> harassment between men and women, is automatically
> discrimination because of sex merely because the words used have
> sexual content or connotations. "The critical issue, Title VII's text
> indicates, is whether members of one sex are exposed to
> disadvantageous terms or conditions of employment to which

members of the other sex are not exposed."

Id. at 80 (citations omitted) (emphasis in original). In Oncale, the Supreme Court emphasized that Title VII was not a general civility code: "[T]he statute does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex. The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment." Id. at 81.

The Kelley Defendants claim that Henderson's alleged conduct cannot be considered to be "because of sex" because Henderson engaged in the alleged conduct in the presence of both men and women. The Seventh Circuit has recognized this type of alleged harasser as an "equal opportunity harasser," for which no Title VII liability can lie". The Seventh Circuit has upheld decisions dismissing claims by a husband and wife (or man and woman) who each claim sexual harassment based on the same facts and circumstances. See Venezia v. Gottlieb Mem. Hosp., Inc., 421 F.3d 468 (7th Cir. 2005); Holman v. Indiana, 211 F.3d 399 (7th Cir. 2000). It is clear that Ms. Treat's allegations in paragraph 19 (b), (c), (f) and (l) of the Amended Complaint were also made by Mr. Treat in paragraph 21 (b), (c), (d) and (e) of the Amended Complaint. The Kelley Defendants argue that Ms. Treat cannot allege that such comments were based on her sex, if her son also alleges that such comments were made to him.

As noted, Ms. Treat alleges that Henderson told "stories about his former roommate in California and his sexual encounters with a male date hired off a computer service." After Henderson shared his story, Ms. Treat told Henderson that she was "not interested in his personal life, did not want to hear them, the story was disgusting, and that it was very

inappropriate." At that point, Henderson stopped telling the story.

During the course of discovery, Plaintiffs produced a printout of a "MySpace" page belonging to Henderson, printed off by Mr. Treat's wife, who shares a mutual friend of Henderson's. "MySpace is 'an online community that lets you meet your friends' friends.'" A.B. v. State of Indiana, 885 N.E.2d 1223, 1224 (Ind. 2008) (citations omitted). On Henderson's MySpace page, he posted a reference to the story that he told Ms. Treat and Ms. Johnson about his California roommate. Henderson posted this information so that it would be available to both male and female friends. The Kelley Defendants argue that because Henderson provided information about the same story related by Ms. Johnson to both men and women, such a comment cannot have been shared with Ms. Treat because of her sex.

Ms. Treat also alleges that Henderson called in to work while he was on vacation and stated that a friend had a vibrator that looked like the Virgin Mary.[55] While Henderson does not recall this particular comment, he recalls calling in to work while on vacation, and recalls that males and females were with him on vacation.

In the Amended Complaint, Ms. Treat also alleges that Henderson stated that Kelley was "in" with a bank because Henderson had hit it off over the phone with the bank's homosexual loan officer. As noted, Henderson acknowledges that he told both males and females that he hit it off with a bank's homosexual loan officer. The Kelley Defendants argue that such statements, made to both males and females, cannot support a sexual harassment claim under Title VII.

Ms. Treat acknowledges that her son, Cody Treat, was present for some of Henderson's harassing behavior, but argues that Mr. Treat was not subjected to the majority of comments

---

[55]  J. Treat Dep., p. 220.

described by his mother and Ms. Johnson.[56] In Mr. Treat's affidavit, attached as Exhibit 6 in his "Designation of Evidence" he states:

> 6.  Daniel Henderson, while he would make sexual comments in front of both men and women, he did not make the same sexually graphic and offensive comments to me as he did my mother, Jill Treat and my sister, Tiffany Johnson.
>
> 7.  Henderson would comment that he was sexually interested in the Sales Manager of Special Finance Department at the Kelly Super Store, at a different location than the store for which I was Special Finance Director.

Ms. Treat claims that other male employees, such as Fred Grote, Gary Thelen and Thomas Kelley, deny hearing Henderson ever make remarks of a sexual nature. (Grote Dep. at 21, Thelen Dep. at 23, T.Kelley Dep. at 25). Ms. Treat further states, without citation to evidence, that "Henderson made the majority of his comments in front of women only and he directed his most graphic sexual comments toward Treat and Johnson." Ms. Treat has presented Johnson's testimony that Henderson told her he enjoyed "the reaction he got" when he discussed his sexual life, and that when he worked in California he liked to pick on a younger girl and "make her boyfriend uncomfortable."[57]

The Kelley Defendants point out that Danielle Gigli, another female TKBPG employee, testified that Henderson made sexual comments in front of both men and women. [58] As the record in this case shows that both men and women were subject to Henderson's repeated discussions of a sexual nature, the court finds that Ms. Treat has not shown that the offensive

---

[56] Ms. Treat cites to "Treat Dep. at 227:17" in support of this argument. Page 227 of Mr. Treat's deposition does not discuss Henderson's behavior at all.

[57] Johnson Dep. at 107-08.

[58] Gigli Dep. at 9-10.

conduct was directed at her because of her sex.  It appears that Henderson would discuss his sexual life with anyone who would listen, and that he particularly enjoyed telling stories to people who would react strongly.  But there is no evidence that he specifically targeted women simply because they were women.

The Kelley Defendants next assert that, even if Ms. Treat showed that the conduct at issue was directed at her because of her sex,  the conduct was not sufficiently severe or pervasive to create a hostile work environment, as it was sporadic conduct stretched over slightly more than three months, consisting solely of verbal remarks.  In evaluating the severity and pervasiveness of the alleged offensive conduct, courts examine "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a
 mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Smith v. Northeastern Ill. Univ., 388 F.3d 559, 566 (7th Cir. 2004). Ultimately, to satisfy the "severe or pervasive" prong, an employee must show that the work environment was both subjectively and objectively offensive. Id. In other words, the environment must be "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Id. The Seventh Circuit repeatedly has noted that unpleasant or boorish behavior is not prohibited by the law. See Russell v. Board of Trustees of the Univ. of Ill. at Chicago, 243 F.3d 336, 343-44 (7th Cir. 2001).  The Kelley Defendants assert that the conduct alleged by Ms. Treat may have been crude and vulgar, and may have been more information than she wanted to receive from Henderson, but that such behavior, even collectively, does not rise to the level of actionable conduct under Title VII.

