UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| JILL L. TREAT, CODY W. TREAT and TIFFANY L. JOHNSON, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) CIVIL NO. 1:08cv173 ) |
| TOM KELLEY BUICK PONTIAC GMC, INC., d/b/a KELLEY SUPERSTORE, KELLEY AUTOMOTIVE GROUP, INC., and DANIEL HENDERSON, | ) ) ) ) ) ) |
| Defendants. | ) |

## OPINION AND ORDER

This matter is before the court on a motion for summary judgment filed by the defendant Daniel Henderson ("Henderson"), on December 4, 2009. The plaintiffs, Jill L. Treat ("Ms. Treat"), Cody W. Treat ("Mr. Treat"), and Tiffany L. Johnson ("Johnson"), filed their response on January 18, 2010, to which Henderson replied on February 4, 2010.

For the following reasons, the motion for summary judgment be granted.

### Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. Fitzpatrick v. Catholic Bishop of Chicago, 916 F.2d 1254, 1256 (7th Cir. 1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and in which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." Id. In Re Matter of Wildman, 859 F.2d 553, 557 (7th Cir. 1988); Klein v. Ryan, 847 F.2d 368, 374 (7th Cir. 1988); Valentine v. Joliet Township High School District No. 204, 802 F.2d 981, 986 (7th Cir. 1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 322 (7th Cir. 1992)(quoting Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact, Celotex, 477 U.S. at 323. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. Goka v. Bobbitt, 862 F.2d 646, 649 (7th Cir. 1988); Guenin v. Sendra Corp., 700 F. Supp. 973, 974 (N.D. Ind. 1988); Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir.), cert. denied, 464 U.S. 960 (1983).

So that the district court may readily determine whether genuine issues of material fact

exist, under Local Rule 56.1, the moving party is obligated to file with the court a "Statement of Material Facts" supported by appropriate citation to the record to which the moving party contends no genuine issues exist.  In addition, the non-movant is obligated to file with the court a "Statement of Genuine Issues" supported by appropriate citation to the record outlining all material facts to which the non-movant contends exist that must be litigated.  See, Waldridge v. American Hoechst Corp. et al., 24 F.3d 918 (7th Cir. 1994).  In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. Anderson, 477 U.S. at 249-251, 106 S.Ct. at 2511.  Furthermore, in determining the motion for summary judgment, the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the "Statement of Genuine Issues" filed in opposition to the motion.  L.R. 56.1

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law.  Anderson, 477 U.S. at 248.  Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute.  Id.  The issue of fact must be genuine. Fed. R. Civ. P. 56(c), (e).  To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586; First National Bank of Cicero v. Lewco Securities Corp., 860 F.2d 1407, 1411 (7th Cir. 1988).  The non-moving party must come forward with specific facts showing that there is a genuine issue for trial.  Id.  A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagree-

ment to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-252. Finally, the court notes that, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. Mason v. Continental Illinois Nat'l Bank, 704 F.2d 361, 367 (7th Cir. 1983).

Discussion

Defendant Tom Kelley Buick Pontiac GMC ("TKBPG") maintains a superstore of used cars, commonly referred to as the "Superstore." TKBPG is part of a group of separate dealerships, commonly known as the "Kelley Automotive Group" (hereinafter "Kelley"). Henderson's employment with TKBPG began on June 15, 2006, and ended on September 30, 2007.[1] During his employment, Henderson served as the Special Finance Director and reported to Fred Grote, Omar Gulam, Jim Kelley and Tom Kelley.[2] The plaintiffs were employed by TKBPG from July 2006 until October 12, 2006. The plaintiffs believed TKBPG acted in violation of their federal civil rights and state law, and thus instituted the instant action[3].

---

[1] Henderson Dep., pp., 24, 25.

[2] Henderson Dep., p.50.

