UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION


JILL L. TREAT, CODY W. TREAT  )
and TIFFANY L. JOHNSON,   )
            )
  Plaintiffs,      )
            )
 v.         )  CIVIL NO.  1:08cv173
            )
TOM KELLEY BUICK PONTIAC GMC, )
INC., d/b/a KELLEY SUPERSTORE,  )
KELLEY AUTOMOTIVE GROUP, INC., )
and DANIEL HENDERSON,   )
            )
  Defendants.     )

## OPINION AND ORDER

This matter is before the court on a motion for summary judgment filed by the defendants

Tom Kelly Buick Pontiac GMC, Inc. d/b/a Kelley Superstore and  Tom Kelley Automotive

Group, Inc., (collectively "the Kelley Defendants"), on December 4, 2009.  The plaintiff, Cody

Treat ("Mr. Treat"), filed his response on January 18, 2010, to which the Kelley Defendants

replied on February 4, 2010.

Also before the court is a "Motion to Strike Evidentiary Submissions of Cody Treat"

filed by the Kelley Defendants on February 4, 2010.  Mr. Treat responded to the motion on

February 18, 2010, to which the Kelley Defendants replied on February 25, 2010.

For the following reasons, the motion for summary judgment and the motion to strike

will both be granted.

## Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. Fitzpatrick v. Catholic Bishop of Chicago, 916 F.2d 1254, 1256 (7th Cir. 1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." Id. In Re Matter of Wildman, 859 F.2d 553, 557 (7th Cir. 1988); Klein v. Ryan, 847 F.2d 368, 374 (7th Cir. 1988); Valentine v. Joliet Township High School District No. 204, 802 F.2d 981, 986 (7th Cir. 1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 322 (7th Cir. 1992)(quoting Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact, Celotex, 477 U.S. at 323. The non-moving party may oppose the

motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. Goka v. Bobbitt, 862 F.2d 646, 649 (7th Cir. 1988); Guenin v. Sendra Corp., 700 F. Supp. 973, 974 (N.D. Ind. 1988); Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir.), cert. denied, 464 U.S. 960 (1983).

So that the district court may readily determine whether genuine issues of material fact exist, under Local Rule 56.1, the moving party is obligated to file with the court a "Statement of Material Facts" supported by appropriate citation to the record to which the moving party contends no genuine issues exist. In addition, the non-movant is obligated to file with the court a "Statement of Genuine Issues" supported by appropriate citation to the record outlining all material facts to which the non-movant contends exist that must be litigated. See, Waldridge v. American Hoechst Corp. et al., 24 F.3d 918 (7th Cir. 1994). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. Anderson, 477 U.S. at 249-251, 106 S.Ct. at 2511. Furthermore, in determining the motion for summary judgment, the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the "Statement of Genuine Issues" filed in opposition to the motion. L.R. 56.1

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. Anderson, 477 U.S. at 248. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. Id. The issue of fact must be genuine. Fed. R. Civ. P. 56(c), (e). To establish a genuine issue of fact, the non-

moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586; First National Bank of Cicero v. Lewco Securities Corp., 860 F.2d 1407, 1411 (7th Cir. 1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. Id. A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-252. Finally, the court notes that, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. Mason v. Continental Illinois Nat'l Bank, 704 F.2d 361, 367 (7th Cir. 1983).

Discussion

Defendant Tom Kelley Buick Pontiac GMC ("TKBPG") maintains a superstore of used cars, commonly referred to as the "Superstore." TKBPG is part of a group of separate dealerships, commonly known as the "Kelley Automotive Group" (hereinafter "Kelley"). Mr. Treat was employed by TKBPG from July 2006 until his termination on October 12, 2006. Mr. Treat believed TKBPG acted violation of his federal civil rights and state law, and thus he instituted the instant action[1].

---

[1] In his Complaint, Treat alleges sexual harassment, sex discrimination, and retaliation in violation of Title VII, as well as negligent retention and supervision, Indiana Wage Act violations, and common law retaliatory discharge. The First Amended Complaint also includes "gender discrimination" in Paragraph 1, although a separate gender discrimination claim cannot be found in the Complaint or briefs. The Kelley Defendants have informed the court that Mr. Treat "already expressly dismissed his claims of assault, battery and intentional infliction of emotional distress." (See DE 83). The Kelley Defendants have further noted that "Treat fails to oppose Kelley Defendants' unrebutted evidence that TKBPG was Treat's employer, and thus fail to present any claims against Kelley Automotive Group, Inc." (Reply Brief at 2). At his

The Kelley Defendants are seeking summary judgment on all of Mr. Treat's remaining claims. The following facts, which are supported by the record, are relevant to the motions under consideration.