Ms. Treat contends that Henderson's comments were constant, and not sporadic, and offers the testimony of Gigli to support this contention. [59]  However, as the Kelley Defendants point out, Ms Treat cannot use Gigli's testimony to establish her own experience with Henderson and, moreover, Gigli was not employed in the Special Finance Department at the same time as Ms. Treat.

Ms. Treat also claims that her office was close to Henderson's and she worked with him up to twelve hours a day, meaning that she was "forced to endure his constant sexually natured comments."   However, the undisputed evidence is that Ms. Treat's office was across the showroom floor from Henderson for most of July 2006[60], and that she worked near Henderson up to ten hours a day, not twelve. [61]

Ms. Treat also relies on the evidence that Henderson told her and Johnson a story about his former roommate's sexual encounters to support her claim that the sexual harassment at work was pervasive.  The undisputed evidence is that this story was divulged at Carlos O'Kelly's (a local restaurant) during lunch, and not at work.  Additionally, once Ms. Treat told Henderson that she did not want to hear about the story, Henderson never mentioned it again. [62]

Ms. Treat claims that the overall conduct she was subjected to makes her case similar to Robinson v. Sappington, 351 F.3d 317 (7th Cir. 2003).  In Robinson, the plaintiff experienced not only sex-related comments, but touching, following, and angry possessive behaviors.  Ms. Treat

---

[59]  Gigli Dep. at 8-12.

[60]  J. Treat Dep. at 74, 106, 107, 108-09.

[61]  Jill Treat Aff. at ¶ 7.

[62]  Johnson Dep. at 60; J. Treat Dep. at 220.

alleges that Henderson commented that some customers were "faggots", asked questions regarding what was appropriate on a first or second date, and shared his text messages from his boyfriends. Ms. Treat argues that this conduct combined with Henderson's graphic sexual comments, along with the fact that Ms. Treat worked in close proximity to Henderson, are sufficient evidence that a reasonable person would find her work environment hostile, as in the Robinson case.

While it is unfortunate that Ms. Treat was subjected to Henderson's crude habit of sharing too much information, which likely made the workplace uncomfortable at times, there is simply insufficient evidence to suggest that an objectively reasonable person would find the work environment "hostile". There are no cases in which such relatively mild conduct suffices to support a claim of hostile work environment. Therefore, Ms. Treat's sexual harassment claim fails on this basis as well.

Next, the court will consider whether, even if Ms. Treat's sexual harassment claim had survived this far, a basis for employer liability exists. Under Title VII, employee harassment by a supervisor creates vicarious and strict liability for the employer. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998). If the alleged harassment does not culminate in a tangible employment action, the Kelley Defendants may raise an affirmative defense comprised of two elements: (1) TKBPG exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) Ms. Treat unreasonably failed to take advantage of any preventive or corrective opportunities provided by TKBPG or to avoid harm otherwise. Id. The Kelley Defendants assert that Ms. Treat has provided no evidence that the comments she attributes to Henderson culminated in her termination, and therefore, TKBPG is entitled to assert the Ellerth

affirmative defense. <u>See</u> <u>Kampmier v. Emeritus Corp</u>., 472 F.3d 930, 943 (7th Cir. 2007) (employer entitled to raise affirmative defense where employee's termination had nothing to do with alleged harassment).

Ms. Treat claims that Henderson docked her pay in September of 2006, and then fired her. However, the Kelley Defendants are correct that Ms. Treat has not shown that either of these alleged adverse employment actions flowed from Henderson's allegedly harassing behavior.

The Kelley Defendants attempt to raise the <u>Ellerth</u> affirmative defense by satisfying the two elements set forth above. The Kelley Defendants claim that TKBPG acted reasonably and that it is beyond dispute that TKBPG disseminated a policy prohibiting sexual harassment and provided a reporting mechanism for complaints. The Kelley Defendants point out that Ms. Treat does not dispute that she attended TKBPG's training seminar on sexual harassment and that she was aware that failing to report harassment to senior management could subject her to disciplinary action[63].

Ms. Treat argues that TKBPG did not take action to promptly correct Henderson's behavior. She states that she spoke to Henderson about his conduct, but that the conduct continued. She also states that after she was fired she contacted Gary Patterson, Kelley's human resource specialist, about Henderson's conduct and that she left phone messages for Tom Kelley which were never returned. The court notes here that, as explained elsewhere in this order, Ms. Treat's deposition testimony (errata) regarding her assertion that she spoke to Gary Patterson about Henderson's conduct has been stricken from the record. However, even considering this

---

[63] J. Treat Dep. at 145.

evidence, it is unclear how evidence that she complained about Henderson's behavior <u>after</u> her termination is relevant. As the Kelley Defendants note, Ms. Treat had ample opportunity to report a harassment complaint to higher management while she was still employed, and it is unreasonable for her to save her complaint until after her termination. Therefore, the court finds that the Kelley Defendants are entitled to rely on the <u>Ellerth</u> affirmative defense and thus Ms. Treat has not established any basis for employer liability arising from Henderson's conduct.

The court will now turn to Ms. Treat's sex discrimination claim. Ms. Treat does not attempt to prove discrimination by the direct method. Thus, she must utilize the indirect method. To establish a prima facie case showing of sex discrimination in violation of Title VII using the indirect method, Ms. Treat must first prove: (1) she is a member of a protected class; (2) she was performing her job in a satisfactory manner; (3) she was subjected to an adverse employment action; and (4) when she was terminated, her duties were absorbed by a man. <u>Merillat v. Metal Spinners, Inc.</u>, 470 F.3d 685, 690 (7th Cir. 2006).