[3] In their Complaint, the plaintiffs allege sexual harassment, sex discrimination, and retaliation in violation of Title VII, violations of the ADEA and EPA, as well as negligent retention and supervision, Indiana Wage Act violations, intentional and negligent infliction of emotional distress, and common law retaliatory discharge. The First Amended Complaint also includes "gender discrimination" in Paragraph 1, although a separate gender discrimination claim cannot be found in the Complaint or briefs. Henderson has informed the court that some of the claims have been dismissed and others were abandoned during the summary judgment briefing stage. It is well-settled that arguments not presented to the district court in response to a summary judgment motion are waived. Palmer v. Marion County, 327 F.3d 588, 597 (7th Cir. 2003). Thus, the court will only discuss in this order the claims that have been expressly briefed: Jill Treat and Cody Treat's wage claims and retaliatory discharge claims, Jill Treat's EPA claim and Jill Treat's intentional infliction of emotional distress claim. Summary judgment will be

The following facts, which are supported by the record, are relevant to the motion under consideration.

In 2006, Kelley's owner and managers, including Tom Kelley, President and Owner of Kelley, Gary Thelen, Chief Financial Officer of Kelley, and Fred Grote, Kelley General Manager, decided to create a new department within TKBPG to help customers with special finance needs.[4] Previously, TKBPG had used its finance and insurance managers for special financing on a case by case basis.[5] Kelley planned for the new Special Finance Department to service the TKBPG's "Superstore," and later it expanded to other stores.[6] Special Finance Department deals were contracted through TKBPG.[7]

To open the department, based upon the recommendation of an industry colleague, Grote hired defendant Henderson to manage the Special Finance Department in June 2006.[8] Henderson then interviewed and hired Ms. Treat to serve as Assistant Manager/Assistant Co-Director of the Special Finance Department.[9] Ms. Treat subsequently recommended that her adult children, Mr. Treat and Johnson work in the Special Finance Department, and Henderson

---

granted on the other claims without further discussion.

[4] Thelen Dep., p. 17; Kelley Dep., pp. 6, 18; Grote Dep., pp. 5, 7.

[5] Kelley Dep., p. 17.

[6] Grote Dep., pp. 17-19.

[7] Henderson Dep., p.103; Kelley Dep., p. 8.

[8] Grote Dep., p. 12.

[9] J. Treat Dep., pp. 57, 71; Henderson Dep., p. 56.

hired Mr. Treat and Johnson as well.[10] In early July, Mr. Treat began working as a salesperson in the Special Finance Department and reported to Henderson and his mother.[11] A few weeks after beginning with Kelley, Henderson promoted Mr. Treat to Special Finance Manager over the salespeople at the Superstore, effective August 1, 2006.[12] Johnson was hired as the Special Finance Department Funding Manager.[13] Johnson also reported directly to her mother and Henderson.[14] Mr. and Ms. Treat's employment ended October 12, 2006, when they were both discharged by Henderson. Johnson quit on this same date.

Ms. Treat alleges that Mr. Henderson: (a) once said their employer was in with one of the banks because the loan officer was homosexual and he and the loan officer had hit it off over the phone; (b) discussed the gay bars in Fort Wayne, how he would meet guys in the bars, and his relationships with them; (c) said he was married to a woman at one time, but when it came to sex with a woman, he did not know what he was supposed to do; (d) once told a story about a former roommate in California and his sexual encounters with a male date; (e) once made remarks about himself and his gay friends being skinny or fat and that they had a vibrator that looked like the Virgin Mary; (f) made comments about male customers being flaming queers or flaming faggots; (g) once brought one of his friends to work in the morning in his car while his friend was still in his pajamas, told everyone not to look at him, and asked Ms. Treat if she

---

[10] Johnson Dep., p. 28.

[11] Henderson Dep., p. 64; Treat Dep., p. 46.

[12] Treat Dep., pp. 46, 50, 51

[13] Johnson Dep., p. 28.

[14] Johnson Dep., p. 43.