In 2006, Kelley's owner and managers, including Tom Kelley, President and Owner of Kelley, Gary Thelen, Chief Financial Officer of Kelley, and Fred Grote, Kelley General Manager, decided to create a new department within TKBPG to help customers with special finance needs.[2]  Previously, TKBPG had used its finance and insurance managers for special financing on a case by case basis.[3]  Kelley planned for the new Special Finance Department to service the TKBPG's "Superstore," and later it expanded to other stores.[4]  Special Finance Department deals were contracted through TKBPG.[5]

To open the department, based upon the recommendation of an industry colleague, Grote hired defendant Daniel Henderson ("Henderson") to manage the Special Finance Department in June 2006.[6]  Henderson then interviewed and hired Jill Treat ("Ms. Treat") to serve as Assistant

---

deposition, Mr. Treat admitted that his intent was to sue his place of employment.  (C. Treat Dep. at 174).  Lastly, the Kelley Defendants note that Mr. Treat has wholly failed to discuss his claims of sexual harassment and sex discrimination in his response brief.  It is well-settled that arguments not presented to the district court in response to a summary judgment motion are waived.  Palmer v. Marion County, 327 F.3d 588, 597 (7th Cir. 2003).  Thus, the court will grant summary judgment on the sexual harassment and sex discrimination claims without further discussion.

[2]  Thelen Dep., p. 17; Kelley Dep., pp. 6, 18; Grote Dep., pp. 5, 7.

[3]  Kelley Dep., p. 17.

[4]  Grote Dep., pp. 17-19.

[5]  Henderson Dep., p.103; Kelley Dep., p. 8.

[6]  Grote Dep., p. 12.

Manager/Assistant Co-Director of the Special Finance Department.[7] Ms. Treat subsequently recommended that her adult children, Mr. Treat and Tiffany Johnson ("Johnson") work in the Special Finance Department, and Henderson hired Mr. Treat and Johnson as well.[8] In early July, Mr. Treat began working as a salesperson in the Special Finance Department and reported to Henderson and his mother.[9] A few weeks after beginning with Kelley, Henderson promoted Mr. Treat to Special Finance Manager over the salespeople at the Superstore, effective August 1, 2006.[10] Mr. Treat's office was in the Superstore, which was the same building where Henderson's office was located until mid- August 2006, when Henderson moved his primary office to the TKBPG building.[11] From the time Henderson moved his primary office to the TKBPG building, Mr. Treat only recalled seeing Henderson face-to-face at the weekly manager meetings.[12] Mr. Treat was also out of the office from September 22, 2006 until October 2, 2006, for his wedding and honeymoon.[13]

Johnson was hired as the Special Finance Department Funding Manager.[14]  Johnson also

---

[7]  J. Treat Dep., pp. 57, 71; Henderson Dep., p. 56.

[8]  Johnson Dep., p. 28.

[9]  Henderson Dep., p. 64; Treat Dep., p. 46.

[10]  Treat Dep., pp. 46, 50, 51

[11]  Treat Dep., pp. 231, 272.

[12]  Treat Dep., p. 272.

[13]  Treat Dep., p. 275.

[14]  Johnson Dep., p. 28.

reported directly to her mother and Henderson.[15]  When Johnson began working in the Special Finance Department, Mr. Treat, Andy Bowman, Amber Folkner, Tom Seat, Rob Pargeon, Ron Lytle, Bret Gump and Josie Johnston worked as salespeople in the department.[16]

In the course of its operations, the Special Finance Department received sales leads from numerous sources. Focus, Inc. was one source, which sent most of its leads to the Superstore location.[17] DOLLAR was another source of sales leads, and typically the leads would be assigned in a "round robin" manner.[18] Once an employee received a lead, they would continue to work the lead to attempt to achieve a sale, even if their attempts during the first month were unsuccessful.[19] Jeff Johnson became a sales manager in the Special Finance Department at the Kelley Chevrolet store and his sales team did not receive as many leads on an ongoing basis from Focus, Inc.[20]

On July 5, 2006, Mr. Treat received Kelley's Team Member Handbook, including Kelley's anti-harassment policy. In its policy, Kelley provides: "If you believe you are subjected to conduct or comments that violate this policy, you are encouraged to, and have a responsibility to immediately report these matters to your team leader or to the General Manager."[21] Mr. Treat

---

[15]  Johnson Dep., p. 43.

[16]  Johnson Dep., p. 50.

[17]  Henderson Dep., pp. 188-91.

[18]  Treat Dep., p. 224.

[19]  Treat Dep., p. 168.

[20]  Henderson Dep., p. 189; Treat Dep., p. 152.

[21]  Treat Dep., pp. 103, Ex. 40.

also understood that he had options to report conduct to more than one person.[22]

In approximately August, Henderson's office was moved to the TKBPG building, also on the Avenue of Autos. Kelley's administrative offices were also located in the TKBPG building. Tom Kelley, Thelen and Grote also had offices in the TKBPG building.