The parties have agreed that Ms. Treat, a female, is a member of a protected class. However, the Kelley Defendants argue that she was not performing her job satisfactorily. Ms. Treat claims that she was satisfactorily performing her job duties and that Henderson never informed her of any problems with her job performance until the meeting in which he terminated her. [64] Ms. Treat asserts that she was not given any written warnings regarding her job performance. [65] Ms. Treat further asserts that no other member of Kelley management ever

---

[64] J. Treat Dep. at 147.

[65] Henderson Dep. at 181.

voiced any complaints regarding her job performance. [66] Ms. Treat points out that Henderson never informed his immediate supervisor, Fred Grote, that he was dissatisfied with Ms. Treat's performance. Ms. Treat also claims that the Special Finance Department had the highest sales while she was employed. [67]

Ms. Treat acknowledges that the dollar amount of CIT was high during her employment, and also acknowledges that the records show a decline in CIT after her termination. However, Ms. Treat claims that the CIT was lower after her termination because sales were lower. Ms. Treat has attempted to enter into the evidence her own calculations of CIT, which she claims shows that as a percentage, CIT did not decline after her termination. For reasons explained elsewhere in this order, the court has granted the Kelley Defendants' motion to strike this evidence. In any event, however, even if CIT had not decreased after her termination, the undisputed facts show that CIT was a problem during her employment and that she knew she was responsible for CIT. Ms. Treat claims that "[t]he high CIT figure was in part a result of Henderson's poor performance. Henderson would often submit contracts with incomplete or inaccurate information, to the point that the banks were calling Treat and complaining". Ms. Treat further states that "[m]any times this resulted in these CIT not being completed within seven (7) days". Notably, Ms. Treat does not state anywhere that she confronted Henderson with these alleged facts, either before or during her termination. Courts have repeatedly found that poor performance is a legitimate business reason justifying termination. See Schultz v. General Elec. Capital Corp., 37 F.3d 329 (7th Cir. 1994); Robison v. Palmer Group, Inc., 2005 WL

---

[66] J. Treat Dep. at 147.

[67] J. Treat Aff. at ¶ 18.

1653986 at *3 (N.D. Ind. 2005)(finding that outside salesperson's unsatisfactory sales numbers provided employer a legitimate business reason for termination).

In the present case, the record shows that Ms. Treat failed to meet an important benchmark of satisfactory work, and that she was terminated for this failure. Thus, the court agrees with the Kelley Defendants that Ms. Treat has failed to make a showing that she was performing satisfactorily.

The Kelly Defendants also assert that Ms. Treat cannot show that a similarly-situated male employee was treated more favorably. Ms. Treat claims she was subjected to two adverse employment actions, being paid less for September 2006 and termination. However, it is clear that Cody Treat also claims that he was underpaid in September 2006, which fact precludes Ms. Treat's sex discrimination claim on that point.

With respect to her termination, Ms. Treat attempts to prove that similarly situated male employees were treated more favorably by claiming that after she was terminated, her duties were absorbed by members outside the protected class. Bellaver v. Quanex Corp. 200 F.3d 485, 493 (7th Cir. 2000). Ms. Treat claims that three individuals, Lee Bowman, Erika Monroe and Henderson, took over her duties. Bowman and Henderson are male, Monroe is female. Ms. Treat asserts that to satisfy the test, not all of her job duties had to be absorbed by males. Ms. Treat cites to Wichmann v. Board of Trustees of S. Ill. Univ., 180 F.3d 791 (7th Cir. 1999), in support of this argument. However, as the Kelley Defendants point out, Wichmann was vacated (on other grounds) and remanded by the United States Supreme Court. See Board of Trustees of S. Ill. Univ. v. Wichmann, 528 U.S. 1111 (2000). Additionally, in Petts v. Rockledge Furniture LLC, 534 F.3d 715, 726 (7th Cir. 2008), the Seventh Circuit explicitly held that in a mini-RIF

34

situation, an employee whose duties were assumed by both female and male employees could not establish a prima facie case, notwithstanding that the employer chose to terminate her rather than her male counterpart. Moreover, as the Kelly Defendants note, Ms. Treat has not shown that the employees who absorbed her duties had the same CIT problems and were not terminated.

As Ms. Treat has not made a sufficient showing that she meets the second or fourth prongs of a prima facie sex discrimination case, summary judgment will be granted in favor of the Kelley Defendants on this claim.

The court will now turn to Ms. Treat's age discrimination claim. Ms. Treat has not presented any direct or circumstantial evidence of age discrimination. Thus, to prevail on her age discrimination claim under the indirect method, Ms. Treat must demonstrate: (1) she is a member of a protected class (40 or over); (2) she was meeting TKBPG's legitimate expectations; (3) she suffered an adverse employment action; and (4) when terminated, her duties were absorbed by someone who is substantially younger than her, i.e. more than ten years younger. Merillat, 470 F.3d at 690; Fisher v. Wayne Dalton Corp., 139 F.3d 1137, 1141 (7th Cir. 1998) (clarifying that substantially younger means a least a ten year age difference between comparators).

As the discussion above relating to Ms. Treat's sex discrimination claim shows, Ms. Treat has not shown that she was meeting her employer's legitimate expectations. Additionally, it is clear that Ms. Treat has not shown that her duties were absorbed by a substantially younger employee. After her termination, Ms. Treat's duties were split between Monroe and Bowman (and, arguably, Henderson). Bowman was 41 years old at the time, and Ms. Treat was 48. Thus,

35

as her duties were absorbed (in part) by someone not "substantially younger", she has not met her prima facie case. Petts, 534 F.3d at 726.

Additionally, the Kelly Defendants assert that they are entitled to the "hirer-firer" inference, because Henderson hired Ms. Treat and then fired her a few months later. See Ritter v. Hill 'n Dale Farm, Inc., 231 F.3d 1039, 1044 (7th Cir. 2000)(fact that same decision-maker hired and fired employee withing two years, when employee was in protected class at the time of hire, creates an inference of non-discrimination); Rand v. CF Indus., Inc., 42 F.3d 1139, 1147 (7th Cir. 1994)(declaring it suspect to claim that "company that hired him at age 47 'had suddenly developed an aversion to older people' two years later"). This court agrees with the Kelley Defendants that there is no indication that Ms. Treat's age had anything to do with her termination. It is undisputed that Henderson fired quite a few employees, both younger and older than Ms. Treat. Moreover, it stretches credibility to suggest that Henderson would hire someone over 40 and then fire that same person three months later due to age. Thus, summary judgment will be granted on Ms. Treat's ADEA claim.