6

thought a limousine was too much for a second date; (h) once asked if it was too early in a relationship to loan his new boyfriend money; (I) made comments that he wanted Ms. Treat's husband; (j) once showed Ms. Treat text messages from his boyfriend stating his boyfriend thought he was cute and later asked Ms. Treat if he could share a blanket with her husband in the back seat; (k) told Ms. Treat that he was envious of her relationship with her husband; and (l) made comments and insinuations about his sexual orientation.[15]

Ms. Treat never received any unwelcome or frightening physical contact from Mr. Henderson and was never afraid or apprehensive that she would receive unwelcome physical contact from him.[16]

Mr. Treat alleges that Mr. Henderson made comments of a sexual nature about men he would like to be sexually involved with.[17] Mr. Treat alleges that Mr. Henderson discussed gay bars.[18] Mr. Treat never asked Mr. Henderson to stop discussing gay bars, but Mr. Henderson stopped when others asked him to stop.[19] Mr. Treat alleges that Mr. Henderson said he was married to a woman at one time, but when it came to sex with a woman, he did not know what he was supposed to do.[20] Mr. Treat alleges that Mr. Henderson made comments about male

---

[15] First Amended Complaint ¶19; J. Treat Dep. 214-229.

[16] J. Treat Dep. 252.

[17] First Amended Complaint ¶21; Cody Treat Dep. 187.

[18] First Amended Complaint ¶21; Cody Treat Dep. 187-190.

[19] Cody Treat Dep. 189.

[20] First Amended Complaint ¶21; Cody Treat Dep. 190-192.

customers being flaming queers or flaming faggots.[21] Mr. Treat alleges that Mr. Henderson made comments and insinuations regarding his sexual orientation while at work.[22]

Mr. Treat never had any physical contact with Mr. Henderson and never feared Mr. Henderson might initiate any physical contact with him.[23]

Henderson has filed a motion for summary judgment on all of the plaintiff's remaining claims. The first issue before the court concerns Ms. Treat and Mr. Treat's wage claims. In Indiana, an employee who seeks to bring a claim for wages under state law must proceed via the Indiana Wage Payment Statute (IC 22-2-5 et seq.)[24] or the Wage Claims Statute (IC 22-2-9 et

---

[21] First Amended Complaint ¶21; Cody Treat Dep. 192-193.

[22] First Amended Complaint ¶21; Cody Treat Dep. 193.

[23] Cody Treat Dep. 197; 198.

[24] IC 22-2-5-1 provides:

> (a) Every person, firm, corporation, limited liability company, or association, their trustees, lessees, or receivers appointed by any court, doing business in Indiana, shall pay each employee at least semimonthly or biweekly, if requested, the amount due the employee. The payment shall be made in lawful money of the United States, by negotiable check, draft, or money order, or by electronic transfer to the financial institution designated by the employee. Any contract in violation of this subsection is void.
>
> (b) Payment shall be made for all wages earned to a date not more than ten (10) business days prior to the date of payment. However, this subsection does not prevent payments being made at shorter intervals than specified in this subsection, nor repeal any law providing for payments at shorter intervals. However, if an employee voluntarily leaves employment, either permanently or temporarily, the employer shall not be required to pay the employee an amount due the employee until the next usual and regular day for payment of wages, as established by the employer. If an employee leaves employment voluntarily, and without the employee's whereabouts or address being unknown to the

8

seq.)²⁵. Henderson argues that the determination of which statute applies to a particular plaintiff depends upon the status of the particular plaintiff. See St. Vincent Hosp. & Health Care Ctr. v. Steele, 766 N.E.2d 699 (Ind. 2002). Henderson takes the position that if a plaintiff has been discharged (or suspended from work because of an industrial dispute), then he or she must bring the wage claim pursuant to the Wage Claims Statute, but if a plaintiff is currently employed or voluntarily terminated their employment, then the Wage Payment Statute applies. Because Mr. and Ms. Treat were discharged, Henderson contends that the Wage Claims Statute applies to their wage claims. The Wage Claims Statute requires that a claim be filed with the Indiana Department of Labor ("IDOL") within two years after the claim accrues. See IC 34-11-2-1 (setting forth two-year statute of limitations for wage claims). It is undisputed that Mr. and Ms.