Mr. Treat alleges that, during his employment with TKBPG, Henderson, who openly gay, made sexually explicit remarks to him, specifically: (1) making comments almost daily of a sexual nature in the presence of Mr. Treat and other Kelley employees about men that Henderson would like to be sexually involved with; (2) Henderson discussed gay bars in Fort Wayne and how he would meet guys, and his relationships with them; (3) Henderson stated that he was married to a woman at one time, but when it came to sex with a woman, he didn't know what he was supposed to do; (4) Henderson made comments about male customers being "flaming queers" or "flaming fagots"; and (5) continuously making comments and insinuations regarding his sexual orientation while at work, including employee meetings. In his deposition, Mr. Treat also testified that he heard Henderson refer to manager Jeff Johnson saying he wanted to "hit it one time," with a sexual connotation.

Mr. Treat claims that he told his mother, Ms. Treat, that he "didn't appreciate hearing about [Henderson's] lifestyle," but told no other Kelley manager.[23] Mr. Treat was aware that he could report such harassment beyond his mother, but chose not to do so, even though Mr. Treat claims he did not feel like his concerns were resolved by his mother.[24]

---

[22] Treat Dep., p. 201.

[23] Treat Dep., p. 194.

[24] Treat Dep., p. 201.

In approximately September 2006, Ms. Treat and Henderson informed Mr. Treat that they perceived he was having difficulty gaining the respect of his employees, and having employees respond to his management.[25] Mr. Treat also was aware that his salespeople were having difficulty meeting their targets.[26] Mr. Treat understood that he would be held accountable for the productivity of the Superstore. [27] In fact, Henderson did not believe that Mr. Treat was performing well in his sales manager role.[28] Mr. Treat's store's sales were lower in September 2006 than in August 2006.[29]

In early October 2006, one of Treat's direct reports, Rob Pargeon, told Treat that he believed that sales leads coming from the DOLLAR system were being reassigned from Treat's employees to the Chevy store, and that this was impacting Pargeon's commissions.[30] Pargeon printed off DOLLAR screens and provided them to Treat, indicating what he believed were the lead reassignments to Johnson's employees.[31] Treat took the printouts of the DOLLAR system with him from TKBPG after he was terminated.[32] On July 5, 2006, Treat signed an "Employee Acknowledgment of Information Safeguarding Obligations" ("Information Safeguarding

---

[25] Treat Dep., pp. 110-11, 116.

[26] Treat Dep., p. 115.

[27] Treat Dep., p. 63.

[28] Henderson Dep., p. 187.

[29] Treat Dep., p. 114.

[30] Treat Dep., pp. 155, 254.

[31] Treat Dep., p. 155.

[32] Treat Dep., p. 155.

Policy"), acknowledging that he would not remove any customer information from Kelley.[33] Treat understood that in the event he failed to comply with the Information Safeguarding Policy, he would be subject to disciplinary action up to and including termination, regardless of whether the violation was intentional or unintentional.[34] Treat knew that he was not allowed to take the DOLLAR system printouts home with him.[35]

On October 12, 2006, when Treat arrived at TKBPG in the morning, Henderson called Treat into Henderson's office. Henderson informed Treat that he "had already let [Ms. Treat] go and that he was not going to insult [Treat's] intelligence and that [Treat] was to leave too."[36] When Henderson asked if Treat had any questions, Treat did not respond, and left Henderson's office.[37] Shortly thereafter, Treat left to pack his belongings.[38] After Treat's termination, Henderson promoted male salesperson Bill Katheis to the Special Finance Sales Manager position held by Treat at the Superstore.[39]

The Kelley Defendants have filed a motion for summary judgment on all of Mr. Treat's remaining claims and have also filed a motion to strike some of Mr. Treat's evidentiary

---

[33] Treat Dep., p. 161, Ex. 33.

[34] Treat Dep., p. 161.

[35] Treat Dep., p. 160.

[36] Treat Dep., p. 119.

[37] Treat Dep., p. 119.

[38] Treat Dep., p. 120.

[39] Johnson Dep., p.158.

submissions. The court will first consider the motion to strike.[40]

The Kelley Defendants contend that references to Ms. Treat's October 11, 2006, e-mail to Henderson must be stricken. On pages four and six of his response brief, Mr. Treat refers to an e-mail allegedly sent by Ms. Treat to Henderson on October 11, 2006, in which Mr. Treat claims that Ms. Treat addressed various issues relating to a telephone conversation with Henderson.[41] However, Mr. Treat has not authenticated the content of any e-mail in his opposition.

Documentary evidence is admissible if authenticated "by evidence sufficient to support a finding that the matter in question is what the proponent claims." Fed. R. Evid. 901(a). The Kelley Defendants argue that the e-mail is not authenticated by anyone and cannot oppose summary judgment.

In response, Mr. Treat asserts that references to the e-mail must be considered because it contains "numerous authenticating elements demonstrating that the document is what it claims to be." (DE 133 at 2). As the Kelley Defendants point out, however, neither Ms. Treat nor Henderson have provided any sworn testimony that such an e-mail was either sent or received by either of them.