The Kelley Defendants also argue that Ms. Treat's retaliation claim[68] is meritless. Ms. Treat has alleged that her termination resulted from her complaints to Henderson about his sex-related comments and her complaints about his alleged unethical conduct. To prove retaliation under the direct method, Ms. Treat must show: (1) statutorily protected activity; (2) materially adverse action taken by the employer; and (3) a causal connection between the two. Amrhein v.

---

[68] In her First Amended Complaint, Ms. Treat states: "This is an action to recover damages for ... retaliation ... under Title VII of the Civil Rights Act as amended 42 U.S.C. 2000." Thus, like the Kelley Defendants, the court will consider this claim to be part of Ms. Treat's claims under Title VII even though the exact nature of the claim is vague.

<u>Health Care Serv. Corp.</u>, 546 F.3d 854, 858 (7th Cir. 2008). Under the indirect method, Ms.

Treat must show: (1) statutorily protected activity; (2) she met her employer's legitimate

expectations; (3) she suffered an adverse employment action; and (4) she was treated less

favorably than similarly-situated employees who did not engage in statutorily protected activity.

<u>Id</u>. at 859.

 The Kelley Defendants argue that under either method, a key component is the decision-

maker's knowledge of the employee's protected activity, and that Ms. Treat has no evidence that

Henderson knew she was engaging in protected activity.

 Ms. Treat relies on the following evidence. On the evening of October 11, 2006, Ms.

Treat called Henderson and informed him that she wanted to talk with him regarding her pay and

how it was calculated. [69] Ms. Treat argues that it is clear from the content of the discussion that

she wanted to discuss her pay and that she did not believe she was being paid the correct

amounts. In the same conversation, Ms. Treat stated that it did not appear sales leads were being

distributed equally throughout the departments. [70] Additionally, Ms. Treat told Henderson that

she wanted to discuss other problems in the department such as his comments and how he had

not previously complied with her requests. Ms. Treat states that she had previously asked

Henderson to stop talking about his sex life on several occasions, but Henderson continued to

make such comments. [71] Ms. Treat argues that it was clear from the context of her statements

that she was again making a complaint about Henderson's sex related comments. Ms. Treat also

---

[69] J. Treat Dep. at 242.

[70] J. Treat Dep. at 242.

[71] J. Treat Dep. at 215.

told Henderson that if the problems were not resolved, she would go "over his head" to Tom Kelley. [72] Ms. Treat argues that these informal statements to Henderson are sufficient to establish liability. See Casna v. City of Loves Park, 574 F.3d 420, 427 (7th Cir. 2009).

Ms. Treat further argues that the timing of her firing in relationship to her complaints to Henderson creates a strong suspicion of retaliatory motive. Ms. Treat claims that she was fired within twenty-four hours of speaking to Henderson about her complaints.[73]

The Kelley Defendants claim that even considering Ms. Treat's description of her conversation with Henderson about her concerns, such statements fail to indicate a connection to a protected class. See Tomanovich v. City of Indianapolis, 457 F.3d 656, 663 (7th Cir. 2006)("Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient."); Miller v. American Family Ins. Co., 203 F.3d 997, 1008 (7th Cir. 2000)("An employee can honestly believe she is the object of discrimination, but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints.").

The Kelley Defendants contend that there is no evidence that Henderson was aware of any statutorily protected activity when he made the decision to terminate Ms. Treat's employment. The Kelly Defendants further contend that Ms. Treat's requests to Henderson that he stop making particular comments does not constitute statutorily protected activity. The

---

[72] J. Treat Dep. at 93.

[73] As noted elsewhere, the Kelley Defendants have submitted undisputed evidence that Henderson made the decision to terminate Ms. Treat several days prior to her complaints.

Kelley Defendants correctly note that Ms. Treat's statements to Henderson that she wanted to discuss her pay and that she believed she was not being paid the correct amounts and that she was concerned about sales leads not being distributed equally, do not indicate unlawful discrimination in violation of Title VII.  In any event, it is undisputed that Henderson made the decision to terminate Ms. Treat before the alleged October 11, 2006 phone call in which she mentioned the issues she wanted to discuss with him.  Although Ms. Treat claims that she also told him she wanted to discuss the fact that he was still making sex related comments after being requested to stop, there is no evidence in the record that this conversation occurred.  (See J. Treat Dep. at 92-93, 242-43).[74]  Accordingly, the court will grant summary judgment on the retaliation claim.

The court will turn next to Ms. Treat's claim under the Equal Pay Act. To prevail on her Equal Pay Act claim, Ms. Treat must prove: (1) higher wages were paid to a male employee; (2) for equal work requiring substantially similar skill, effort and responsibilities, and (3) the work was performed under similar working conditions. Warren v. Solo Cup Co., 516 F.3d 627, 629 (7th Cir. 2008). For purposes of this claim, Ms. Treat compares herself to Henderson.[75] On the second element, Ms. Treat must show that her job and Henderson's involved a "common core of tasks" or that "a significant portion of the two jobs is identical." Howard v. Lear Corp. EEDS and Interiors, 234 F.3d 1005 (7th Cir. 2000). If there is a common core, any differences in duties

---

[74]  Ms. Treat testified in her deposition that she believed Henderson would have known she wanted to talk to him about not discussing his personal life only because she had told him and sent an email.  (J. Treat Dep. at 314-15).  However, Ms. Treat has not provided the court with any evidence of emails being sent or received discussing these matters.