---

employer, the employer is not subject to section 2 of this chapter until:
    (1) ten (10) business days have elapsed after the employee has made a demand for the wages due the employee; or

    (2) the employee has furnished the employee's address where the wages may be sent or forwarded.

²⁵IC 22-2-9-2 provides:

(a) Whenever any employer separates any employee from the payroll, the unpaid wages or compensation of such employee shall become due and payable at regular pay day for pay period in which separation occurred: Provided, however, That this provision shall not apply to railroads in the payment by them to their employees.

(b) In the event of suspension of work, as the result of an industrial dispute, the wages and compensation earned and unpaid at the time of such suspension shall become due and payable at the next regular pay day, including, without abatement or reduction, all amounts due all persons whose work has been suspended as a result of such industrial dispute.

9

Treat did not file a claim with the IDOL and that the statute of limitations for doing so has long passed.

Mr. and Ms. Treat take the position that the employment status of an employee <u>at the time a wage claim arises</u> determines if the employee has a claim under the Indiana Wage Payment Statute or the Indiana Wage Claim Statute. Thus, they argue that since they were employed at the time their wage claim accrued, they can maintain their present suit under the Wage Payment Statute. Mr. and Ms. Treat rely on <u>Harney v. Speedway SuperAmerica, LLC</u>, 2007 WL 2710824 (S.D. Ind. 2007), <u>aff'd on other grounds</u>, 526 F.3d 1099 (7th Cir. 2008), to support their position.

In <u>Steele</u>, cited by the Kelley Defendants, the Seventh Circuit held that:

> Although both the Wage Claims Statute and the Wage Payment Statute set forth two different procedural frameworks for wage disputes, each statute applies to different categories of claimants. The Wage Claims Statute references employees who have been separated from work by their employer and employees whose work has been suspended as a result of an industrial dispute. I.C. § 22-2-9-2(a), (b). By contrast, the Wage Payment Statute references current employees and those who have voluntarily left employment, either permanently or temporarily. I.C. § 22-2-5-1(b). Because Dr. Steele was a current employee of St. Vincent at the time of the wage dispute, he proceeded correctly under the Wage Payment Statute.

In <u>Harney</u>, cited by Mr. and Ms. Treat, the District Court for the Southern District of Indiana stated:

> The Wage Payment Statute, Indiana Code § 22-2-5-1 et seq., provides employees the right to receive wages in a timely fashion. <u>See</u> St. Vincent Hosp. & Health Care Ctr., Inc. v. Steele, 766 N.E.2d 699, 703 (Ind. 2002). The Wage Payment Statute requires that an employer pay its employees' wages within ten days of the date that they are earned and provides for damages against those employers who fail to do so. <u>See</u> Ind.Code §§ 22-2-5-1 and -2; <u>Naugle v. Beech Grove City Schs</u>., 864 N.E.2d 1058, 1066-69

> (Ind. 2007). By its terms, it only applies to current employees or those who voluntarily terminate their employment. See Ind.Code § 22-2-5-1; Steele, 766 N.E.2d at 705.
>
> The Wage Claims Statute, Indiana Code § 22-2-9-1 et seq., describes how disputes about the amount of wages due are resolved and requires that unpaid wages or compensation of a discharged employee are "due and payable at regular pay day for the pay period in which separation occurred." See Ind.Code § 22-2-9-2-(a); Steele, 766 N.E.2d at 704. Unlike the Wage Payment Statute, the Wage Claims Statute only applies to employees who have been discharged or suspended from work because of an industrial dispute. See Steele, 766 N.E.2d at 705.
>
> Based on the differences in these two statutes, it is clear that Greiner's claims arise only under the Wage Payment Statute because she voluntarily terminated her employment with Speedway. In fact, she has now conceded as much. See Pls.' Sur-Reply at 2, n. 1. With respect to Harney and DeBord, both of whom were discharged, the answer cannot be so easily categorized. However, the Court concludes that (1) their claims for bonuses that they did not receive are governed by the Wage Claims Statute, and (2) those bonuses that they did receive while still employed, but which were paid outside of the ten-day period, are governed by the Wage Payment Statute.