The Kelley Defendants argue that Mr. Treat's arguments not only fail to authenticate the

---

[40] Although not part of the motion to strike, the Kelley Defendants in their summary judgment brief have made a general request that the court "delete" Mr. Treat's errata sheets to his deposition testimony. The Kelley Defendants have not pointed out any specific instances where Mr. Treat's errata sheets are relied upon in this case, and a review of Mr. Treat's "Genuine Issue of Material Facts" (attached to his response brief) reveals that Mr. Treat has not cited to his errata sheets in support of his factual statements. Thus, the court will consider the errata sheets a non-issue with respect to the summary judgment motion under consideration.

[41] The Kelley Defendants note that, interestingly, Ms. Treat's summary judgment opposition materials make no mention of such an e-mail. The purported e-mail appears to be attached to Cody Treat's Designation as Exhibit J.

11

e-mail and remove its hearsay problem, but expose its core relevance deficiency.  In his efforts to keep the e-mail in evidence Mr. Treat states that the "e-mail is being offered to demonstrate that Henderson had knowledge of Cody Treat's complaints, via the e-mail sent from Jill Treat to Henderson."  (DE 133 at 4).  The Kelley Defendants argue that this is precisely what the e-mail does not do.  That is, nowhere does Ms. Treat's evidence demonstrate that Henderson received any such e-mail, and such information is not within any Plaintiffs' personal knowledge. This court agrees with the Kelley Defendants that Mr. Treat's references to the unauthenticated e-mail constituted inadmissible hearsay and are conclusory and irrelevant. Thus the e-mail cannot be used to oppose summary judgment.  Toro Co. v. Krouse, Kern & Co., Inc., 644 F. Supp. 986, 990 (N. D. Ind. 1986).

The Kelley Defendants next argue that Ms. Treat's calculation for July, August and September 2006 pay, which is attached to her affidavit, and Mr. Treat's reference to the same, must be stricken.  In his Affidavit, Mr. Treat states that based upon his comparison of Deal Recaps to the monthly report, he "learned that many of the Special Finance Department deals had not been included in calculating my wages."[42]  Mr. Treat then refers to the supporting documents attached to Ms. Treat's Affidavit.

The calculations in question were subject to a motion to strike in relation to the Kelley Defendants' motion for summary judgment on Ms. Treat's claims.  In the order resolving that motion to strike, the court held that "[a]s there is no evidence that she has personal knowledge of how to calculate wages and commissions, this portion of her affidavit and the accompanying calculations she has presented will be stricken."  (Order at p. 23).  For the reasons detailed in the

---

[42]  Cody Treat Aff., ¶ 20.

prior order, the present request to strike the calculations will also be granted.

The court will now address the Kelley Defendants' motion for summary judgment. Mr. Treat claims that he engaged in statutorily protected activity when he reported to Ms. Treat that he was displeased with how Henderson was distributing leads unequally between the Kelley stores, and that he believed the reason for the disparity was that Henderson was sexually attracted to a manager at another Kelley store.

Mr. Treat must prove retaliation by the direct or indirect method. Under the direct method, Mr. Treat must show: (1) statutorily protected activity; (2) materially adverse action taken by the employer; and (3) a causal connection between the two. Amrhein v. Health Care Serv. Corp., 546 F.3d 854, 858 (7th Cir. 2008). Under the indirect method, Mr. Treat must show: (1) he engaged in a statutorily protected activity; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. Id. at 859.

Under either method, a key component of a retaliation claim is the decisionmaker's knowledge of the employee's protected activity. The Kelley Defendants argue that Mr. Treat's evidence falls fatally short. Mr. Treat admits that he never talked to Henderson about his alleged complaints, and is relying upon alleged complaints made by his mother to Henderson.[43]

Ms. Treat testified that she talked to Henderson about more leads going to the Chevy store than the Superstore, but Ms. Treat did not indicate that there was any discriminatory

---

[43] C. Treat Aff.. ¶¶ 12, 13

13

conduct at issue.[44]  Rather, Ms. Treat merely indicated that she believed that the leads were not being divided "fairly" or "evenly".[45]

It is clear that even considering Ms. Treat's description of her conversation with Henderson about her concerns, such statements fail to indicate a connection to a protected class. See Tomanovich v. City of Indianapolis, 457 F.3d 656, 663 (7th Cir. 2006) ("Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient."); Miller v. American Family Mut. Ins. Co., 203 F.3d 997, 1008 (7th Cir. 2000) ("An employee can honestly believe she is the object of discrimination, but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints."). This court agrees with the Kelley Defendants that there is no evidence that Henderson was aware of any statutorily protected activity by Mr. Treat when he made the decision to terminate Mr. Treat's employment.   As the Kelley Defendants argue, even if Henderson understood that Mr. Treat was complaining (through his mother) that he was not receiving leads because of his sex[46], Henderson would not understand this as protected activity because "paramour favoritism" is not actionable in the Seventh Circuit.  Preston v. Wisconsin Health Fund, 397 F.3d 539, 551 (7th Cir. 2008).