[75] J. Treat Dep., p. 309.

or responsibilities between her and Henderson must be substantially different to justify the pay disparity. Stropka v. Alliance of Amer. Insurers, 141 F.3d 681, 685 (7th Cir. 1998).

The Kelley Defendants argue that Ms. Treat fails to set forth a prima facie EPA case because she has not shown that her job duties were "substantially similar" to those of Henderson. The Kelley Defendants emphasize that Henderson was Ms. Treat's supervisor, with authority to hire and fire her. Additionally, Henderson had the authority to determine who else joined the Special Finance Department, and was the individual who most often reported to senior management regarding the Special Finance Department. Henderson had the authority to re-hire persons fired by others in the Department, without explaining his decision. Ms. Treat acknowledges that she never fired anyone by herself. Ms. Treat has also acknowledged that Henderson was responsible for the growth and direction of the Special Finance Department and that Henderson made the decision to centralize the Department in the TKBPG building.

Thus, the Kelley Defendants conclude that Ms. Treat is indisputably not similarly-situated to Henderson, and their respective work was not "equal" for purposes of the EPA. See Sims-Fingers v. City of Indianapolis, 493 F.3d 768, 771 (7th Cir. 2007); see also Cullen v. Indiana Univ. Bd. of Trustees, 338 F.3d 693 (7th Cir. 2003)(affirming summary judgment for employer because plaintiff professor could not show that male professor had equal levels of responsibility).

Ms. Treat claims that she was similarly situated to Henderson because they had the same job title, worked at the same facility, and performed substantially the same job. Ms. Treat points out that "jobs need not be identical in every respect before the Equal Pay Act is applicable". Corning Glass Works v. Brennan, 417 U.S. 188, 203 n.24 (1974).

It seems clear that Henderson and Ms. Treat had a "common core of tasks".  Once a plaintiff establishes a "common core" of tasks, the court must determine whether any additional tasks make the jobs "substantially different."  Merillat v. Metal Spinners, Inc., 470 F.3d 685, 695 (7th Cir. 2006).  When assessing job duties, each of the elements listed in the EPA (skill, effort and responsibilities) must be met individually to establish a prima facie case.  Id.  The court should look to the actual job duties performed by each employee, not to his or her job description or title.  Id; Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1461 (7th Cir. 1994).

In Merillat, the Seventh Circuit upheld the grant of summary judgment on an Equal Pay Act claim, stating:

> Ms. Merillat asserts that she and Wehr had many of the same tasks, including: negotiating with suppliers, buying materials, and allocating materials for production.  However, Metal Spinners submits that there are two areas in which Ms. Merillat and Wehr's job duties differed.  These two differences, it asserts, makes their respective jobs "substantially different" for purposes of the Equal Pay Act: (1) Wehr's responsibility for "strategic planning"; (2) Wehr's supervision of Ms. Merillat.
>
> *     *     *
>
> Metal Spinners contends that part of Wehr's job duties included strategic planning. . . . We believe that it is clear on the record as a whole that, with respect to strategic planning, Ms. Merillat's day-to-day duties with regard to suppliers did not change appreciably; she never assumed corporate-wide responsibility for the planning responsibilities place on Wehr's shoulders . . . .
>
> *     *     *
>
>  . . . . All parties agree that Wehr's job duties included functioning as Ms. Merillat's supervisor. . . . [Merillat] explained that Wehr, not she, had the authority to hire and fire employees. . . . Wehr therefore had supervisory duties that Ms. Merillat did not exercise.  Of course, as we have noted, not all differences in supervisory duty render two positions unequal for purposes of the EPA.  See Fallon

> v. State of Illinois, 882 F.2d 1206, 1209-10 (7th Cir. 1989). Indeed,
> there are some indications that Wehr's supervisory duties were, in
> actuality, minimal. . . . Nevertheless, it is clear that, although
> neither had great supervisory authority over other personnel, Wehr
> did have more authority than Ms. Merillat.
> We conclude that the record, fairly read in its totality, leads to
> the conclusion that Wehr and Ms. Merillat did not have equal
> levels of responsibility. . . . Ms. Merillat has therefore failed to
> establish a prima facie case under the Equal Pay Act.

Id. at 695-697.

This court finds that the job differences in this case are similar to that present in Merillat, in that Henderson had more responsibility for strategic planning and also had more supervisory responsibility than Ms. Treat. Accordingly, as in Merillat, it is clear that Ms. Treat has failed to establish her prima facie EPA claim.

Next, the court will discuss Ms. Treat's negligent retention and supervision claim. To bring a cause of action for negligent hiring and retention, Ms. Treat must show that Kelley hired and retained Henderson in its employ despite knowing that Henderson was in the "habit of misconducting [him]self in a manner dangerous to others." Briggs v. Finley, 631 N.E.2d 959, 967 (Ind. Ct. App. 1994). During Henderson's deposition, Ms. Treat's counsel elicited testimony regarding Henderson's prior criminal convictions for obtaining property by false pretenses and credit card abuse. The Kelley Defendants claim that there is no evidence of any prior dangerous sex-related conduct by Henderson, nor any evidence that they were aware of any such conduct.

Indiana recognizes the tort of negligent retention of an employee and has adopted the Restatement (Second) of Torts as the standard outlining liability for the tort. Sandage v. Board of Commissioners of Vanderburgh County, 897 N.E.2d 507, 511-12 (Ind. Ct. App. 2008). Section

317 of the Restatement provides that a master is "under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm," if (1) the servant is on the master's premises or using the master's chattel and (2) the master knows or has reason to know that he can control his servant and knows or should know of the necessity and opportunity for exercising such control. Restatement (Second) of Torts § 317 (1965).

The Kelley Defendants argue that the sex-related remarks such as those alleged by Ms. Treat cannot be considered to have created a reasonable risk of "bodily harm" for purposes of this cause of action. This court recently held that a supervisor's statement to a subordinate employee suggesting that the employee sleep with the supervisor's ex-husband over a period of three days was not "dangerous" within the meaning of § 317. See McClain v. TP Orthodontics, 2009 WL 2381915 (N.D. Ind).