Because some of the claims of the discharged plaintiffs in Harney proceeded under the Wage Payment Statute instead of the Wage Claims Statute, Mr. and Ms. Treat conclude that their wage claims should also be governed by the Wage Payment Statute. While this court believes that Henderson's interpretation of the cases is more correct, as the cases clearly indicate that it is the status of the claimant that determines which statute applies, the court notes that even applying Harney as interpreted by Mr. and Ms. Treat does not lead the court to their conclusion. That is, in Harney, the court held that the wage claims involving amounts that were not paid prior to the employees' discharge were governed by the Wage Claims Statute. It is clear that Mr. and Ms. Treat are seeking to recover amounts that they were not paid (and are not merely arguing that

11

they were not paid within the statutory ten-day period), and thus under any interpretation of the statutes, it is obvious that they should have proceeded under the Wage Claims Statute.

Mr. and Ms. Treat have also cited to Anderson v. Northeast Otolaryngology, P.C., 2006 WL 2331142 (S.D. Ind.), for the proposition that a wage claim accrues on the date an employee is not paid the amounts due. The issue in Anderson was whether the plaintiff had filed her wage claims within the statute of limitations, and the Magistrate Judge held that "each pay period triggers a separate cause of action." Mr. and Ms. Treat are presumably arguing that since their claims arose while they were still employees, then the Wage Payment Statute applies. However, this interpretation would render the Wage Claims Statute practically useless, as nearly all claims for wages arise while a person is employed. The Magistrate Judge in Anderson was not called upon to decide which wage statute applied, and this court will not extend the holding in Anderson to the facts of this case. Rather, this court will follow the Seventh Circuit holding in Steele that the determination of which statute applies depends upon the status of the plaintiff.

Under the Steele analysis, the Wage Claims Statute applies to Mr. and Ms. Treat's wage claims. As the Wage Claims Statute requires that they file a claim with the IDOL, and they did not do so, the court will grant summary judgment in favor of Henderson on the wage claims.

Moreover, as Henderson notes, The Wage Claims Statute defines "employer" as "every person ... employing any person in this state." Ind. Code § 22-2-9-1. Clearly, Henderson did not employ Mr. and Ms. Treat and was not their employer. Thus, Henderson cannot be liable under the Indiana Wage Claims Statute and summary judgment will be granted on this basis also.

Henderson next argues that Mr. and Ms. Treat's retaliatory discharge claim is without merit. Indiana common law recognizes a cause of action for wrongful discharge where an

employee is terminated for refusing to commit an unlawful act for which the employee could be held personally liable. McGarrity v. Berlin Metals, Inc., 774 N.E.2d 71, 76 (Ind. Ct. App. 2002). Henderson asserts that Mr. and Ms. Treat do not claim that Henderson terminated their employment for refusing to commit an unlawful act but that, rather, they allege that "Henderson on a repeated basis asked [plaintiffs] to provide false information on loan applications and/or forge signatures of customers on loan applications."[26] (DE 113 at 6).

Mr. Treat relies on McClanahan v. Remington Freight Lines, 517 N.E.2d 390 (Ind. 1988), in which an employee claimed he was wrongly discharged for fulfilling a statutory duty and the Indiana Supreme Court held he had stated a cause of action. However, the actual holding in McClanahan was that the employee "stated a cause of action when he alleged he was wrongfully discharged for refusing to commit an illegal act for which he would have been personally liable."