---

[44] J. Treat Dep., p. 242.

[45] J. Treat Dep., pp. 92-93, 242-43.

[46] Even if Mr. Treat had specifically complained of "paramour favoritism", i.e., leads being transferred to Jeff Johnson because Henderson was sexually interested in him, this does not support an argument that Mr. Treat was complaining that he was not receiving leads "because of his sex", as Jeff Johnson and Mr. Treat are both male.

In addition, it is undisputed that Mr. Treat's supervisors, Henderson and Ms. Treat, did not believe that Mr. Treat was an effective manager.[47] As such, Treat's personal belief that he was doing a good job is insufficient to create an issue of material fact as to pretext in this case, and his retaliation claim further fails under the indirect method. In any event, it is undisputed that Henderson told Thelen about his decision to fire Mr. Treat several days before the termination[48] (and thus before Ms. Treat's alleged discussion with Henderson of Mr. Treat's complaints).

Accordingly, for all the reasons recited above, the court will grant summary judgment on the retaliation claim.

Next, the court will discuss Mr. Treat's negligent retention and supervision claim. To bring a cause of action for negligent hiring and retention, Mr. Treat must show that Kelley hired and retained Henderson in its employ despite knowing that Henderson was in the "habit of misconducting [him]self in a manner dangerous to others." Briggs v. Finley, 631 N.E.2d 959, 967 (Ind. Ct. App. 1994). During Henderson's deposition, Mr. Treat's counsel elicited testimony regarding Henderson's prior criminal convictions for obtaining property by false pretenses and credit card abuse. The Kelley Defendants claim that there is no evidence of any prior dangerous sex-related conduct by Henderson, nor any evidence that they were aware of any such conduct.

Indiana recognizes the tort of negligent retention of an employee and has adopted the Restatement (Second) of Torts as the standard outlining liability for the tort. Sandage v. Board of

---

[47] Henderson Dep., p. 187 ; Treat Dep., pp. 110, 115-16.

[48] Thelen Dep., pp. 110, 115-16.

Commissioners of Vanderburgh County, 897 N.E.2d 507, 511-12 (Ind. Ct. App. 2008). Section 317 of the Restatement provides that a master is "under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm," if (1) the servant is on the master's premises or using the master's chattel and (2) the master knows or has reason to know that he can control his servant and knows or should know of the necessity and opportunity for exercising such control. Restatement (Second) of Torts § 317 (1965).

The Kelley Defendants argue that the sex-related remarks such as those alleged by Mr. Treat cannot be considered to have created a reasonable risk of "bodily harm" for purposes of this cause of action. This court recently held that a supervisor's statement to a subordinate employee suggesting that the employee sleep with the supervisor's ex-husband over a period of three days was not "dangerous" within the meaning of § 317. See McClain v. TP Orthodontics, 2009 WL 2381915 (N.D. Ind).

The Kelley Defendants further argue that even if Henderson's alleged comments created a reasonable risk of bodily harm they had no duty to Mr. Treat regarding such alleged comments. Specifically, "[i]mposition of a duty is limited to those instances where a reasonably foreseeable victim is injured by a reasonably foreseeable harm." Id. (quoting Webb v. Jarvis, 575 N.E.2d 992, 995 (Ind. 1991)). The Kelley Defendants contend that Mr. Treat does not, and cannot, allege that the sex-related conduct by Henderson was "reasonably foreseeable" to them, and thus his negligent hiring and retention claim must fail.

Mr. Treat argues that this case is similar to Grzan v. Charter Hosp. of Northwest Ind.,

702 N.E.2d 786, 793 (Ind. Ct. App. 1998). In <u>Grzan</u>, it was rumored that an employee was engaging in an inappropriate sexual relationship with a patient. The affidavits of two employees confirmed this rumor, and the court found such "evidence to be sufficient to raise a question of fact about whether [the employer] knew or should have known of [the employee's] improper sexual conduct with Grzan." <u>Id</u>.

Mr. Treat acknowledges that he did not personally inform his employer of Henderson's propensity for sexually inappropriate conduct, but argues that his conduct was pervasive enough that it was common knowledge among Kelley employees. Mr. Treat cites to the deposition testimony of Gigli, a non-management employee who was around Henderson after Mr. Treat was terminated, in his attempt to show that his employer's managers were aware of Henderson's conduct during Mr. Treat's employment. Clearly, Mr. Treat's evidence misses the mark and cannot establish foreseeability.