The Kelley Defendants further argue that even if Henderson's alleged comments created a reasonable risk of bodily harm they had no duty to Ms. Treat regarding such alleged comments. Specifically, "[i]mposition of a duty is limited to those instances where a reasonably foreseeable victim is injured by a reasonably foreseeable harm." Id. (quoting Webb v. Jarvis, 575 N.E.2d 992, 995 (Ind. 1991)). The Kelley Defendants contend that Ms. Treat does not, and cannot, allege that the sex-related conduct by Henderson was "reasonably foreseeable" to them, and thus her negligent hiring and retention claim must fail.

Ms. Treat argues that this case is similar to Grzan v. Charter Hosp. of Northwest Ind., 702 N.E.2d 786, 793 (Ind. Ct. App. 1998).  In Grzan, it was rumored that an employee was

43

engaging in an inappropriate sexual relationship with a patient. The affidavits of two employees confirmed this rumor, and the court found such "evidence to be sufficient to raise a question of fact about whether [the employer] knew or should have known of [the employee's] improper sexual conduct with Grzan." Id.

Ms. Treat acknowledges that she did not personally inform her employer of Henderson's propensity for sexually inappropriate conduct, but argues that his conduct was pervasive enough that it was common knowledge among Kelley employees. Ms. Treat cites to the deposition testimony of Gigli, a non-management employee who was around Henderson after Ms. Treat was terminated, in her attempt to show that her employer's managers were aware of Henderson's conduct during Ms. Treat's employment. Clearly, Ms. Treat's evidence misses the mark and cannot establish foreseeability.

Likewise, Grzan does not provide support for Ms. Treat's claims. Ms. Grzan, unlike Ms. Treat was subjected to actual alleged "bodily harm" by a mental health counselor at Charter Hospital in the form of hugging, kissing, fondling and oral sex, and the court held there was a question of fact whether the Hospital had information that an employee was engaging in an inappropriate sexual relationship with a patient. Id. at 789, 793. In the present case, it is abundantly clear that Ms. Treat was not subject to any sort of "bodily harm" and she does not even make any allegations of that sort and, moreover, there is no evidence that the Kelley Defendants knew of Henderson's propensity to act inappropriately during the time that Ms. Treat was employed. Accordingly, summary judgment will be granted in favor of the Kelley Defendants on Ms. Treat's negligent retention and supervision claim.

The next issue before the court concerns Ms. Treat's Indiana Wage Claim. In Indiana, an

employee who seeks to bring a claim for wages under state law must proceed via the Indiana

Wage Payment Statute (IC 22-2-5 et seq.)[76] or the Wage Claims Statute (IC 22-2-9 et seq.)[77].

---

[76] IC 22-2-5-1 provides:

(a) Every person, firm, corporation, limited liability company, or association, their trustees, lessees, or receivers appointed by any court, doing business in Indiana, shall pay each employee at least semimonthly or biweekly, if requested, the amount due the employee. The payment shall be made in lawful money of the United States, by negotiable check, draft, or money order, or by electronic transfer to the financial institution designated by the employee. Any contract in violation of this subsection is void.

(b) Payment shall be made for all wages earned to a date not more than ten (10) business days prior to the date of payment. However, this subsection does not prevent payments being made at shorter intervals than specified in this subsection, nor repeal any law providing for payments at shorter intervals. However, if an employee voluntarily leaves employment, either permanently or temporarily, the employer shall not be required to pay the employee an amount due the employee until the next usual and regular day for payment of wages, as established by the employer. If an employee leaves employment voluntarily, and without the employee's whereabouts or address being unknown to the employer, the employer is not subject to section 2 of this chapter until:

    (1) ten (10) business days have elapsed after the employee has made a demand for the wages due the employee; or

    (2) the employee has furnished the employee's address where the wages may be sent or forwarded.

[77] IC 22-2-9-2 provides:

(a) Whenever any employer separates any employee from the pay-roll, the unpaid wages or compensation of such employee shall become due and payable at regular pay day for pay period in which separation occurred: Provided, however, That this provision shall not apply to railroads in the payment by them to their employees.

(b) In the event of suspension of work, as the result of an industrial

45

The Kelley Defendants argue that the determination of which statute applies to a particular plaintiff depends upon the status of the particular plaintiff. See St. Vincent Hosp. & Health Care Ctr. v. Steele, 766 N.E.2d 699 (Ind. 2002). The Kelley Defendants take the position that if a plaintiff has been discharged (or suspended from work because of an industrial dispute), then he or she must bring the wage claim pursuant to the Wage Claims Statute, but if a plaintiff is currently employed or voluntarily terminated their employment, then the Wage Payment Statute applies. Because Ms. Treat was discharged, the Kelley Defendants contend that the Wage Claims Statute applies to her wage claim. The Wage Claims Statute requires that a claim be filed with the Indiana Department of Labor ("IDOL") within two years after the claim accrues. See IC 34-11-2-1 (setting forth two-year statute of limitations for wage claims). It is undisputed that Ms. Treat did not file a claim with the IDOL and that the statute of limitations for doing so has long passed.

Ms. Treat takes the position that the employment status of an employee at the time a wage claim arises determines if the employee has a claim under the Indiana Wage Payment Statute or the Indiana Wage Claim Statute. Thus, she argues that since she was employed at the time her wage claim accrued, she can maintain her present suit under the Wage Payment Statute. Ms. Treat relies on Harney v. Speedway SuperAmerica, LLC, 2007 WL 2710824 (S.D. Ind. 2007), aff'd on other grounds, 526 F.3d 1099 (7th Cir. 2008), to support her position.

In Steele, cited by the Kelley Defendants, the Seventh Circuit held that:

> dispute, the wages and compensation earned and unpaid at the time of such suspension shall become due and payable at the next regular pay day, including, without abatement or reduction, all amounts due all persons whose work has been suspended as a result of such industrial dispute.