There is simply no evidence before the court that Mr. Treat or Ms. Treat were fired for refusing to commit an illegal act. In fact, in their depositions, neither Mr. Treat nor Ms. Treat mention that Henderson allegedly asked them to do anything illegal. Moreover, even if Henderson had asked them to provide false information or forge signatures (as set forth in their affidavits), there is no evidence that either plaintiff was fired for failing to commit these acts. Rather, the evidence is that Henderson would simply commit the acts himself.[27] Accordingly, Mr. and Ms. Treat's common law claims for wrongful discharge cannot withstand summary judgment.

---

[26] J. Treat Aff., ¶ 20; C. Treat Aff., ¶ 14; Johnson Aff. ¶ 8.

[27] J. Treat Aff., ¶ 20.

The court will turn next to Ms. Treat's claim under the Equal Pay Act.[28] To prevail on her Equal Pay Act claim, Ms. Treat must prove: (1) higher wages were paid to a male employee; (2) for equal work requiring substantially similar skill, effort and responsibilities, and (3) the work was performed under similar working conditions. Warren v. Solo Cup Co., 516 F.3d 627, 629 (7th Cir. 2008). For purposes of this claim, Ms. Treat compares herself to Henderson.[29] On the second element, Ms. Treat must show that her job and Henderson's involved a "common core of tasks" or that "a significant portion of the two jobs is identical." Howard v. Lear Corp. EEDS and Interiors, 234 F.3d 1005 (7th Cir. 2000). If there is a common core, any differences in duties or responsibilities between her and Henderson must be substantially different to justify the pay disparity. Stropka v. Alliance of Amer. Insurers, 141 F.3d 681, 685 (7th Cir. 1998).

Henderson has adopted the Kelley Defendants' argument that Ms. Treat fails to set forth a prima facie EPA case because she has not shown that her job duties were "substantially similar" to those of Henderson. The Kelley Defendants emphasize that Henderson was Ms. Treat's supervisor, with authority to hire and fire her. Additionally, Henderson had the authority to determine who else joined the Special Finance Department, and was the individual who most

---

[28] The Seventh Circuit Court of Appeals has not yet decided whether the EPA provides for individual liability. However, a number of federal district courts have held that the EPA does not provide for individual liability. See Harris v. City of Harvey, 992 F.Supp. 1012 (N.D. Ill. 1998); Varner v. Illinois State University, 972 F. Supp. 458 (C.D. Ill. 1997); Anderson v. Township, 1997 WL 769461 (N.D. Ill. 19970; Pommier v. James L. Edelstein Enterprises, 816 F. Supp. 476 (N.D. Ill. 1993). In the present case it is clear that a prima facie EPA case has not been shown, thus the court will address the claim on its merits, rather than determining whether individual liability lies under the EPA.

[29] J. Treat Dep., p. 309.

often reported to senior management regarding the Special Finance Department. Henderson had the authority to re-hire persons fired by others in the Department, without explaining his decision. Ms. Treat acknowledges that she never fired anyone by herself. Ms. Treat has also acknowledged that Henderson was responsible for the growth and direction of the Special Finance Department and that Henderson made the decision to centralize the Department in the TKBPG building.

Thus, the Kelley Defendants (and Henderson) conclude that Ms. Treat is indisputably not similarly-situated to Henderson, and their respective work was not "equal" for purposes of the EPA. See Sims-Fingers v. City of Indianapolis, 493 F.3d 768, 771 (7th Cir. 2007); see also Cullen v. Indiana Univ. Bd. of Trustees, 338 F.3d 693 (7th Cir. 2003)(affirming summary judgment for employer because plaintiff professor could not show that male professor had equal levels of responsibility).