Likewise, <u>Grzan</u> does not provide support for Mr. Treat's claims. Ms. Grzan, unlike Mr. Treat was subjected to actual alleged "bodily harm" by a mental health counselor at Charter Hospital in the form of hugging, kissing, fondling and oral sex, and the court held there was a question of fact whether the Hospital had information that an employee was engaging in an inappropriate sexual relationship with a patient. <u>Id</u>. at 789, 793. In the present case, it is abundantly clear that Mr. Treat was not subject to any sort of "bodily harm" and he does not even make any allegations of that sort and, moreover, there is no evidence that the Kelley Defendants knew of Henderson's propensity to act inappropriately during the time that Mr. Treat was employed. Accordingly, summary judgment will be granted in favor of the Kelley Defendants on Mr. Treat's negligent retention and supervision claim.

The next issue before the court concerns Mr. Treat's Indiana Wage Claim. In Indiana, an employee who seeks to bring a claim for wages under state law must proceed via the Indiana Wage Payment Statute (IC 22-2-5 et seq.)[49] or the Wage Claims Statute (IC 22-2-9 et seq.)[50].

---

[49] IC 22-2-5-1 provides:

> (a) Every person, firm, corporation, limited liability company, or association, their trustees, lessees, or receivers appointed by any court, doing business in Indiana, shall pay each employee at least semimonthly or biweekly, if requested, the amount due the employee. The payment shall be made in lawful money of the United States, by negotiable check, draft, or money order, or by electronic transfer to the financial institution designated by the employee. Any contract in violation of this subsection is void.

> (b) Payment shall be made for all wages earned to a date not more than ten (10) business days prior to the date of payment. However, this subsection does not prevent payments being made at shorter intervals than specified in this subsection, nor repeal any law providing for payments at shorter intervals. However, if an employee voluntarily leaves employment, either permanently or temporarily, the employer shall not be required to pay the employee an amount due the employee until the next usual and regular day for payment of wages, as established by the employer. If an employee leaves employment voluntarily, and without the employee's whereabouts or address being unknown to the employer, the employer is not subject to section 2 of this chapter until:

> > (1) ten (10) business days have elapsed after the employee has made a demand for the wages due the employee; or

> > (2) the employee has furnished the employee's address where the wages may be sent or forwarded.

[50] IC 22-2-9-2 provides:

> (a) Whenever any employer separates any employee from the payroll, the unpaid wages or compensation of such employee shall become due and payable at regular pay day for pay period in which separation occurred: Provided, however, That this provision shall not apply to railroads in the payment by them to their employees.

The Kelley Defendants argue that the determination of which statute applies to a particular plaintiff depends upon the status of the particular plaintiff.  See St. Vincent Hosp. & Health Care Ctr. v. Steele, 766 N.E.2d 699 (Ind. 2002).  The Kelley Defendants take the position that if a plaintiff has been discharged (or suspended from work because of an industrial dispute), then he or she must bring the wage claim pursuant to the Wage Claims Statute, but if a plaintiff is currently employed or voluntarily terminated their employment, then the Wage Payment Statute applies.  Because Mr. Treat was discharged, the Kelley Defendants contend that the Wage Claims Statute applies to his wage claim.  The Wage Claims Statute requires that a claim be filed with the Indiana Department of Labor ("IDOL") within two years after the claim accrues. See IC 34-11-2-1 (setting forth two-year statute of limitations for wage claims). It is undisputed that Mr. Treat did not file a claim with the IDOL and that the statute of limitations for doing so has long passed.

Mr. Treat takes the position that the employment status of an employee at the time a wage claim arises determines if the employee has a claim under the Indiana Wage Payment Statute or the Indiana Wage Claim Statute.  Thus, he argues that since he was employed at the time his wage claim accrued, he can maintain his present suit under the Wage Payment Statute. Mr. Treat relies on Harney v. Speedway SuperAmerica, LLC, 2007 WL 2710824 (S.D. Ind. 2007), aff'd on other grounds, 526 F.3d 1099 (7th Cir. 2008), to support his position.

_____

> (b) In the event of suspension of work, as the result of an industrial dispute, the wages and compensation earned and unpaid at the time of such suspension shall become due and payable at the next regular pay day, including, without abatement or reduction, all amounts due all persons whose work has been suspended as a result of such industrial dispute.

In <u>Steele</u>, cited by the Kelley Defendants, the Seventh Circuit held that:

> Although both the Wage Claims Statute and the Wage Payment Statute set forth two different procedural frameworks for wage disputes, each statute applies to different categories of claimants. The Wage Claims Statute references employees who have been separated from work by their employer and employees whose work has been suspended as a result of an industrial dispute. I.C. § 22-2-9-2(a), (b). By contrast, the Wage Payment Statute references current employees and those who have voluntarily left employment, either permanently or temporarily. I.C. § 22-2-5-1(b). Because Dr. Steele was a current employee of St. Vincent at the time of the wage dispute, he proceeded correctly under the Wage Payment Statute.