Although both the Wage Claims Statute and the Wage Payment Statute set forth two different procedural frameworks for wage disputes, each statute applies to different categories of claimants. The Wage Claims Statute references employees who have been separated from work by their employer and employees whose work has been suspended as a result of an industrial dispute. I.C. § 22-2-9-2(a), (b). By contrast, the Wage Payment Statute references current employees and those who have voluntarily left employment, either permanently or temporarily. I.C. § 22-2-5-1(b). Because Dr. Steele was a current employee of St. Vincent at the time of the wage dispute, he proceeded correctly under the Wage Payment Statute.

In <u>Harney</u>, cited by Ms. Treat, the District Court for the Southern District of Indiana stated:

The Wage Payment Statute, Indiana Code § 22-2-5-1 et seq., provides employees the right to receive wages in a timely fashion. <u>See</u> <u>St. Vincent Hosp. & Health Care Ctr., Inc. v. Steele</u>, 766 N.E.2d 699, 703 (Ind. 2002). The Wage Payment Statute requires that an employer pay its employees' wages within ten days of the date that they are earned and provides for damages against those employers who fail to do so. <u>See</u> Ind.Code §§ 22-2-5-1 and -2; <u>Naugle v. Beech Grove City Schs</u>., 864 N.E.2d 1058, 1066-69 (Ind. 2007). By its terms, it only applies to current employees or those who voluntarily terminate their employment. <u>See</u> Ind.Code § 22-2-5-1; <u>Steele</u>, 766 N.E.2d at 705.

The Wage Claims Statute, Indiana Code § 22-2-9-1 et seq., describes how disputes about the amount of wages due are resolved and requires that unpaid wages or compensation of a discharged employee are "due and payable at regular pay day for the pay period in which separation occurred." <u>See</u> Ind.Code § 22-2-9-2-(a); <u>Steele</u>, 766 N.E.2d at 704. Unlike the Wage Payment Statute, the Wage Claims Statute only applies to employees who have been discharged or suspended from work because of an industrial dispute. <u>See</u> <u>Steele</u>, 766 N.E.2d at 705.

Based on the differences in these two statutes, it is clear that Greiner's claims arise only under the Wage Payment Statute because she voluntarily terminated her employment with Speedway. In fact, she has now conceded as much. <u>See</u> Pls.' Sur-Reply at 2, n. 1. With respect to Harney and DeBord, both of whom were discharged, the answer cannot be so easily categorized. However, the Court concludes that (1) their claims for

> bonuses that they did not receive are governed by the Wage Claims
> Statute, and (2) those bonuses that they did receive while still
> employed, but which were paid outside of the ten-day period, are
> governed by the Wage Payment Statute.

Because some of the claims of the discharged plaintiffs proceeded under the Wage Payment

Statute instead of the Wage Claims Statute, Ms. Treat concludes that her wage claims should

also be governed by the Wage Payment Statute. While this court believes that the Kelley

Defendants' interpretation of the cases is more correct, as the cases clearly indicate that it is the

status of the claimant that determines which statute applies, the court notes that even applying

Harney as interpreted by Ms. Treat does not lead the court to her conclusion. That is, in Harney,

the court held that the wage claims involving amounts that were not paid prior to the employees'

discharge were governed by the Wage Claims Statute. It is clear that Ms. Treat is seeking to

recover amounts that she was not paid (and is not merely arguing that she was not paid within

the statutory ten-day period), and thus under any interpretation of the statutes, it is obvious that

she should have proceeded under the Wage Claims Statute.

Ms. Treat has also cited to Anderson v. Northeast Otolaryngology, P.C., 2006 WL

2331142 (S.D. Ind.), for the proposition that a wage claim accrues on the date an employee is not

paid the amounts due. The issue in Anderson was whether the plaintiff had filed her wage

claims within the statute of limitations, and the Magistrate Judge held that "each pay period

triggers a separate cause of action." Ms. Treat is presumably arguing that since her claims arose

while she was still an employee, then the Wage Payment Statute applies. However, this

interpretation would render the Wage Claims Statute practically useless, as nearly all claims for

wages arise while a person is employed. The Magistrate Judge in Anderson was not called upon

to decide which wage statute applied, and this court will not extend the holding in Anderson to

48

the facts of this case.  Rather, this court will follow the Seventh Circuit holding in <u>Steele</u> that the determination of which statute applies depends upon the status of the plaintiff.

Under the <u>Steele</u> analysis, the Wage Claims Statute applies to Ms. Treat's wage claims. As the Wage Claims Statute requires that she file a claim with the IDOL, and she did not do so, the court will grant summary judgment in favor of the Kelley Defendants on her wage claims.

The Kelley Defendants next argue that Ms. Treat's retaliatory discharge claim is without merit.  Indiana common law recognizes a cause of action for wrongful discharge where an employee is terminated for refusing to commit an unlawful act for which the employee could be held personally liable. <u>McGarrity v. Berlin Metals, Inc.</u>, 774 N.E.2d 71, 76 (Ind. Ct. App. 2002). The Kelley Defendants assert that Ms. Treat does not claim that Henderson terminated her employment for refusing to commit an unlawful act but that, rather, she alleges that Henderson terminated her employment because she threatened to report his actions to Kelley management. Indeed, Ms. Treat admits that she told Henderson that she "would not operate with banks in such a fashion." The Kelley Defendants thus argue that Ms. Treat's wrongful discharge claim does not create any liability.  <u>See</u> <u>Bregin v. Liquidebt Sys., Inc</u>., 2008 WL 150611 (N.D. Ind.)(recognizing that Indiana courts do not extend the wrongful discharge exception to the employment-at-will doctrine to employees whose employment is terminated for whistle-blowing or reporting their employer's misdeeds).  The Kelley Defendants conclude that even if Ms. Treat had reported Henderson's alleged unethical conduct and been terminated for that reason, she would not have a cause of action for wrongful discharge.

Ms. Treat relies on <u>McClanahan v. Remington Freight Lines</u>, 517 N.E.2d 390 (Ind. 1988), in which an employee claimed he was wrongly discharged for fulfilling a statutory duty

and the Indiana Supreme Court held he had stated a cause of action. However, the actual holding in <u>McClanahan</u> was that the employee "stated a cause of action when he alleged he was wrongfully discharged for refusing to commit an illegal act for which he would have been personally liable."