Ms. Treat claims that she was similarly situated to Henderson because they had the same job title, worked at the same facility, and performed substantially the same job. Ms. Treat points out that "jobs need not be identical in every respect before the Equal Pay Act is applicable". Corning Glass Works v. Brennan, 417 U.S. 188, 203 n.24 (1974).

It seems clear that Henderson and Ms. Treat had a "common core of tasks". Once a plaintiff establishes a "common core" of tasks, the court must determine whether any additional tasks make the jobs "substantially different." Merillat v. Metal Spinners, Inc., 470 F.3d 685, 695 (7th Cir. 2006). When assessing job duties, each of the elements listed in the EPA (skill, effort and responsibilities) must be met individually to establish a prima facie case. Id. The court should look to the actual job duties performed by each employee, not to his or her job description

or title.  Id; Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1461 (7th Cir. 1994).

In Merillat, the Seventh Circuit upheld the grant of summary judgment on an Equal Pay Act claim, stating:

> Ms. Merillat asserts that she and Wehr had many of the same tasks, including: negotiating with suppliers, buying materials, and allocating materials for production.  However, Metal Spinners submits that there are two areas in which Ms. Merillat and Wehr's job duties differed.  These two differences, it asserts, makes their respective jobs "substantially different" for purposes of the Equal Pay Act: (1) Wehr's responsibility for "strategic planning"; (2) Wehr's supervision of Ms. Merillat.
>
> *   *   *
>
> Metal Spinners contends that part of Wehr's job duties included strategic planning. . . . We believe that it is clear on the record as a whole that, with respect to strategic planning, Ms. Merillat's day-to-day duties with regard to suppliers did not change appreciably; she never assumed corporate-wide responsibility for the planning responsibilities place on Wehr's shoulders . . . .
>
> *   *   *
>
> . . . . All parties agree that Wehr's job duties included functioning as Ms. Merillat's supervisor. . . . [Merillat] explained that Wehr, not she, had the authority to hire and fire employees. . . . Wehr therefore had supervisory duties that Ms. Merillat did not exercise.  Of course, as we have noted, not all differences in supervisory duty render two positions unequal for purposes of the EPA.  See Fallon v. State of Illinois, 882 F.2d 1206, 1209-10 (7th Cir. 1989).  Indeed, there are some indications that Wehr's supervisory duties were, in actuality, minimal. . . . Nevertheless, it is clear that, although neither had great supervisory authority over other personnel, Wehr did have more authority than Ms. Merillat.
> We conclude that the record, fairly read in its totality, leads to the conclusion that Wehr and Ms. Merillat did not have equal levels of responsibility. . . . Ms. Merillat has therefore failed to establish a prima facie case under the Equal Pay Act.

Id. at 695-697.

This court finds that the job differences in this case are similar to that present in Merillat, in that Henderson had more responsibility for strategic planning and also had more supervisory responsibility than Ms. Treat. Accordingly, as in Merillat, it is clear that Ms. Treat has failed to establish her prima facie EPA claim.

The final issue raised by Henderson's motion is whether Ms. Treat's claim of intentional infliction of emotional distress can survive summary judgment. Under Indiana law, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." Cullison v. Medley, 570 N.E.2d 27, 31 (Ind. 1991). Courts have found conduct to be extreme and outrageous "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" Lachenman v. Stice, 838 N.E.2d 451, 457 (Ind. Ct. App. 2005). The plaintiffs point out that Ms. Treat and Johnson have testified that Henderson enjoyed trying to disgust female employees with stories about his homosexual lifestyle.[30] Johnson further testified that Henderson so enjoyed offending and harassing the plaintiffs with his graphic stories that he would simply laugh out loud when asked to stop.[31]

The plaintiffs argue that whether Henderson's conduct rises to the level of "extreme and outrageous" is a matter to be decided by a trier of fact. The plaintiffs assert that it is outside the

---

[30] Johnson Dep., pp. 108, 145.