In <u>Harney</u>, cited by Mr. Treat, the District Court for the Southern District of Indiana stated:

> The Wage Payment Statute, Indiana Code § 22-2-5-1 et seq., provides employees the right to receive wages in a timely fashion. <u>See</u> <u>St. Vincent Hosp. & Health Care Ctr., Inc. v. Steele</u>, 766 N.E.2d 699, 703 (Ind. 2002). The Wage Payment Statute requires that an employer pay its employees' wages within ten days of the date that they are earned and provides for damages against those employers who fail to do so. <u>See</u> Ind.Code §§ 22-2-5-1 and -2; <u>Naugle v. Beech Grove City Schs</u>., 864 N.E.2d 1058, 1066-69 (Ind. 2007). By its terms, it only applies to current employees or those who voluntarily terminate their employment. <u>See</u> Ind.Code § 22-2-5-1; <u>Steele</u>, 766 N.E.2d at 705.
>
> The Wage Claims Statute, Indiana Code § 22-2-9-1 et seq., describes how disputes about the amount of wages due are resolved and requires that unpaid wages or compensation of a discharged employee are "due and payable at regular pay day for the pay period in which separation occurred." <u>See</u> Ind.Code § 22-2-9-2-(a); <u>Steele</u>, 766 N.E.2d at 704. Unlike the Wage Payment Statute, the Wage Claims Statute only applies to employees who have been discharged or suspended from work because of an industrial dispute. <u>See</u> <u>Steele</u>, 766 N.E.2d at 705.
>
> Based on the differences in these two statutes, it is clear that Greiner's claims arise only under the Wage Payment Statute because she voluntarily terminated her employment with Speedway. In fact, she has now conceded as much. <u>See</u> Pls.' Sur-Reply at 2, n. 1. With respect to Harney and DeBord, both of

whom were discharged, the answer cannot be so easily categorized. However, the Court concludes that (1) their claims for bonuses that they did not receive are governed by the Wage Claims Statute, and (2) those bonuses that they did receive while still employed, but which were paid outside of the ten-day period, are governed by the Wage Payment Statute.

Because some of the claims of the discharged plaintiffs proceeded under the Wage Payment Statute instead of the Wage Claims Statute, Mr. Treat concludes that his wage claims should also be governed by the Wage Payment Statute. While this court believes that the Kelley Defendants' interpretation of the cases is more correct, as the cases clearly indicate that it is the status of the claimant that determines which statute applies, the court notes that even applying <u>Harney</u> as interpreted by Mr. Treat does not lead the court to his conclusion. That is, in <u>Harney</u>, the court held that the wage claims involving amounts that <u>were not paid</u> prior to the employees' discharge were governed by the Wage Claims Statute. It is clear that Mr. Treat is seeking to recover amounts that he was not paid (and is not merely arguing that he was not paid within the statutory ten-day period), and thus under any interpretation of the statutes, it is obvious that he should have proceeded under the Wage Claims Statute.

Mr. Treat has also cited to <u>Anderson v. Northeast Otolaryngology, P.C.</u>, 2006 WL 2331142 (S.D. Ind.), for the proposition that a wage claim accrues on the date an employee is not paid the amounts due. The issue in <u>Anderson</u> was whether the plaintiff had filed her wage claims within the statute of limitations, and the Magistrate Judge held that "each pay period triggers a separate cause of action." Mr. Treat is presumably arguing that since his claims arose while he was still an employee, then the Wage Payment Statute applies. However, this interpretation would render the Wage Claims Statute practically useless, as nearly all claims for wages arise while a person is employed. The Magistrate Judge in <u>Anderson</u> was not called upon

to decide which wage statute applied, and this court will not extend the holding in <u>Anderson</u> to the facts of this case. Rather, this court will follow the Seventh Circuit holding in <u>Steele</u> that the determination of which statute applies depends upon the status of the plaintiff.

Under the <u>Steele</u> analysis, the Wage Claims Statute applies to Mr. Treat's wage claims. As the Wage Claims Statute requires that he file a claim with the IDOL, and he did not do so, the court will grant summary judgment in favor of the Kelley Defendants on his wage claims.

The Kelley Defendants next argue that Mr. Treat's retaliatory discharge claim is without merit. Indiana common law recognizes a cause of action for wrongful discharge where an employee is terminated for refusing to commit an unlawful act for which the employee could be held personally liable. <u>McGarrity v. Berlin Metals, Inc.</u>, 774 N.E.2d 71, 76 (Ind. Ct. App. 2002). The Kelley Defendants assert that Mr. Treat does not claim that Henderson terminated his employment for refusing to commit an unlawful act but that, rather, he alleges that he "experienced Henderson's requests to provide false information on loan applications and/or forge signatures of customers on loan applications." (Response Brief at 14; C. Treat Aff., ¶ 14). Treat testified that Henderson made him "stretch the truth" regarding customers' positions or income. However, Treat acknowledged that the actual words that Henderson used were "in order to get the most approvals, to sell the most cars, to keep your job, that you needed to present them the way that he knew best suited the banks by their compute systems and their buyers and lenders."[51]

The Kelley Defendants thus argue that Mr. Treat's wrongful discharge claim does not create any liability. <u>See</u> <u>Bregin v. Liquidebt Sys., Inc.</u>, 2008 WL 150611 (N.D.