Ms. Treat alleges that the cause of the extended length of time for the CIT was in large part due to Henderson presenting false information on loan applications to banks. She further claims that Henderson would on a repeated basis ask her (and Johnson) to provide false information on loan applications and/or forge signatures of customers on loan applications. Ms. Treat states that when she refused to participate in such actions, Henderson would take the action himself. Ms. Treat alleges that she was then fired because the CIT was too high. According to Ms. Treat the CIT was too high because she refused to submit fraudulent loan applications[78] and also took the time to correct any loan applications she found to be in violation of the law.

However, the Kelley Defendants note that Ms. Treat has not offered any admissible evidence to support her claim that she was taking longer with contracts because of Henderson's fraudulent behavior. Ms. Treat has not provided admissible evidence of the fraudulent contracts she allegedly took time to fix, other than her unsupported testimony that they existed. Thus, the Kelley Defendants argue that Ms. Treat cannot demonstrate any link between Henderson's decision to terminate her employment with the additional time she alleges she took to avoid submitting fraudulent information. Ms. Treat has acknowledged in her deposition that she believes Henderson terminated her to prevent her from talking to his boss about how he handled

---

[78] Ms. Treat has testified in her deposition that Henderson never required her to make any false or fraudulent statement to any federally-insured financial institution. (J. Treat Dep. at 335).

the application process. [79]  Thus it is clear to this court that Ms. Treat is proceeding as a

whistleblower and not as someone who was fired for refusing to commit an illegal act.  As was

clearly held in Bregin, whistleblowers are not protected from wrongful discharge under Indiana's

common law[80].  Accordingly, Ms. Treat's common law claim for wrongful discharge cannot

withstand summary judgment.

The final issue presented by the Kelley Defendants' motion for summary judgment is,

assuming that any of Ms. Treat's claims were to survive summary judgment, whether after-

acquired evidence bars her reinstatement, front pay and certain back pay claims. In the seminal

case on the after-acquired evidence doctrine, McKennon v. Nashville Banner Pub. Co., 513 U.S.

352 (1995), the United States Supreme Court held that in "determining appropriate remedial

action" for alleged discrimination, "the employee's wrongdoing becomes relevant not to punish

the employee . . . but to take due account of the lawful prerogatives of the employer in the usual

course of its business and the corresponding equities that it has arising from the employee's

wrongdoing." Id. at 361. In McKennon, the Court concluded that, as a general rule, neither

reinstatement nor front pay is an appropriate remedy in cases of employee wrongdoing "that

would lead to legitimate discharge." Id. at 361- 62. With respect to back pay, the Court held that

the "beginning point" of a formulation of any back pay award should be a calculation from the

date of the allegedly unlawful discharge to the date the new information was discovered. Id. at

---

[79] J. Treat. Dep. at 316.

[80]  Bregin noted that "[w]histle-blower cases are not included in the public policy
exception to at-will terminations because, while an employee's reports of his employer's illegal
activities would be 'advantageous if substantiated,' they are not 'mandatory under law, unlike
compliance with a state's penal code.'" (quoting McClanahan, 517 N.E.2d at 393 n. 1).

362.

During her deposition, Ms. Treat admitted that she took Kelley's proprietary documents with her after she was terminated and, indeed, produced them to the Kelley Defendants in this case. Ms. Treat further admits that she signed an Information Safeguarding Policy, and also admits that the documents she took from Kelley were proprietary documents and did not belong to her. The Kelley Defendants argue that such a violation is grounds for termination under Kelley's policy. Kelley Defendants became aware that Ms. Treat took such documents when she produced them in discovery in this case.

The Kelley Defendants also assert that Ms. Treat knew that the anti-harassment policy required her, as a manager, to immediately report a potential infraction to senior management or the human resources specialist. Ms. Treat knew that Tom Kelley, Gary Thelen and Fred Grote were all members of senior management, and that Gary Patterson was the human resources specialist. Ms. Treat also knew that failing to report a violation of which she was aware would subject her to disciplinary action, including discharge. Ms. Treat, who claims she received complaints from Mr. Treat and Johnson, admits that she did not report such complaints to anyone but Henderson. However, the Kelley Defendants were not aware of Ms. Treat's failure until TKBPG received the EEOC charges from Plaintiffs in this case.

Therefore, the Kelley Defendants claim that they are entitled to summary judgment on any claim by Ms. Treat for reinstatement, front pay or back pay after the date of her EEOC charge against TKBPG.

Ms. Treat argues that the Kelley Defendants have not submitted any evidence that her alleged wrongdoing was of such severity that she would have been terminated. She claims that

the Kelley Defendants must show by a preponderance of the evidence that the after-acquired evidence would have resulted in her termination. Ms. Treat relies on <u>Sheehan v. Dolen Corp.</u>, 173 F.3d 1039 (7th Cir. 1999). In <u>Sheehan</u>, however, it was undisputed that no one at Dolen had ever been fired for falsifying a resume, and there was also an inference that other falsification had occurred. <u>Id</u>. at 1047. In the present case, the Kelley Defendants have uncontroverted evidence that Ms. Treat violated the Information Safeguarding Policy and the reporting requirements of the Anti-Harassment Policy. Further, Ms. Treat has not produced any evidence that such violations are not grounds for termination and has not produced evidence of any employee who was not terminated for similar violations. Accordingly, it is clear that the Kelley Defendants have met their burden of demonstrating the applicability of the after-acquired evidence defense and, even if any of her claims had survived, she would not be entitled to reinstatement, front pay or back pay after the date of her EEOC charge.

Conclusion

On the basis of the foregoing, the Kelley Defendants' motion for summary judgment [DE 101] and the Kelley Defendants' motion to strike [DE 125] are both hereby GRANTED.

Entered: April 30, 2010.

s/ William C.  Lee<br>
William C. Lee, Judge<br>
United States District Court