[31] Johnson Dep., p. 61.

bounds of decency for any person to give a vivid account of a male friend's same-sex relations, to recite a graphic description of an injury suffered to his friend's penis as a result of sexual intercourse, and to inform others of a vibrator shaped like the Virgin Mary.

Henderson, however, strongly asserts that his alleged conduct, even if presumed to be true, does not rise to an actionable level for purposes of an intentional infliction of emotional distress claim. The proof requirements for establishing an intentional infliction of emotional distress claim are "rigorous." Rhoades v. Penn-Harris- Madison School Corporation, 574 F.Supp.2d 888, 908 (N.D. Ind. 2008); Lindsey v. DeGroot, 898 N.E.2d 1251, 1264 (Ind. Ct. App. 2009). A person commits the tort of intentional infliction of emotional distress when he, "by extreme and outrageous conduct, intentionally or recklessly causes severe emotional distress to another." Hassler v. Raytheon Technical Services Comp., 2000 WL 33309587, *7 (S.D. Ind. 2000) (unreported); Lindsey, 898 N.E.2d at 1264. Liability for intentional infliction of emotional distress is "found only where the conduct 'has been so outrageous in character, and so extreme in degree, as to go beyond all possible rounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Hassler, 2000 WL 33309587, *7. Stated differently, liability is found only "where conduct exceeds all bounds usually tolerated by a decent society and causes mental distress of very serious kind." Lindsey, 898 N.E.2d at 1264.

In this case, Ms. Treat essentially alleges that Mr. Henderson discussed gay sex with her. Henderson argues that this alleged conduct does not rise to an actionable level. See Neal v. Rock-Tenn Company, 2005 WL 19399955 (S.D. Ind. 2005) (unreported). In Neal, the employee claimed her supervisor's conduct constituted intentional infliction of emotional distress. The Court granted summary judgment to the defendants on that claim, stating:

18

> Moreover, the Defendants are entitled to summary judgment on the intentional infliction of emotional distress claims because the evidence does not meet the rigorous requirements to prove such a tort. The plaintiff must prove that the defendant engaged in "extreme and outrageous" conduct which exceeds "all possible bounds of decency" and is "regarded as atrocious, and utterly intolerable in a civilized community." … Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' … None of Quaife's conduct including his daily viewing of pornography on the internet, placing of sexually-oriented magazines on Ms. Neal's desk, emerging from his office with an apparent erection, and accepting her resignation, would leave an average member of the community to exclaim"Outrageous!" … This is not to suggest that a reasonable person would not find Quaife's conduct offensive -most would. However, his conduct could not be regarded as atrocious and utterly intolerable in a civilized community.

Id. at *11. The conduct alleged in Neal, which did not rise to an actionable level, is analogous to the conduct alleged in this case. Unfortunately, the conduct of which Ms. Treat complains is routinely distributed across the airwaves as a form of entertainment for millions of paying customers. Clearly, sexually-natured content has become the accepted and expected form of entertainment in America. None of it is shocking or outrageous anymore.

Thus, clearly, the conduct Ms. Treat alleges does not rise to an actionable level, and therefore, she cannot establish intentional infliction of emotional distress. Ms. Treat's intentional infliction of emotional distress claim also fails because she has not shown that Henderson intended to harm her emotionally. "'It is the intent to harm the plaintiff emotionally which constitutes the basis for the tort of intentional infliction of emotional distress.'" Lindsey, 898 N.E.2d at 1264. While there is evidence that Henderson immaturely thought it was amusing to disgust women with distasteful stories, there is no evidence that Henderson's actions were anything more than boorish office antics or that he intended to cause any lasting emotional harm.

19

Accordingly, for all the above reasons, summary judgment will be granted on the intentional infliction of emotional distress claim.

## Conclusion

On the basis of the foregoing, Henderson's motion for summary judgment [DE 89] is hereby GRANTED.

Entered: April 30, 2010.

s/ William C. Lee  
William C. Lee, Judge  
United States District Court