---

[51] Treat Dep., p. 232.

Ind.)(recognizing that Indiana courts do not extend the wrongful discharge exception to the employment-at-will doctrine to employees whose employment is terminated for whistle-blowing or reporting their employer's misdeeds). The Kelley Defendants conclude that even if Mr. Treat had reported Henderson's alleged unethical conduct and been terminated for that reason, he would not have a cause of action for wrongful discharge.

Mr. Treat relies on McClanahan v. Remington Freight Lines, 517 N.E.2d 390 (Ind. 1988), in which an employee claimed he was wrongly discharged for fulfilling a statutory duty and the Indiana Supreme Court held he had stated a cause of action. However, the actual holding in McClanahan was that the employee "stated a cause of action when he alleged he was wrongfully discharged for refusing to commit an illegal act for which he would have been personally liable."

It is clear to this court that Mr. Treat is not proceeding as someone who was fired for refusing to commit an illegal act. Accordingly, Mr. Treat's common law claim for wrongful discharge cannot withstand summary judgment.

The final issue presented by the Kelley Defendants' motion for summary judgment is, assuming that any of Mr. Treat's claims were to survive summary judgment, whether after-acquired evidence bars his reinstatement, front pay and certain back pay claims. In the seminal case on the after-acquired evidence doctrine, McKennon v. Nashville Banner Pub. Co., 513 U.S. 352 (1995), the United States Supreme Court held that in "determining appropriate remedial action" for alleged discrimination, "the employee's wrongdoing becomes relevant not to punish the employee . . . but to take due account of the lawful prerogatives of the employer in the usual course of its business and the corresponding equities that it has arising from the employee's

wrongdoing." Id. at 361. In McKennon, the Court concluded that, as a general rule, neither reinstatement nor front pay is an appropriate remedy in cases of employee wrongdoing "that would lead to legitimate discharge." Id. at 361- 62. With respect to back pay, the Court held that the "beginning point" of a formulation of any back pay award should be a calculation from the date of the allegedly unlawful discharge to the date the new information was discovered. Id. at 362.

During his deposition, Mr. Treat admitted that he took Kelley's proprietary documents with him after he was terminated and, indeed, produced them to the Kelley Defendants in this case. Mr. Treat further admits that he signed an Information Safeguarding Policy, and also admits that the documents he took from Kelley were proprietary documents and did not belong to him. The Kelley Defendants argue that such a violation is grounds for termination under Kelley's policy. The Kelley Defendants became aware that Mr. Treat took such documents when he produced them in discovery in this case.

The Kelley Defendants also assert that Mr. Treat knew that the anti-harassment policy required him, as a manager, to immediately report a potential infraction to senior management or the human resources specialist. Mr. Treat also knew that failing to report a violation of which he was aware would subject him to disciplinary action, including discharge. Mr. Treat did not report any complaints to senior management or the human resources specialist. As such, the Kelley Defendants were not aware of Mr. Treat's failure until TKBPG received the EEOC charges from Plaintiffs in this case.

Therefore, the Kelley Defendants claim that they are entitled to summary judgment on any claim by Mr. Treat for reinstatement, front pay or back pay after the date of his EEOC

charge against TKBPG.

Mr. Treat argues that the Kelley Defendants have not submitted any evidence that his alleged wrongdoing was of such severity that he would have been terminated. He claims that the Kelley Defendants must show by a preponderance of the evidence that the after-acquired evidence would have resulted in his termination. Mr. Treat relies on Sheehan v. Dolen Corp., 173 F.3d 1039 (7th Cir. 1999). In Sheehan, however, it was undisputed that no one at Dolen had ever been fired for falsifying a resume, and there was also an inference that other falsification had occurred. Id. at 1047. In the present case, the Kelley Defendants have uncontroverted evidence that Mr. Treat violated the Information Safeguarding Policy and the reporting requirements of the Anti-Harassment Policy. Further, Mr. Treat has not produced any evidence that such violations are not grounds for termination and has not produced evidence of any employee who was not terminated for similar violations. Accordingly, it is clear that the Kelley Defendants have met their burden of demonstrating the applicability of the after-acquired evidence defense and, even if any of Mr. Treat's claims had survived, he would not be entitled to reinstatement, front pay or back pay after the date of his EEOC charge.

Conclusion

On the basis of the foregoing, the Kelley Defendants' motion for summary judgment [DE 97] and the Kelley Defendants' motion to strike [DE 127] are both hereby GRANTED.


Entered: April 30, 2010.


s/ William C.  Lee
William C. Lee, Judge
United States District Court